**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Crawford's Auto Center, Inc., On Behalf   :
Of Itself And All Others Similarly Situated,  :
                                    :
            Plaintiff,           :
                                      :
          v.                :
                                      :
State Farm Mutual Automobile Insurance   :
Company, State Farm General Insurance   :
Company, State Farm Indemnity Company,  :
State Farm Guaranty Insurance Company,  :
State Farm Fire and Casualty Company,   :
State Farm County Mutual Insurance     :
Company of Texas, Allstate Corporation,  :
Allstate Insurance Company, Allstate    :
County Mutual Insurance Company,      :
Allstate Fire & Casualty Insurance     :
Company, Allstate Indemnity Company,   :
Allstate New Jersey Insurance, Allstate   :
New Jersey Property & Casualty Insurance  :
Company, Allstate Property & Casualty   :
Insurance Company, Encompass Indemnity  :
Company, Esurance Insurance Company,   :
Esurance Property & Casualty Insurance   :
Company, Government Employees       :
Insurance Company, GEICO General     :
Insurance Company, GEICO Indemnity   :
Company, GEICO Casualty Company,    :
GEICO Advantage Insurance Company,   :
GEICO Choice Insurance Company,     :
GEICO Secure Insurance Company,     :
GEICO County Mutual Insurance       :
Company, The Progressive Corporation,   :
Progressive American Insurance Company,  :
Progressive Casualty Insurance Company,  :
Progressive Gulf Insurance Company,    :
Progressive Specialty Insurance Company,  :

Progressive Classic Insurance Company,          :
Progressive Michigan Insurance Company,         :
Progressive Mountain Insurance Company,         :
Progressive Northern Insurance Company,         :
Progressive Northwestern Insurance,             :
Progressive Preferred Insurance Company,        :
Progressive Security Insurance Company,         :
Progressive Southeastern Insurance              :
Company, Progressive West Insurance             :
Company, Progressive Advanced Insurance         :
Company, Progressive Choice Insurance           :
Company, Progressive Direct Insurance           :
Company, Progressive Garden State               :
Insurance, Progressive Marathon Insurance       :
Company, Progressive Paloverde Insurance        :
Company, Progressive Select Insurance           :
Company, Progressive Premier Insurance          :
of IL, Progressive Universal Insurance          :
Company, Progressive County Mutual              :
Insurance Company, Artisan & Truckers           :
Casualty Company, United Financial              :
Casualty Company, Farmers Insurance             :
Exchange, Truck Insurance Exchange,             :
Farmers Insurance Company of Arizona,           :
Farmers Insurance Company of Oregon,            :
Farmers Insurance Company of Washington,:
Farmers Insurance Company, Inc., Farmers        :
Texas County Mutual Insurance Company,          :
Illinois Farmers Insurance Company,             :
Mid-Century Insurance Company, Foremost         :
County Mutual Insurance Company,                :
Foremost Insurance Company Grand                :
Rapids, Bristol West Insurance Company,         :
Coast National Insurance Company,               :
21st Century Centennial Insurance               :
Company, 21st Century Indemnity                 :
Insurance Company, 21st Century                 :
Insurance Company, Liberty Mutual               :
Holding Co., Inc., Liberty Mutual Group,        :
Inc., The First Liberty Insurance               :

Corporation, Liberty County Mutual            :
Insurance Company, Texas, Liberty Mutual  :
Fire Insurance Company, Liberty               :
Mutual Insurance Company, LM General     :
Insurance Company, Peerless Insurance       :
Company, Safeco Insurance Company of      :
America, Safeco Insurance Company of       :
Illinois, Nationwide Mutual Insurance         :
Company, Allied Property & Casualty         :
Insurance Company, AMCO Insurance        :
Company, Depositors Insurance Company,   :
Nationwide Insurance Company of             :
America, Colonial County Mutual              :
Insurance Company, Nationwide Affinity     :
Insurance Company of America,                :
Nationwide Agribusiness Insurance           :
Company, Nationwide Property & Casualty  :
Insurance Company, Nationwide Mutual      :
Fire Insurance Company                         :
                                             :
            Defendants.                       :


**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................. 1

II.    JURISDICTION AND VENUE ........................................................... 7

III.   PARTIES ............................................................................................ 8

    A.   Plaintiff .................................................................................... 8

    B.   Defendants ............................................................................... 9

    C.   Conspirators ........................................................................... 16

IV.   FACTUAL BACKGROUND ............................................................ 20

    A.   Insurers and Insured Collision Repairs ................................. 20

        1.  Market Share ................................................................... 20

        2.  Direct Repair Programs................................................... 21

    B.   Repair Appraisals and the Information Provider Products ......... 24

        1.  Estimating Products ........................................................ 24

        2.  Insurers Drive the Estimating Market............................. 25

            a.   Revenue................................................................... 25

            b.   Influence ................................................................. 27

    C.   Insurers Establish an Artificial Prevailing Rate to Control and Suppress Repair Costs.................................................................................. 29

        1.  Information Provider Data Is DRP Data But Is Represented As the Prevailing Rate ................................................................................ 30

        2.  Compensation for Labor Rates, Refinishing, the Scope and Extent of Repair Procedures, and Parts Is Suppressed................................. 33

            a.   Labor Rates .............................................................. 33

            b.   Refinishing – Compensation for "Paint and Materials" ....... 37

            c.   Defendant Insurers' and Conspirator Insurers' Use of the Estimating Systems to Suppress the Scope and Extent of Compensable Repair Procedures................. 40

               i.   The Process of the Estimating Programs ........................ 42

               ii.  The Estimating Reference Guides ................................. 42

                   a)   The Estimating Programs Are Merely a "Guide" ................... 43

                   b)   "Included" and "Not Included" Operations ............................ 46

              iii.  Standard Labor Times and Allowances for Procedures in the Estimating Programs Are Not Representative and Are Often Misleading....................... 58

iv.  Suppression of Repair Estimates ................................................................. 60

d.    Parts................................................................................................................ 65

D.    The Conduct of State Farm ....................................................................................... 66

1.  Most Favored Nation Provision ...................................................................... 67

2.  RPM Reports.................................................................................................... 70

3.  State Farm Survey ........................................................................................... 71

E.    Sharing of Information Between and Among Insurers Further Enables the
Suppression of Compensation to Repair Facilities ..................................................... 75

1.  Information Sharing Between and Among Insurers ......................................... 76

a.    Exchange of Information through the Subrogation Process .............................. 77

b.    Data Sharing through the Information Providers............................................... 77

c.    Enforcement of Most Favored Nation Provisions  in DRP Agreements and
Insurer Audits of DRP Facilities...................................................................... 79

d.    Insurer Discussion and Comparison of Repair Costs and Pricing Trends ........ 80

e.    Additional Communication Between and Among Insurers and their
Conspirators ..................................................................................................... 81

V.     RICO ALLEGATIONS ................................................................................................ 82

A.    Standing, Causation and Injury................................................................................. 83

B.    The RICO Enterprises................................................................................................ 84

1.  Purpose of the RICO Enterprises.................................................................... 85

2.  Relationships Among the Associates in the RICO Enterprises ....................... 85

a.    The Allstate Enterprise .................................................................................... 86

b.    The GEICO Enterprise...................................................................................... 88

c.    The Progressive Enterprise ............................................................................... 91

d.    The Farmers Enterprise..................................................................................... 93

e.    The Liberty Mutual Enterprise.......................................................................... 95

f.    The Nationwide Enterprise ............................................................................... 98

g.    The State Farm Enterprise .............................................................................. 100

h.    Conduct of the Members in the RICO Enterprises ......................................... 103

3.  Continuous Existence of the RICO Enterprises............................................ 103

C.    Pattern of Racketeering Activity.............................................................................. 104

D.    Predicate Acts ......................................................................................................... 105

    E.    Interstate Commerce ................................................................................ 108

VI.       PLAINTIFF'S SUPPRESSED COMPENSATION ................................... 108

VII.      CLASS ACTION ALLEGATIONS .......................................................... 121

    A.    The Classes: ................................................................................... 121

        1.    The State Farm Enterprise Class:.................................................. 121

        2.    The Allstate Enterprise Class:....................................................... 121

        3.    The GEICO Enterprise Class:........................................................ 122

        4.    The Progressive Enterprise Class: ................................................. 122

        5.    The Farmers Enterprise Class:....................................................... 122

        6.    The Liberty Mutual Enterprise Class:............................................ 123

        7.    The Nationwide Enterprise Class: ................................................. 123

VIII.     FRAUDULENT CONCEALMENT..................................................... 127

IX.       TOLLING OF APPLICABLE STATUTES OF INFORMATION ............... 127

X.        CLAIMS FOR RELIEF ........................................................................ 128

COUNT I .................................................................................................. 128

COUNT II ................................................................................................ 132

COUNT III............................................................................................... 135

COUNT IV................................................................................................ 139

COUNT V ................................................................................................ 143

COUNT VI................................................................................................ 146

COUNT VII .............................................................................................. 150

COUNT VIII............................................................................................. 154

COUNT IX................................................................................................ 156

PRAYER FOR RELIEF ............................................................................. 157

JURY DEMAND ....................................................................................... 158

Plaintiff Crawford's Auto Center, Inc., on behalf of itself and the classes of all others similarly situated as defined below, as and for its complaint against Defendants State Farm Mutual Automobile Insurance Company, Allstate Corporation, Government Employees Insurance Company (GEICO), The Progressive Corporation, Farmers Insurance Exchange, Liberty Mutual Group, Inc., Nationwide Mutual Insurance Company and their respective affiliates, subsidiaries and divisions, as defined in detail below, alleges as follows based on: (a) personal knowledge; (b) the investigation of its counsel; and (c) information and belief.

## I. NATURE OF THE ACTION

1. This nationwide class action seeks damages and additional relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and other state laws, to remedy Defendant insurers' long-running unlawful conduct to suppress compensation to repair facilities for automotive collision repairs covered by insurance. Defendant insurers State Farm, Allstate, GEICO, Progressive, Farmers, Liberty Mutual and Nationwide, together with their three conspirator insurers (defined below), are the ten largest private passenger auto insurers in the United States, collectively holding 70% of the market, and control all aspects of collision repairs, including establishing the industry standards for compensation paid to repair facilities.

2. To achieve this suppression of compensation, Defendant insurers and conspirator insurers have all established and enforced an artificial market value for collision repairs, known in the industry as the "prevailing rate", which dictates the compensation paid to repair facilities for labor, the costs incurred for paint, parts and materials used in repairs, and the scope and extent of compensable repair procedures. These so-called prevailing rates, however, are lower than market rates for repairs would have been, and would be, in a market free of fraud, deception and artificial restraint. Rather, these are fixed rates set by insurers, and incorporated into their

respective nationwide direct repair programs, consisting of repair facilities willing, or economically forced, to agree to accept these fixed rates in exchange for referrals of repair work – as, indeed, the Defendant insurers and conspirator insurers have the leverage to steer and withhold business to control and enforce these rates.  As alleged in detail below, through fraud and deception, Defendant insurers have been able to impose these fixed rates upon Plaintiff and the members of the respective classes defined below, which do not participate in the Defendant insurers' (or conspirator insurers') respective direct repair programs.  The imposition of these wrongfully and artificially suppressed rates has injured Plaintiff and the members of the classes by reducing the compensation that they received for repairs below the levels that would have existed but for the unlawful conduct of the Defendant insurers and their co-conspirators.

3.     There are four major components to repair compensation, each of which has been suppressed by virtue of Defendant insurers' conduct.  One, labor, which is a flat, hourly rate paid for performing repair and refinishing procedures on the vehicle.  Two, "paint and materials", which is reimbursement for the costs incurred by repair facilities for the paint and related materials necessary to refinish the vehicle.  Insurers likewise use a flat, hourly rate to compensate repair facilities for "paint and materials", even though these are material, rather than labor, costs.  Three, the cost of the parts used by the repair facilities in performing the repairs on the vehicle.  Four, the scope and extent of repair procedures necessary to restore the vehicle to pre-loss condition (i.e., the condition of the vehicle prior to the damage), which is determined using computerized estimating programs from one of three companies – the so-called independent information providers (known as CCC, Mitchell and Audatex – defined below), which are also conspirators in this action.

4.      As is relevant here, the information providers serve two functions in the collision repair industry.  The information providers sell the estimating programs.  All collision repairs require a repair estimate, which appraises the damage to the vehicle, serves as the blueprint for the repairs that are to be performed, and establishes the scope and extent of the repairs based on required labor procedures and parts, as well as the time to perform the repairs – all of which dictates and determines the cost of repairs.  All repair estimates are prepared using an estimating program from one of the information providers, and the estimating programs are used by both insurers and repair facilities (i.e., direct and non-direct repair facilities).  All Defendant insurers (and conspirator insurers) use the estimating programs of at least one information provider.  And, the information providers sell the same programs to insurers as well as repair facilities.  The information providers, therefore, serve two masters, the Defendant insurers (and the conspirator insurers), which are responsible (directly or indirectly) for the majority of their revenue, and the repair facilities, which must use the estimating programs to perform their work because the estimates are the only means by which insured repairs are paid.  The competing interests are evident in how the information providers market their product.  With respect to the insurance industry, the programs are marketed by the information providers as controlling costs and purportedly improving accuracy, but with respect to the repair facilities, the purported goal is preparing comprehensive estimates.

5.      In fact, the information providers furnish Defendant insurers with the framework and tools to accomplish their goal to suppress compensation to repair facilities.  Indeed, the information provider estimating programs consistently designate times to perform repair procedures that are understated; bundle required repair procedures to significantly understate the time necessary to perform the procedures in a professional and competent manner; impose

3

formulas for calculating times for repair procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; and collapse and combine repair procedures to achieve what is known as "overlap" or "redundancy", in order to reduce the time – and cost – in repair estimates. Further, the information providers have written their programs so that any time a repair estimate contains additional or supplemented repair procedures that are required in the judgment and discretion of the repair professional, and/or contains a deviation from any of the designated labor times, those entries are highlighted for audit by Defendant insurers, enabling Defendant insurers to avoid appropriately compensating non-direct repair facilities for work that the insurers contend is subsumed by bundled procedures – or because the purported prevailing standard in the industry is not to charge for these necessary added procedures or enhancements in time. The information providers also furnish Defendant insurers with what are known as "scrubber" programs, enabling the insurers to search and audit repair estimates from non-direct repair facilities (and, in fact, direct repair facilities as well) to likewise avoid appropriately compensating non-direct repair facilities for repair procedures or costs that do not comport with what Defendant insurers each contend are the industry prevailing rates – and Defendant insurers refuse to pay for repairs other than at their so-called industry prevailing rates.

6. Second, in addition to selling the estimating programs, the information providers serve as the information storehouse for the collision repair industry. Each information provider collects and synthesizes the repair data from the insurers that use its estimating program, and this data is then furnished to the respective Defendant insurers (and conspirator insurers) for all insured repairs covered by that particular insurer, and for all insured repairs in the aggregate covered by the other insurers utilizing that data provider's estimating program. This repair data,

however, is heavily biased because it is predicated on repairs by the insurers' direct repair facilities, which by contract are required to accept the industry prevailing rates set, respectively, by Defendant insurers (and conspirator insurers); it does *not* properly incorporate data from repair facilities, like Plaintiff and the members of the respective classes, that are not on the Defendant insurers' (or conspirator insurers') direct repair programs. Thus, although this data is cited as representative of industry prevailing rates, it is, in fact, a feedback loop of the fixed rates that the insurers set with their respective direct repair facilities, which have been "laundered" through the so-called independent information providers.

7.     Accordingly, in practice, the information providers are simply not the independent authority of repair standards and costs, but rather, a fulcrum enabling the Defendant insurers to suppress compensation to the repair facilities.

8.     Defendant insurers have each formed separate association-in-fact RICO enterprises with the respective information providers that they use. By virtue of these RICO enterprises, Defendant insurers are able to fraudulently establish and misrepresent to Plaintiff and the class members the so-called industry prevailing rates for: (1) labor; (2) "paint and materials"; (3) parts; and (4) the scope and extent of compensable repair procedures. These prevailing rates are, in actuality, simply the rates that Defendant insurers' require their respective direct repair facilities to accept for labor, "paint and materials", and parts, and for preparing repair estimates in accordance with each insurer's "estimating profile" and company-wide estimating protocol, which outline the fixed limits for the time, scope and cost of compensable repairs paid by each insurer.

9.     Armed with the fixed, pre-determined rates with their direct repair facilities, the underlying industry repair data – which is shared or exchanged between and/or among Defendant

insurers (and conspirator insurers) but to which non-direct repair facilities like Plaintiff and the members of the respective classes do not have access, and estimating programs that work decidedly to their advantage, Defendant insurers can and do misrepresent to Plaintiff and the members of the respective classes that deviations in hourly labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair procedures, and/or parts prices do not constitute the prevailing rates in the industry and/or that no other repair facilities charge those rates or for those repair procedures. Further, Defendant insurers conceal the foundation and basis for the purported prevailing rates and the manner in which such prevailing rates are determined and maintained, in requiring non-direct repair facilities to accept suppressed compensation for the repairs performed.

10.     Plaintiff and the members of the respective classes were paid compensation by Defendant insurers for the collision repairs predicated on misrepresentations and omissions concerning prevailing rates, market values and industry standards. As a direct and proximate result, Defendant insurers were able to and did suppress compensation for collision repairs by Plaintiff and the members of the respective classes that were not part of the respective Defendant insurers' direct repair programs, and Plaintiff and the members of the respective classes were paid less than they otherwise would have been paid for their collision repairs. Plaintiff and the members of the respective classes would not have accepted the suppressed compensation for repair work and services but for Defendant insurers' conduct.

11.     In sum, repair compensation has remained flat and stagnant for years, but, given that insured collision repair services account for between approximately 75% and 90% of all repairs annually in the United States, and Defendant insurers (and conspirator insurers) comprise the majority of the insured repair market, repair facilities like Plaintiff and the members of the

respective classes face a Hobson's choice: Sell their repair services into a rigged market at suppressed rates or do not sell at all – and go out of business. This class action is essential to remedy the Defendant insurers' ongoing unlawful conduct, and provide the appropriate compensation to which Plaintiff and the respective classes are entitled.

## II.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 for Plaintiff's claims arising under RICO, §§ 1961 *et seq*.

13.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(a), (b) and (d) because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity that affected interstate trade and commerce discussed below has been carried out in this District. This Court also has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 1391(b), (c), and (d) because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity that affected interstate trade and commerce discussed below has been carried out in this District.

14.     Defendants' conduct, as described in this complaint, was within the flow of, was intended to, and did have, a substantial effect on, the interstate commerce of the United States, including in this District. Further, the RICO conspiracies in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

15.     Each Defendant, or one or more of its affiliates, used the instrumentalities of interstate commerce, including interstate wires and the U.S. mail, to join or effectuate their RICO conspiracies.

16.     Accordingly, this Court has personal jurisdiction over each Defendant, because each Defendant – throughout the United States and including in this District – transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of their illegal schemes and conspiracies.  The RICO conspiracies were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

17.     This Court has supplemental subject matter jurisdiction over the pendant state law claims pursuant to 28 U.S.C. §1367.  This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for Plaintiff and the classes exceeds $5,000,000, and there are members of the classes who are citizens of a different state than the Defendants.

18.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a), (b) and (d), and 28 U.S.C. § 1391(b), (c), and (d), because Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity and events alleged below that affected interstate trade and commerce occurred in this District.

III.    **PARTIES**

   A.    **Plaintiff**

19.     Plaintiff Crawford's Auto Center, Inc. ("Plaintiff" or "Crawford's") is a Pennsylvania corporation with its principal place of business at 302 West Uwchlan Avenue, Downingtown, Pennsylvania.  Crawford's was and is engaged in the business of automotive collision repair, among other things.  At all relevant times, Crawford's was injured – and continues to be injured – as a result of Defendants' unlawful conduct.

8

### B.    **Defendants**

20.    Defendant State Farm Mutual Automobile Insurance Company is an Illinois corporation, having its principal place of business in Illinois. State Farm Mutual Automobile Insurance Company, together with its affiliates, subsidiaries and/or divisions, defendants State Farm General Insurance Company, an Illinois corporation, having its principal place of business in New Jersey, State Farm Indemnity Company, an Illinois corporation, having its principal place of business in New Jersey, State Farm Guaranty Insurance Company, an Illinois corporation, having its principal place of business in New Jersey, State Farm Fire and Casualty Company, an Illinois corporation, having its principal place of business in Illinois, State Farm County Mutual Insurance Company of Texas, a Texas corporation, having its principal place of business in Texas, and State Farm Lloyds, a Texas corporation, having its principal place of business in Texas (collectively referred to herein as "State Farm"), issues automotive insurance in various states and throughout the country. State Farm has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.

21.    Defendant Allstate Corporation is a Delaware corporation, having its principal place of business in Illinois. Defendant Allstate Insurance Company is an Illinois corporation, having its principal place of business in Illinois. Allstate Corporation and Allstate Insurance Company, together with their affiliates, subsidiaries and/or divisions, defendants Allstate County Mutual Insurance Company, an Illinois corporation, having its principal place of business in Texas, Allstate Fire & Casualty Insurance Company, an Illinois corporation, having its principal place of business in Illinois, Allstate Indemnity Company, an Illinois corporation, having its

principal place of business in Illinois, Allstate New Jersey Insurance, an Illinois corporation, having its principal place of business in New Jersey, Allstate New Jersey Property & Casualty Insurance Company, an Illinois corporation, having its principal place of business in New Jersey, Allstate Property & Casualty Insurance Company, an Illinois corporation, having its principal place of business in Illinois, Encompass Indemnity Company, an Illinois corporation, having its principal place of business in Illinois, Esurance Insurance Company, an Illinois corporation, having its principal place of business in California, Esurance Property & Casualty Insurance Company, an Illinois corporation, having its principal place of business in California (collectively referred to herein as "Allstate"), issue automotive insurance in various states and throughout the country. Allstate has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.[1]

22. Defendant Government Employees Insurance Company is a Maryland corporation, having its principal place of business in Maryland. Government Employees Insurance Company together with its affiliates, subsidiaries and/or divisions, defendants GEICO General Insurance Company, a Maryland corporation, having its principal place of business in Maryland, GEICO Indemnity Company, a Maryland corporation, having its principal place of business in Washington, DC, GEICO Casualty Company, a Maryland corporation, having its principal place of business in Washington, DC, GEICO Advantage Insurance Company, a

---

[1] Allstate also includes subsidiaries, affiliates and/or divisions Encompass Insurance Company of NJ, Encompass Property and Casualty Insurance NJ, Allstate North American Insurance Company, Allstate Texas Lloyds, Castle Key Insurance Company, Castle Key Indemnity Company, Encompass Floridian Indemnity, Encompass Floridian Insurance Company, Allstate Vehicle & Property Insurance Company, Encompass Home and Auto Insurance Company, Encompass Independent Insurance Company, Encompass Insurance Company, Encompass Insurance Company of America, Encompass Insurance Company of Massachusetts, Encompass Property & Casualty Company, Northbrook Indemnity Company, North Light Specialty Insurance Company, Esurance Insurance Company of NJ and First Colonial Insurance Company.

10

Nebraska corporation, having its principal place of business in Maryland, GEICO Choice Insurance Company, a Nebraska corporation, having its principal place of business in Maryland, GEICO Secure Insurance Company, a Nebraska corporation, having its principal place of business in Maryland, and GEICO County Mutual Insurance Company, a Texas corporation, having its principal place of business in Texas (collectively referred to herein as "GEICO"), issues automotive insurance in various states and throughout the country. GEICO has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.

23.     Defendant The Progressive Corporation is an Ohio corporation, having its principal place of business in Ohio. The Progressive Corporation, together with its affiliates, subsidiaries and/or divisions, defendants Progressive American Insurance Company, a Florida corporation, having its principal place of business in Florida, Progressive Casualty Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Gulf Insurance Company, a Mississippi corporation, having its principal place of business in Ohio, Progressive Specialty Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Classic Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Michigan Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Mountain Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Northern Insurance Company, a Wisconsin corporation, having its principal place of business in Ohio, Progressive Northwestern Insurance, an Ohio corporation, having its principal place of business in Ohio, Progressive Preferred Insurance Company, an Ohio corporation, having its

11

principal place of business in Ohio, Progressive Security Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Southeastern Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive West Insurance Company, a California corporation, having its principal place of business in California, Progressive Advanced Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Choice Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Direct Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Garden State Insurance, an Ohio corporation, having its principal place of business in Ohio, Progressive Marathon Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Paloverde Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Premier Insurance of IL, an Ohio corporation, having its principal place of business in Ohio, Progressive Select Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive Universal Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Progressive County Mutual Insurance Company, a Texas corporation, having its principal place of business in Ohio, Artisan & Truckers Casualty Company, an Ohio corporation, having its principal place of business in Ohio, and United Financial Casualty Company, a Missouri corporation, having its principal place of business in Ohio (collectively referred to herein as "Progressive"), issues automotive insurance in various states and throughout the country. Progressive has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims

12

adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.[2]

24.     Defendant Farmers Insurance Exchange is an inter-insurance exchange, having its principal place of business in California.  Defendant Truck Insurance Exchange is an inter-insurance exchange, having its principal place of business in California.  Farmers Insurance Exchange and Truck Insurance Exchange, together with their affiliates, subsidiaries and/or divisions, defendants Farmers Insurance Company of Arizona, an Arizona corporation, having its principal place of business in Arizona, Farmers Insurance Company of Oregon, an Oregon corporation, having its principal place of business in Oregon, Farmers Insurance Company of Washington, a Washington corporation, having its principal place of business in Washington, Farmers Insurance Company, Inc., a California corporation, having its principal place of business in California, Farmers Texas County Mutual Insurance Company, a Texas corporation, having its principal place of business in Texas, Illinois Farmers Insurance Company, an Illinois corporation, having its principal place of business in Illinois, Mid-Century Insurance Company, a California corporation, having its principal place of business in California, Foremost County Mutual Insurance Company, a Michigan corporation, having its principal place of business in Texas, Foremost Insurance Company Grand Rapids, Michigan, a Michigan corporation, having its principal place of business in Michigan, Bristol West Insurance Company, a Delaware corporation, having its principal place of business in Florida, Coast National Insurance Company, a Delaware corporation, having its principal place of business in California, 21st Century Centennial Insurance Company, a Delaware corporation, having its principal place of

---

[2] Progressive also includes subsidiaries, affiliates and/or divisions Progressive Bayside Insurance Company, Progressive Hawaii Insurance Corp, Progressive Commercial Casualty Company, Progressive Express Insurance Company, Progressive Freedom Insurance Company, Progressive Max Insurance Company, Drive New Jersey Insurance Company, National Continental Insurance Company and Mountain Laurel Assurance Company.

business in Delaware, 21st Century Indemnity Insurance Company, a Delaware corporation, having its principal place of business in Delaware and 21st Century Insurance Company, a Delaware corporation, having its principal place of business in Delaware (collectively referred to herein as "Farmers"), issues automotive insurance in various states and throughout the country. Farmers has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.[3]

25.    Defendant Liberty Mutual Holding Co., Inc. is a Massachusetts corporation, having its principal place of business in Massachusetts. Defendant Liberty Mutual Group, Inc. is a Massachusetts corporation, having its principal place of business in Massachusetts. Liberty Mutual Holding Co., Inc. and Liberty Mutual Group, Inc., together with their affiliates, subsidiaries and/or divisions, defendants The First Liberty Insurance Corporation, an Illinois corporation, having its principal place of business in Illinois, Liberty County Mutual Insurance Company, a Texas corporation, having its principal place of business in Texas, Liberty Mutual Fire Insurance Company, a Massachusetts corporation, having its principal place of business in Massachusetts, Liberty Mutual Insurance Company, a Massachusetts corporation, having its principal place of business in Massachusetts, LM General Insurance Company, an Illinois

---

[3] Farmers also includes subsidiaries, affiliates and/or divisions Civic Property & Casualty Company, Exact Property & Casualty Company, Farmers Insurance Company of Idaho, Farmers Insurance of Columbus, Inc., Farmers New Century Insurance Company, Farmers New World Life Insurance Company, Farmers Reinsurance Company, Mid-Century Insurance Company of Texas, Texas Farmers Insurance Company, Farmers Specialty Insurance Company (formerly known as American Federation Insurance Company), Foremost Lloyds of Texas, Foremost Property & Casualty Insurance Company, Foremost Signature Insurance Company, Bristol West Insurance Companies, Bristol West Casualty Insurance Company, Bristol West Preferred Insurance Company, Security National Insurance Company, 21st Century Insurance Companies, 21st Century Advantage Insurance Company, 21st Century Assurance Company, 21st Century Auto Insurance Company of New Jersey, 21st Century Casualty Company, 21st Century Insurance Company of the Southwest, 21st Century National Insurance Company, 21st Century Pacific Insurance Company, 21st Century Pinnacle Insurance Company, 21st Century Preferred Insurance Company, 21st Century Premier Insurance Company, 21st Century Security Insurance Company, 21st Century Superior Insurance Company, American Pacific Insurance Company, Inc. and Farmers Insurance Hawaii, Inc.

14

corporation, having its principal place of business in Illinois, Peerless Insurance Company, a Massachusetts corporation, having its principal place of business in New Hampshire, Safeco Insurance Company of America, a Washington corporation, having its principal place of business in Washington and Safeco Insurance Company of Illinois, an Illinois corporation, having its principal place of business in Illinois (collectively referred to herein as "Liberty Mutual"), issue automotive insurance in various states and throughout the country. Liberty Mutual has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.[4]

26.     Defendant Nationwide Mutual Insurance Company is an Ohio corporation, having its principal place of business in Ohio. Nationwide Mutual Insurance Company, together with its affiliates, subsidiaries and/or divisions, defendants Allied Property & Casualty Insurance Company, an Iowa corporation, having its principal place of business in Iowa, AMCO Insurance Company, an Ohio corporation, having its principal place of business in Ohio, Depositors Insurance Company, an Ohio corporation, having its principal place of business in Ohio,

---

[4] Liberty Mutual also includes subsidiaries, affiliates and/or divisions American Economy Insurance Company, American Fire and Casualty Company, America First Insurance Company, America First Lloyds Insurance Company, American States Insurance Company, American States Insurance Company of Texas, American States Lloyds Ins. Company, American States Preferred Insurance Company, Bridgefield Casualty Insurance Company, Bridgefield Employers Insurance Company, Colorado Casualty Insurance Company, Consolidated Insurance Company, Employers Insurance Company of Wausau, Excelsior Insurance Company, The First National Insurance Company of America, General Insurance Company of America, Golden Eagle Insurance Corporation, Hawkeye-Security Insurance Company, Indiana Insurance Company, Insurance Company of Illinois, Liberty Insurance Company, Liberty Insurance Underwriters, Inc., Liberty Lloyds of Texas Insurance Company, Liberty Mutual Mid-Atlantic Insurance Company, Liberty Northwest Insurance Corporation, Liberty Personal Insurance Company, LM Insurance Corporation, LM Property and Casualty Insurance Company, Mid-American Fire and Casualty Company, Midwestern Indemnity Company, Montgomery Mutual Insurance Company, National Insurance Association, The Netherlands Insurance Company, North Pacific Insurance Company, Ohio Casualty Insurance Company, Ohio Security Insurance Company, Oregon Automobile Insurance Company, Peerless Indemnity Insurance Company, Safeco Insurance Company of Indiana, Safeco Insurance Company of Oregon, Safeco Lloyds Insurance Company, Safeco National Insurance Company, West American Insurance Company, Wausau Business Insurance Company and Wausau Underwriters Insurance Company.

15

Nationwide Insurance Company of America, an Ohio corporation, having its principal place of business in Ohio, Colonial County Mutual Insurance Company, a Texas corporation, having its principal place of business in Texas, Nationwide Affinity Insurance Company of America, an Ohio corporation, having its principal place of business in Ohio, Nationwide Agribusiness Insurance Company, an Iowa corporation, having its principal place of business in Iowa, Nationwide Property & Casualty Insurance Company, an Ohio corporation, having its principal place of business in Ohio, and Nationwide Mutual Fire Insurance Company, an Ohio corporation, having its principal place of business in Ohio (collectively referred to herein as "Nationwide"), issues automotive insurance in various states and throughout the country. Nationwide has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.[5]

27.     Collectively, State Farm, Allstate, GEICO, Progressive, Farmers, Liberty Mutual and Nationwide are referred to herein as the "Defendant Insurers".

**C.     Conspirators**

28.     Entities other than Defendant insurers, which are not named as defendants in this action, participated as conspirators with Defendant Insurers and/or as members of the respective RICO enterprises defined below, including, without limitation:

---

[5] Nationwide also includes subsidiaries, affiliates and/or divisions Crestbrook Insurance Company, National Casualty Company, Nationwide Assurance Company, Nationwide Lloyds, Scottsdale Indemnity Company, Scottsdale Insurance Company, Freedom Specialty Insurance Company, Scottsdale Surplus Lines Insurance, Western Heritage Insurance Company, Titan Indemnity Company, Titan Insurance Company, Victoria Fire & Casualty Company, Victoria Automobile Insurance Company, Victoria National Insurance Company, Victoria Select Insurance Company, Victoria Specialty Insurance Company and Farmland Mutual Insurance Company.

a.    United States Automobile Association is a Texas corporation, having its principal place of business in Texas.  United States Automobile Association, together with its affiliates, subsidiaries and/or divisions, USAA Casualty Insurance Company, USAA General Indemnity Company, Garrison Property & Casualty Insurance Company and USAA County Mutual insurance Company (collectively referred to herein as "USAA"), issues automotive insurance in various states and throughout the country.  USAA has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.

b.    The Travelers Companies, Inc. is a Minnesota corporation, having its principal place of business in New York.  The Travelers Companies, Inc., together with its affiliates, subsidiaries and/or divisions (collectively, "Travelers"), issues automotive insurance in various states and throughout the country.[6]  Travelers has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims

---

[6] The Travelers Companies, Inc.'s affiliates, subsidiaries and/or divisions are St. Paul Fire & Marine Insurance Company, Athena Assurance Company, Discover Specialty Insurance Company, Discover Property & Casualty Insurance Company, St. Paul Protective Insurance Company, St. Paul Fire & Casualty Insurance, St. Paul Guardian Insurance Company, St. Paul Medical Liability Insurance Company, St. Paul Mercury Insurance Company, St. Paul Surplus Lines Insurance Company, United States Fidelity & Guarantee Company, Fidelity & Guaranty Insurance Company, Fidelity & Guaranty Insurance Underwriters, Travelers Property Casualty Company, Travelers Insurance Group Holdings, Standard Fire Insurance Company, Auto Insurance Company of Hartford, Travelers Personal Insurance Company, Travelers Personal Security, Travelers Property Casualty Insurance Company, Travelers Casualty & Surety Company, Farmington Casualty Company, Travelers Casualty Insurance Company America, Travelers Casualty Company of CT, Travelers Commercial Insurance Company, Travelers Excess & Surplus Lines, Travelers Lloyds of Texas Insurance Company, Travelers Indemnity Company, Charter Oak Fire Insurance Company, First Floridian Auto & Home Insurance Company, First Trenton Indemnity Company, Gulf Underwriters Insurance Company, American Equity Insurance Company, American Equity Specialty CT, Northland Insurance Company CT, Northfield Insurance Company, Northland Casualty Company, Phoenix Insurance Company, Travelers Indemnity Company of America, Travelers Indemnity Company of CT, Travelers Property Casualty Company of America, Select Insurance Company, TravCo Insurance Company, Travelers Company Casualty Company, Travelers Home and Marine and Travelers Lloyds Insurance Company.

adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.

c.     American Family Mutual Insurance Company Inc. is a Wisconsin corporation, having its principal place of business in Wisconsin.  American Family Mutual Insurance Company Inc., together with its affiliates, subsidiaries and/or divisions, American Standard Insurance Company of Ohio and American Standard Insurance Company of Wisconsin (collectively, "American Family"), issues automotive insurance in various states and throughout the country".  American Family has company-wide, systematic and uniform claims management practices, and operates as a single, integrated enterprise for claims adjustment and administration purposes, including, without limitation, the conduct and subject matter at issue in this action.

d.     CCC Information Services Inc. ("CCC") is a Delaware corporation, having its principal place of business in Illinois.  CCC is also a successor in interest to CCC Information Services Group, Inc.   CCC provides software programs, products and data to insurers and repair facilities concerning, among other things, automotive collision repairs.

e.     Mitchell International, Inc. ("Mitchell") is a Delaware corporation, having its principal place of business in California.  Mitchell provides software programs, products and data to insurers and repair facilities concerning, among other things, automotive collision repairs.

f.     Audatex North America, Inc., d/b/a AudaExplore ("Audatex") is a Delaware corporation, having its principal place of business in California.  Audatex is wholly owned by Solera Holdings, Inc., a Delaware corporation, having its principal place of business in Texas, and Audatex is a successor in interest to, and/or formerly known as, ADP Claims Solutions Group, Inc.  Audatex provides software programs, products and data to insurers and repair facilities concerning, among other things, automotive collision repairs.

18

29.     Collectively, USAA, Travelers and American Family are referred to herein as the "Conspirator Insurers".

30.     Collectively, CCC, Mitchell and Audatex are referred to herein as the "Information Providers".

31.     All of Defendant Insurers' respective actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendant Insurers' various officers, agents, employees, or other representatives while actively engaged in the management of Defendant Insurers' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent and/or ostensible authority of Defendant Insurers.

32.     Whenever reference is made to an act, statement or transaction of any corporations or entity in the Complaint, including each of the Defendant Insurers and Conspirators, the allegation means the corporation or entity acted, stated or transacted by or through its directors, members, partners, officers, employees or agents while they were engaged in the management, direction, control or conduct of the corporation's or entity's business and acting within the scope of their authority.

33.     At all times referenced in this Complaint, the respective Defendant Insurers and/or Conspirators were agents and representatives of, and aided and abetted the unlawful conduct of, each of the other Defendant Insurers and Conspirators in the combinations, conspiracies and enterprises described in this Complaint.  In doing the things alleged herein, each and every Defendant Insurer and Conspirator was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other respective Defendant Insurers and/or Conspirators.  All actions of each Defendant Insurer and

19

Conspirator as alleged herein were ratified and/or approved by other respective Defendant

Insurers and/or Conspirators.

## IV.     FACTUAL BACKGROUND

### A.     Insurers and Insured Collision Repairs

#### 1.     Market Share

34.     Defendant Insurers and Conspirator Insurers comprise the top ten private

passenger auto insurers in the United States (based on premiums written) and collectively hold a

national market share of approximately 70%, as follows:

> State Farm – 17.9%
> Allstate – 10.1%
> GEICO – 9.7%
> Progressive – 8.4%
> Farmers - 6.0%
> USAA – 4.9%
> Liberty Mutual - 4.8%
> Nationwide - 4.1%
> Travelers - 2.0%
> American Family – 1.9%

35.     Total market share for the top 5 insurers increased between 2001 and 2012 from

approximately 48.5% in 2001 to 52.5% in 2012, and the total market share of the top 10

companies increased between 2001 and 2012 from approximately 65.8% in 2001 to 69.7% in

2012.[7]

36.     Accordingly, market concentration has steadily increased – and continues to do

so.  Likewise, control of the national market for auto insurance in the United States increasingly

rests with the largest insurers, as the only material market share growth in the past decade was

achieved by these carriers.

---

[7] No other insurers materially exceed 1% in market share.  The combined market share of the top 11-15 insurers is
only 6.2%, and for the top 11-25 insurers is only 13.7%.

37.     Automotive collision repairs of damaged vehicles covered by insurance account for approximately $25-$30 billion in repair costs annually, based on both first-party and third-party claims.  Further, these repairs account for between approximately 75% and 90% of all automotive collision repairs in the United States each year.[8]

38.     Upon information and belief, the collision repairs covered and paid for by or through Defendant Insurers and Conspirator Insurers track and/or align with their respective percentages of market share.

39.     Given their collective market share, Defendant Insurers and Conspirator Insurers, as alleged in detail below, have been able to establish the industry standards for collision repairs, including the compensation for collision repair services.

## 2.     Direct Repair Programs

40.     Defendant Insurers and Conspirator Insurers all have what are known as direct repair programs ("DRPs").  DRPs are comprised of collision repair facilities around the country that agree to abide by certain uniform standards and procedures in the repairs covered by Defendant Insurers and Conspirator Insurers.  Ostensibly, the DRP networks ensure that Defendant Insurers and Conspirator Insurers can maintain control and quality in the repair process, but in fact the DRP relationships enable Defendant Insurers and Conspirator Insurers to control the cost of insured repairs, and establish what is known as the "prevailing competitive price" or "prevailing rate" of the repairs (hereinafter, the "prevailing rate").  As described herein, Defendant Insurers and Conspirator Insurers, through various means but, in particular, their DRP relationships, have created an artificial market rate for repairs – the prevailing rate – that has

---

[8] Collision repairs are the restorative and replacement procedures performed on vehicles that affect (or potentially affect) the structural, safety and cosmetic components of the vehicle, including all procedures that repair, restore, replace or refinish any such structural, safety or cosmetic components or features, and which bring the vehicle to the same or approximate condition prior to the damage in terms of function, use and appearance.

been imposed upon repair facilities throughout the country (DRP and non-DRP), and has enabled Defendant Insurers and Conspirator Insurers to artificially suppress compensation to repair facilities for insured collision repairs.

41. Each DRP facility executes a uniform written agreement with one or more of the Defendant Insurers and Conspirator Insurers ("DRP agreement"), agreeing to abide by the terms dictated by each respective insurer for its direct repair facilities. Frequently, repair facilities serve as a DRP facility for multiple insurers, executing agreements with each respective insurer to establish the parameters and standards for repairs covered and paid for by or through each insurer.

42. Insurers control virtually all aspects of the repairs performed by their DRP facilities, including the cost and the methods by which repair estimates are created which, in turn, dictates the scope and extent of the repairs using one of the three Information Provider estimating systems. First, as described herein, Defendant Insurers and Conspirator Insurers either mandate or strongly recommend that their DRP facilities use the same estimating system to create repair estimates. Further, the DRP facilities agree to abide by the Defendant Insurers' and Conspirator Insurers' customized "estimating profile" that each has with CCC, Mitchell or Audatex, as well as the uniform estimating protocol (i.e., guidelines) that each of the respective Defendant Insurers and Conspirator Insurers maintains. Together, the estimating profile and company protocol outline the limits for the time, scope and cost of compensable repairs.

43. Second, the DRP agreements dictate, among other things, compensation for repairs, including hourly labor rates, reimbursement for what is known as "paint and materials" (described below), parts prices and required discounts on parts provided to insurers – as well as the types of parts: original equipment, aftermarket, recycled, used or salvage/crash parts, charges

for certain repair procedures, and the permitted mark-up (i.e., price above cost) on various items such as storage, towing and the like.

44.     The DRP repair facilities are willing – or are economically forced – to enter into these agreements with Defendant Insurers and Conspirator Insurers and abide by the terms and conditions because, in return, Defendant Insurers and Conspirator Insurers refer (i.e., "steer") repair work to these facilities.  Accordingly, DRP facilities (willingly or not) trade rate for volume of repair referrals (or, at least, the opportunity for referral).  Though the referrals are not "guaranteed" under the DRP agreements, Defendant Insurers and Conspirator Insurers are notorious for steering work to their DRP facilities.  Although insurers are not legally permitted to require that vehicles covered by insurance be repaired at their DRP facilities, Defendant Insurers and Conspirator Insurers all advise vehicle owners that, if the repairs are performed at a DRP facility, there will be no out-of-pocket costs, the repairs will be guaranteed – even though the insurers fail to advise the vehicle owners that the guarantee generally is underwritten by the facility rather than the insurer (save for parts), and there will be no delay in the repairs and that the facility meets the guidelines of the insurer.  In contrast, if a vehicle owner indicates a preference to have the repairs performed at a non-DRP facility, Defendant Insurers typically send letters outlining the foregoing in an attempt to convince the vehicle owner to reconsider.  Often, Defendant Insurers and Conspirator Insurers will impose unreasonable and arbitrary delays and interfere with the repair process when performed at a non-DRP facility.  Defendant Insurers and Conspirator Insurers are so successful at steering that industry reports indicate that approximately 50-60% of all repairs covered by Defendant Insurers and Conspirator Insurers are performed by DRP facilities.

45.     Of course, the real reason that Defendant Insurers and Conspirator Insurers steer repairs to their DRP facilities is so that they control the repair process and, most importantly, the cost.  Further, the DRP rates are utilized by Defendant Insurers and Conspirator Insurers to establish the artificial prevailing rate, which is then imposed upon the entire collision repair industry.

**B.      Repair Appraisals and the Information Provider Products**

**1.      Estimating Products**

46.     Before a damaged vehicle is repaired, a repair appraisal – or estimate – is prepared.  The estimate appraises the damage to the vehicle, serves as the blueprint for the repairs that are to be performed, and establishes the scope and cost of the repairs based on required labor operations, time and price.  Repair estimates are prepared using estimating software products sold by one of the Information Providers, CCC, Mitchell and Audatex. Defendant Insurers and Conspirator Insurers (and virtually every insurer), as well as the vast majority of repair facilities, subscribe to one or more of the estimating software products sold by the Information Providers, which collectively make up the damage repair estimating market in the U.S.[9]

47.     Estimating products consist of three main components: (1) a spreadsheet that tracks the line items that are a part of a vehicle repair estimate; (2) the database from which parts and labor costs are pulled; and (3) the software that calculates the total cost of the repair, taking into account labor and repair procedures.  In addition, as described below, the estimating

---

[9] CCC, Mitchell and Audatex also sell what is known as "total loss" valuation software.  Certain damage to a vehicle may prove so costly that the insurer will declare the vehicle a "total loss" because the estimated cost of the repair approaches or exceeds the vehicle's value.  Damages that result in a "total loss" to vehicles do not generally require or result in collision repairs and, accordingly, the "total loss" valuation software is not a part of this action.

24

programs each come with reference manuals, which explain and detail the repair procedures and the methods for preparing comprehensive estimates.

### 2. Insurers Drive the Estimating Market

#### a. Revenue

48.     In addition to estimating, the Information Providers sell a number of other automotive damage and related products, including workflow management products, business intelligence products, and repair facility or shop management software.  Insurance companies often purchase a bundle of products from one of the Information Providers, which include a core estimating program together with other management and operational products.  With the exception of State Farm (which uses various products from all three Information Providers), upon information and belief, the Defendant Insurers and Conspirator Insurers generally have exclusive contractual relationships with, and purchase estimating products from, one of the three Information Providers.[10]

49.     In addition, the Defendant Insurers and Conspirator Insurers mandate – or strongly recommend – that their DRP network facilities license the same estimating product (and several add-on products) from the same Information Provider with which the Defendant Insurers and Conspirator Insurers have a relationship.  Upon information and belief, Allstate, GEICO, Farmers, USAA and Nationwide all use CCC to prepare estimates.  GEICO and Nationwide have "closed" DRP estimating platforms, meaning that their DRP facilities are required to use the

---

[10] There are certain exceptions.  For example, Safeco Insurance Company, which is owned by Liberty Mutual, uses CCC, while Liberty Mutual uses Audatex.  Upon information and belief, at the expiration of Safeco's existing contract with CCC, it will switch to align with Liberty Mutual's Information Provider estimating system.  In any event, upon information and belief, Safeco's estimating profile and estimating protocol and guidelines are dictated by, and align with, Liberty Mutual's.

CCC program to prepare estimates.  Allstate, Farmers and USAA have "open" DRP estimating platforms (although use of CCC is preferred and encouraged).[11]

50.    Upon information and belief, Progressive uses Mitchell estimating products. Further, Progressive has an "open" DRP estimating platform, but that is a misnomer given that Progressive's in-house claims adjusters prepare all of their repair estimates, rather than the DRP facilities.  Travelers also uses Mitchell, and has an "open" platform.

51.    Upon information and belief, Liberty Mutual and American Family use Audatex, and both have "closed" DRP estimating platforms.

52.    With respect to State Farm, upon information and belief, it purchases certain products from all three Information Providers, but uses Audatex to prepare estimates in 4 regions around the country and Mitchell in 8 other regions.  State Farm has an "open" DRP estimating platform.

53.    Defendant Insurers and Conspirator Insurers each pay millions of dollars per year for Information Provider products.  Upon information and belief, State Farm and Allstate purchase between $10 million and $20 million in products annually.  Information Provider revenue for estimating products also derive from repair facilities.  Reportedly, 60% of estimating revenue comes from repair facilities and insurers account for 40% of the revenue.  However, given that Defendant Insurers and Conspirator Insurers mandate that their DRP facilities use the same Information Provider estimating programs, Defendant Insurers and Conspirator Insurers create a secondary revenue stream for Information Providers through the insurers' respective DRP facilities, and thus account for and control a significant portion of that additional 60% in

---

[11] An open platform simply means that the insurer will accept for review a repair facility estimate using another estimating program, but the insurers still prepare their own estimates.  In any event, an open platform does not mean that estimating profiles and guidelines are discretionary.  Rather, they are still strictly enforced.

repair facility revenue for the Information Providers. And, generally, if a repair facility is a DRP facility for multiple insurers – which frequently is the case – that facility will license estimating programs from multiple Information Providers. Given the number of DRP facilities, the Defendants Insurers and Conspirator insurers account for almost 75% of the Information Providers' revenue.

54. Further, Defendant Insurers and Conspirator Insurers sign longer-term contracts – generally two to five years in length, locking in that annual revenue for the Information Providers. The repair facilities execute license agreements with the Information Providers, which likewise have multi-year terms, but the repair facilities generally pay only a total of several thousand dollars annually for the estimating programs (and any add-ons). Accordingly, despite the fact that there are tens of thousands of repair facilities in the United States and only a small number of major insurers, Defendant Insurers and Conspirator Insurers wield substantial leverage and economic influence with the Information Providers.

**b.** **Influence**

55. Defendant Insurers and Conspirator Insurers regularly meet and consult with the Information Providers. For example, upon information and belief, all three Information Providers have facilities near State Farm's headquarters, as well as employee representatives on State Farm's and other insurer's sites, and discussions about the estimating programs consistently take place. Further, the Information Providers regularly visit Tech-Cor, Allstate's repair testing and training facility, as well as Allstate's headquarters. As described below, the Information Providers all sponsor conferences and annual events, attended by Defendant Insurers and Conspirator Insurers, at which the parties discuss the Information Provider programs, estimating processes, and methods for improving "accuracy" and "cost containment".

27

56. Further, upon information and belief, Defendant Insurers and Conspirator Insurers regularly request, encourage and/or suggest (if not require, under threat of lost business) that Information Providers find ways to reduce severity on insured claim repairs, i.e., reduce costs, by, among other things: (i) reducing time for labor operations (by re-doing time studies until the desired time is achieved or simply shaving time arbitrarily from required operations); (ii) collapsing and combing ("bundling") labor operations – and finding more redundancy (known as "overlap") in order to remove times for necessary labor operations; (iii) omitting or truncating necessary labor operations; and/or (iv) requiring that labor operations be entered manually by repair facilities preparing estimates, enabling Defendant Insurers and Conspirator Insurers to challenge and suppress compensation for these operations or the time ascribed to them, as described at length below.

57. The Information Providers' estimating systems have become entrenched as the only accepted method of preparing repair estimates. As a result, all members participating in the collision repair industry must utilize one of the three estimating systems. Notwithstanding their purported efforts to do so, the Information Providers simply cannot serve two masters. Indeed, the Information Providers, which fiercely compete for the business of Defendant Insurers and Conspirator Insurers, represent their products to insurers as a means by which to control and reduce costs, which is clearly countervailing to the concept of selling the software tool to the repair facilities to prepare the most accurate and comprehensive repair estimates – and be compensated accordingly. In truth, the Information Providers' interests clearly lie with their larger customer: Defendant Insurers and Conspirator Insurers.

### C.  Insurers Establish an Artificial Prevailing Rate to Control and Suppress Repair Costs

58.     In order to control and suppress costs, Defendant Insurers and Conspirator Insurers have created the prevailing rate – an artificial measure of the market value for repairs. This so-called prevailing rate controls all categories of compensation for repair rates: (i) hourly labor rates; (ii) reimbursement for "paint and materials"; (iii) parts pricing; and (iv) the scope and extent of compensable repair procedures – and designated labor times contained in the Information Provider estimating systems.  Defendant Insurers and Conspirator Insurers have perpetuated this industry prevailing rate with great success.  There is no statistical validity to the purported prevailing rates.  Further, the rates are comprised of flawed and rigged data, predicated on the agreements that Defendant Insurers and Conspirator Insurers have executed with their respective DRP network facilities, which facilities see no choice but to accept the purported prevailing rates in exchange for work.  These prevailing rates are then forced upon non-DRP facilities (like Plaintiff and the classes here), which never entered contracts to accept these rates from Defendant Insurers and Conspirator Insurers.

59.     Though it varies by insurer, approximately 50% of the repairs covered by insurance are performed by facilities that are not part of a particular insurer's DRP. Accordingly, insurers should be required to pay competitive industry rates for professional repairs performed by facilities that are not operating under that insurer's DRP program.  There is no uniform, industry rate for repairs; nor should there be.  Collision repairs are a service performed by highly skilled professionals, who each have and demonstrate particular levels of expertise, certification, training, equipment, capacity and quality of workmanship, and compensation should be set based on skill and competition.  Defendant Insurers and Conspirator

Insurers refuse to recognize these gradations and refuse to appropriately compensate these repair professionals and facilities. Instead, insurers want to commoditize repairs and make them fungible – and pay the lowest amount for repairs possible. To achieve this end, Defendant Insurers and Conspirator Insurers have usurped control of repairs – and the price, and created an artificial market value, i.e., the prevailing rate. And, Defendant Insurers and Conspirator Insurers have the leverage to steer and withhold business from repair facilities to reinforce the prevailing rates.

60. Defendant Insurers and Conspirator Insurers thus have established a rigged market in which collision repair facilities must sell their repairs to insurers, which cover and pay for between approximately 75% and 90% of all automotive damage repairs annually (and Defendant insurers and Conspirator Insurers account for approximately 70% of that figure), and the collision repair facilities do not have a choice as to whether to participate in the sale of their repair services to insurers. Rather, they face a Hobson's choice: Sell into a rigged market or do not sell at all – and go out of business.[12]

### 1. Information Provider Data Is DRP Data But Is Represented As the Prevailing Rate

61. The Information Providers maintain data on every aspect of repairs, which is valuable for insurers for myriad reasons, but the most important is establishing the so-called prevailing rate for every component of repairs, which the Defendants Insurers then use to force all repair facilities to accept. This purported market value is based on a feedback loop of information to the Information Providers from the Defendant Insurers' and Conspirator Insurers'

---

[12] Parenthetically, this industry has been subjected to a history of alleged trade restraint, intimidation and coercion by insurers, resulting in a consent decree some 50 years ago prohibiting some of the conduct that still presently occurs. *See U.S. v. Association of Casualty and Surety Companies et al.*, 1963 U.S. Dist. LEXIS 9949, 1963 Trade Cas. (CCH) P70,917 (S.D.N.Y. Nov. 27, 1963).

DRP network facilities, which have previously agreed to repair rates that the Defendant Insurers and Conspirator Insurers dictate as the prevailing rate. What the Defendant Insurers and Conspirator Insurers contend is the prevailing rate is really an artificially suppressed rate. The Information Providers perpetuate the artifice because they are beholden to Defendant Insurers and Conspirator Insurers for the majority of their revenue and because the Information Providers' only competition is themselves.

62.     CCC, Mitchell and Audatex maintain all data relating to repairs, including, among other things: the cost of repairs, the types of vehicles repaired; the number of estimates per repair (including initial repair estimates and supplement estimates) and what percentage of each repair is based on the original estimate and the estimate supplement(s); the cost of parts and the types of parts used in the repairs (original equipment, aftermarket, recycled, salvage, etc.), as well as the percentage of the total cost of the repair based on parts; the labor rates for all aspects of the repair, including sheet metal, frame/unibody, mechanical and paint/refinish rates, as well as the cost of labor as a percentage of the total repair cost (and the percentage of each type of labor rate); the cost of paint supplies and the percentage of the total repair costs based on reimbursement for paint supplies; the number of hours spent on each category of repair; the total time for repairs; and the time and scope of all labor operations and repair procedures.

63.     Defendant Insurers and Conspirator Insurers are provided with this data, which can be manipulated and sorted in myriad ways according to insurer preference, based on industry rates, types of repairs, types of repair facilities and the like. In addition, the data can be provided based on national figures, geographic region (i.e., state or city) or even individual repair facility. Further, the data is provided in two ways: (1) specific to the Defendant Insurer or Conspirator Insurer requesting the data; and (2) in the aggregate for all insured repairs based on estimates

uploaded to that specific Information Provider (e.g., CCC for insured repairs of Allstate, GEICO, Farmers and Nationwide); and, again, this data can then be arranged nationally, by geographic region or by individual repair facility. Upon further information and belief, the aggregate insurer repair data is available for purchase from all three Information Providers by any insurer.

64.    The data maintained by the Information Providers is heavily weighted toward DRP facility repairs. Though all participants in the industry for insured repairs use one of the Information Providers to prepare estimates, the estimates are not "uploaded" to the Information Provider data base until they are accepted for payment by Defendant Insurers or Conspirator Insurers. Thus, there are generally only three scenarios in which repair estimates are uploaded to the Information Providers: (1) those estimates prepared by claims adjusters for Defendant Insurers and Conspirator Insurers (or prepared by so-called independent appraisers who work for Defendant Insurers and Conspirator Insurers); (2) estimates prepared by the DRP facilities for Defendant Insurers and Conspirator Insurers; and (3) estimates prepared when non-DRP facilities are performing the repairs, which are only accepted by Defendant Insurers and Conspirator Insurers after being subjected to Defendants Insurers' and Conspirator Insurers' artificial suppression of rates. Indeed, upon information and belief, in the event that a non-DRP facility performs the repairs and two separate repair estimates are prepared – one by the insurer and the other by the repair facility – only the Defendant Insurer's or Conspirator Insurer's repair estimate is uploaded into the Information Provider system and used for data-keeping purposes; non-DRP facility estimates generally are discarded for purposes of data collection and reporting of industry rates. Upon information and belief, even if the non-DRP facility repair estimate is initially uploaded to one of the Information Providers, the data is ultimately "cleansed", so that only those estimates which underlie actual insurance claims data is reported . As a result, the

data that is maintained by Information Providers and promulgated as actual or representative industry data comes from DRP or insurer-written estimates. Non-DRP estimates simply are not properly incorporated into the Information Provider data.

65. The Information Provider data is then cited and used by Defendant Insurers and Conspirator Insurers as the prevailing rate. These are the rates that Defendant Insurers and Conspirator Insurers require from DRP facilities, the rates that are forced upon non-DRP facilities, and the rates which appear in insurance claims repair data estimates uploaded to the Information Providers – and the self-fulfilling cycle of suppressed compensation for automotive collision repairs is perpetuated.

66. Further, even in the few situations where Defendant Insurers and Conspirator Insurers do make adjustments to account for increased labor rates, reimbursement for "paint and materials" and/or the scope and extent of required repair procedures and allotted labor time for those procedures on a particular repair, Defendant Insurers will only report those adjustments as generic, line item entries on the repair estimates that are uploaded to the Information Providers, so that they are not captured or incorporated into those rate categories for statistical purposes. In effect, those adjustments are treated as "one-offs", which are not incorporated into the overall prevailing rates.

### 2. Compensation for Labor Rates, Refinishing, the Scope and Extent of Repair Procedures, and Parts Is Suppressed

#### a. Labor Rates

67. Compensation for labor accounts for, on average, approximately 40% - 45% of every collision repair. Labor rates are comprised of four different categories: (i) labor relating to sheet metal, the most significant category, which includes the repairs to and replacement of the

vehicle body and parts; (ii) refinishing, which includes painting and application of primers, sealants and coatings, as well as the related refinishing operations like sanding, buffing and polishing; (iii) mechanical, which includes operations on the engine; and (iv) frame/unibody, which includes aligning or realigning the vehicle body frame for repairs to the frame and/or other vehicle parts (collectively, "labor rates").

68.    Refinishing labor rates generally track sheet metal labor rates.  With respect to mechanical rates, although mechanical work is frequently required in collision repairs, and standard industry mechanical rates, i.e., rates that are paid to facilities that do strictly mechanical work, is significantly higher (often double or triple collision rates), Defendant Insurers (and Conspirator Insurers) refuse to compensate collision repair facilities at the standard industry mechanical rates for the same repair procedures.  Likewise, although frame/unibody rates are higher in the industry than sheet metal rates, Defendant Insurers and Conspirator Insurers generally refuse to compensate collision facilities at those higher industry rates for frame/unibody repair procedures.

69.    In all events, and at all material times, it is well documented that all of Defendant Insurers' and Conspirator Insurers' hourly labor rates for collision repair services have remained depressed.  Though there have been nominal rate increases, Defendant Insurers' and Conspirator Insurers' labor rates around the country have remained flat and stagnant – and this is not confined or particular to any state or geographic region.  While there are differences in labor rates between regions, all repair facilities throughout the country have been subjected to the same rate suppression predicated on the Defendant Insurers' and Conspirator Insurers' manufactured, artificial market value for labor rates through the imposition of the prevailing rate.

70. Further, the various geographic regions utilized and reported by the Information Providers – and, in turn, the Defendant Insurers and Conspirator Insurers – are not foundationally sound. There is no validity to grouping all repair facilities in these pre-determined regions together for purposes of comparing, determining or calculating labor rates.

71. As alleged in detail below, Defendant Insurers' and Conspirator Insurers' ability to impose artificially suppressed, uniform labor rates is further enabled by their extensive sharing of collision repair data, which permits Defendant Insurers and Conspirator Insurers to gauge and align labor rates. Accordingly, notwithstanding the fact that there are differences in labor rates among geographic regions, the labor rates for Defendant Insurers and Conspirator Insurers are the same or nearly the same in all states and geographic regions across the country.

72. All industry participants recognize and acknowledge the phenomenon of suppressed and stagnant labor rates – and that rates move uniformly. By way of example, according to CCC, nationwide labor rates during the five-year period from 2007 – 2011 experienced only nominal increases year over year, generally averaging 1.7%. Mitchell likewise tracks labor rates throughout the country and its reports align with the findings of CCC. For example, in its quarterly and annual reports, as part of its national labor rate analysis, Mitchell tracks and reports a sampling of labor rate changes in a number of states year over year (including in a number of the most populous states - California, Florida, Texas, Illinois, Ohio, Michigan, New Jersey, Arizona, Rhode Island, Nevada and Hawaii). According to Mitchell, labor rates during the nine-year period from 2006 through 2013 have experienced nominal

percentage increases (again, generally averaging less than 2%), demonstrating that labor rates have consistently remained flat and stagnant across the board.[13]

73.     In addition, numerous state trade associations and/or state regulatory authorities, including, again by way of example only, Maryland, Virginia, Washington D.C., Massachusetts, Washington State, Georgia, Texas and Nevada, have conducted industry surveys and extensive analyses of repair facilities (as well as insurers), yielding the same or similar findings: Labor rates have consistently remained flat and stagnant – year over year, and that rates move uniformly.  This has been caused by Defendant Insurers' (and Conspirator Insurers') prevailing rates with their DRP network facilities and their overall effect in the industry.

74.     Repair facilities are operated by skilled professionals, and their services are not fungible, notwithstanding Defendant Insurers' and Conspirator Insurers' efforts to make them so. Like other professionals – and contrary to artificial and uniform prevailing rates that Defendant Insurers and Conspirator Insurers have been able to establish through means that have little to do with free market competition or value, the services of automotive repair professionals should be based on factors such as quality, experience, training and facility capabilities, and the compensation for these services should be based, at least in part, on these factors.  Defendant Insurers' and Conspirator Insurers' use of leverage to control the flow of repairs to maintain suppressed labor rates focuses solely on achieving the greatest cost savings, but is counter to the obligation that vehicles must properly be restored to pre-loss condition, and risks the quality of the repairs.  Accordingly, Defendant Insurers and Conspirator Insurers have affected the market so that the pay the same or similar labor rates to all repair facilities in each geographic region, irrespective of quality, experience, training, equipment and/or certification.

---

[13] There have been limited exceptions, but, as Mitchell has explained, those are due to unique or extenuating circumstances.

75. Further, notwithstanding the fact that the frequency and severity of insured repairs have remained relatively stable and consistent, auto insurance premiums have generally experienced steady and significant increases. Thus, while Defendant Insurers (and Conspirator Insurers) have paid stable and consistent repair compensation on an annual basis, the insurers have increased premiums – and simply retained the majority of the savings as internal profit.

**b.** **Refinishing – Compensation for "Paint and Materials"**

76. "Refinishing" consists of applying primer, sealer, paint (known as base coat or color coat), and what is known as "clear coat" to parts that have been repaired and/or replaced, as well as the procedures necessary to sand, buff, polish, blend and the like to achieve the required condition and appearance of the vehicle after repairs and replacement of parts have been completed. Repair facilities are compensated in two ways for refinishing a vehicle. First, facilities are paid for the labor required to perform the foregoing refinishing procedures. These are refinishing labor rates as described above, and the labor rates for refinishing generally track labor rates for sheet metal repairs. Second, repair facilities are compensated for what is known as "paint and materials", which consist of the facility's cost of paint, coating, sealant and decontaminant products, as well as the materials that are used to prepare the vehicle for refinishing and to perform refinishing procedures, such as flex additives, sand paper, tape, masking products, bagging and the like (known as "allied materials"). Compensation for "paint and materials" comprises, on average, 10% of the total cost of a collision repair.

77. Defendant Insurers and Conspirator Insurers have historically and consistently used what is known as the "dollar per paint hour" method of compensating repair facilities for the costs of "paint and materials". The "dollar per paint hour" is a standard flat rate, and is a completely arbitrary measure of compensation that has no basis in, or correlation to, the actual

37

costs incurred by repair facilities for "paint and materials". It is simply another means by which Defendant Insurers and Conspirator Insurers have created an artificial prevailing rate for compensation in order to suppress costs, and imposed that purported prevailing rate upon the repair industry.

78.     In contrast, Plaintiff Crawford's, like many repair facilities, uses an invoice methodology based on actual prices paid by Crawford's for "paint and materials", to account for and seek reimbursement from insurers for these costs. In addition, there are also software programs known as "paint materials calculators" or "refinishing materials calculators" that likewise are based on manufacturer pricing and acquisition costs.

79.     Defendant Insurers and Conspirator Insurers, however, refuse to compensate repair facilities, like Crawford's, based these more accurate methodologies. Upon information and belief, Defendant Insurers and Conspirator Insurers have all conducted and/or shared analyses demonstrating that permitting the use of paint materials calculators or actual invoices as the method for compensation to repair facilities for "paint and materials" would substantially increase insurers' severity (i.e., costs) on insured claim repairs. In particular, upon information and belief, State Farm and Allstate have both done analysis concerning the impact of compensating repair facilities based on paint calculators and determined that repair estimates – and compensation to repair facilities – would increase by between $65 and $150 per repair, with an approximate blended average of $100 per repair, based on the more precise measure of the cost of "paint and materials". Given that State Farm and Allstate each pay for millions of insured claim repairs each year, the increased financial cost to State Farm and Allstate would equate to hundreds of millions of dollars annually. Upon further information and belief, certain

38

of the other Defendant Insurers and Conspirator Insurers have conducted similar analysis and reached similar conclusions.

80.     As a result, Defendant Insurers and Conspirator Insurers have refused to accept paint materials calculators or invoicing as a method for compensating repair facilities for "paint and materials", notwithstanding the fact that the industry recognizes that their prevailing rate of "dollar per paint hour" is not as accurate.  Defendant Insurers and Conspirator Insurers require their DRP facilities to accept compensation for "paint and materials" based on the "dollar per paint hour" methodology.  By generally refusing to recognize the paint materials calculator or any manufacturer-based (or paint jobber-based) invoice method of compensation for "paint and materials", Defendant Insurers and Conspirator Insurers ensure that only the "dollar per paint hour" method of compensation appears in the repair data uploaded to the Information Providers – the purported independent source of industry data, or is contained in any of the insurers' purported market surveys, which are based primarily upon their DRP data.  And, given that the "dollar per paint hour" is the sole measure for compensation in the Information Provider estimating systems, Defendants Insurers and Conspirator Insurers are able to perpetuate the "dollar per paint hour" as the prevailing rate for "paint and materials", and artificially suppress compensation.

81.     Significantly, Mitchell, one of the three Information Providers, sells its own refinish materials calculator ("RMC") because it, too, has recognized the flawed "inaccurate flat hourly rate formula" (i.e., the "dollar per paint hour").  However, even Mitchell's RMC has been consistently criticized and challenged by the repair industry because, among other things, it does not keep pace with current and updated manufacturer pricing, and fails to properly account for

required cost variations that relate to the particular types of paints and sealants used in each repair.

82.     According to an industry source, between 2005 and 2013, the cumulative increase in the cost of paint and materials nationally was approximately 73.9%, while the cumulative increase in compensation to repair facilities for "paint and materials" during the same time period was approximately 31%, a difference of over 40%.

83.     Further, there is no basis for Defendant Insurers and Conspirator Insurers to compensate repair facilities differently by geographic region for the cost of "paint and materials". Defendant Insurers and Conspirator Insurers have applied varying dollar per paint hour figures in different geographic regions, notwithstanding the fact that paints and sealants are generally priced uniformly nationwide – as is the cost of allied materials. Again, all collision repair facilities are subjected to artificial suppression of compensation for the cost of "paint and materials" – the suppression simply varies according to region. And, like the labor rates, the prevailing rates for "paint and materials" are the same or nearly the same in the respective geographic regions, but repair facilities have all been subjected to the same conduct.

84.     As a direct result of Defendant Insurers and Conspirator Insurers refusal to compensate repair facilities based on any measure other than the artificial "dollar per paint hour" method, and the restraint of the "dollar per paint hour", compensation to repair facilities has been artificially suppressed.

> **c.      Defendant Insurers' and Conspirator Insurers' Use of the Estimating Systems to Suppress the Scope and Extent of Compensable Repair Procedures**

85.     Defendant Insurers and Conspirator Insurers also utilize the prevailing rate to control repair estimates. As described herein, the industry only recognizes repair estimates

prepared using estimating programs from CCC, Mitchell or Audatex.  Defendant Insurers and

Conspirators Insurers purchase these estimating programs and claims management packages

from the respective Information Providers.  Repair facilities all license one or more of the

estimating programs.  The Information Providers – and their estimating programs – are depicted

as the so-called independent standard for developing the scope and extent of collision repairs.

And it is the repair estimate that not only defines the scope and extent of repairs, but also the

cost, which controls the compensation to the repair facilities.  Defendant Insurers and

Conspirator Insurers use the Information Provider programs – facilitated by the Information

Providers – to constrain repair estimates and suppress compensation to repair facilities.

86.     All three estimating systems state that they are to be used merely as a "guide" to

determine the scope and extent of the repair procedures, which are unique and particular to each

repair.  The intent behind the estimating programs is that the repair procedures and the labor

times designated for such procedures will be supplemented, added to and adjusted, predicated on

the damage to and condition of each vehicle, and the scope and extent of the required repairs.

Defendant Insurers and Conspirator Insurers, however, each create their own estimating profile

that is mandated for use by their respective DRP facilities, as well as their company estimating

protocol, which together impose strict limits on the scope and extent of compensable repair

procedures.

87.     As described above, it is the repair estimates prepared by Defendant Insurers and

Conspirator Insurers and their DRP facilities which are uploaded to the Information Providers

and maintained as industry representative data.  This feedback loop of data becomes the so-

called prevailing rate for the scope and extent of the repairs, and the limits on compensable

41

procedures and labor times, which, in turn, is then forced upon non-DRP facilities as the prevailing rate in the industry.

### i. The Process of the Estimating Programs

88.     The Information Provider estimating programs are designed to anticipate the base set of repair procedures and tasks that are required for each part of the vehicle, and then, depending on the damage to and condition of the vehicle, various procedures and tasks are added as required.  The estimating process works in sequence, so that, for example, when repairing a bumper, the program contains a base set of repair procedures for repairing or replacing a bumper (as the case may be), which the individual preparing the estimate enters and which have designated, i.e., pre-set, labor times.  Then, there are additional repair procedures or tasks listed which the estimator can enter as necessary, which bring up yet another set of repair procedures and tasks – or simply a discrete task or procedure.  These additional procedures may have a designated labor time or formula that calculates the labor time – or they may not.  If not, the estimator enters the labor time.  Frequently, there are no additional repair procedures or tasks listed at all – or the additional repair procedures that are listed are insufficient in scope or the full complement of required tasks, and the estimator is required to manually enter the procedures and all attendant tasks as well the labor times for all.

### ii. The Estimating Reference Guides

89.     CCC, Mitchell and Audatex each furnish estimating guides or reference manuals (known in the industry as "Procedure Pages") that work in tandem with their estimating programs to provide users with more in-depth, detailed information and explanation about preparing comprehensive estimates.

a) **The Estimating Programs Are Merely a "Guide"**

90. The Information Provider guides all start with the premise that repair procedures and times are based on working with *new, undamaged parts* and that only repair professionals – analyzing the damage to and condition of the vehicle – can appropriately determine the full scope and extent of the required repair and refinishing procedures. Further, the guides clearly express that the anticipated repairs will be supplemented, added to and adjusted accordingly. Indeed, the Information Providers clearly states that the designated labor times and repair procedures are only a "guide."

91. For example, CCC's Guide to Estimating (based on Motor Information Systems' Collision Estimating Data), Revised as of 09/13 (the "CCC Guide"), a true and correct copy of which is attached hereto as Exhibit "A", provides, in pertinent part, that:

**LABOR TIME PREMISE**[14]

The times reported in this publication are to be used as a GUIDE ONLY. Reported times include normal align procedure to insure proper fit of the individual new part being replaced. Reported times include tube/paddled OEM caulking and seam sealer removal/application on welded replacement panels. Sprayable seam sealer equipment requires preparation and adjustment before application and is NOT INCLUDED IN LABOR TIME.

Times do not apply to vehicles with equipment other than that supplied by the vehicle manufacturer as standard or regular production options. If other equipment is used, the time may be adjusted to compensate for the variables. Removal and replacement of exchanged or used parts is not considered. If additional aligning or repair must be made, such factors should be considered when developing the estimate. Items not listed under the INCLUDED/DOES NOT INCLUDE heading for any given procedure have not been considered in the estimated work time development for that procedure, unless specified by a footnote. All included/not included items for labor procedures listed between pages G10 and G33 are for component R&R and R&I procedures unless otherwise indicated in operation heading.

---

[14] All emphasis in the Information Provider Guides is as supplied in the original.

OPERATION TIMES LISTED ARE BASED ON NEW UNDAMAGED PARTS INSTALLED ON NEW UNDAMAGED VEHICLES AS INDIVIDUAL OPERATIONS. TIME HAS NOT BEEN CONSIDERED FOR ALIGNMENT PULLS, DAMAGE-RELATED ACCESS TIME, DAMAGED, USED, REMANUFACTURED OR AFTERMARKET PARTS. SOME OPERATION TIMES ARE APPLICABLE AFTER BOLTED, ATTACHED OR RELATED PARTS HAVE BEEN REMOVED. REFER TO SPECIFIC FOOTNOTES ATTACHED TO OPERATION TIME LISTING.

\* \* \*

**REFINISH TIME LISTINGS**

All refinish times are listed in hours and tenths of an hour. A time in parentheses adjacent to the part name, such as (p3.5) indicates three and one half hours. Replacement operation time does not include time necessary to refinish the component. Operation times for the application of painted-on stripes are not covered in this publication. The time necessary to perform this type of operation should be estimated after an on-the-spot evaluation of required procedure.

**REFINISH TIME PREMISE**

Published refinish times are for one color applied to new undamaged replacement components, without exterior trim, interior trim or other attached components and applied in one continuous process. For damaged panel(s), published refinish times may be applied after the damaged panel has been returned to a NEW UNDAMAGED condition. Refinish times do not include time which may be required to match color tints or defective finish textures on interior or exterior surfaces. Nor do they include time which may be required to correct finish imperfections caused by improper weather conditions, application, or environmental contamination such as dust, dirt, grease, etc. MOTOR advises all parties consider these factors beforehand to determine mutually acceptable provisions in the event such conditions exist or occur.

CCC Guide at G10; G34.

92.     Likewise, the Mitchell Guide to Professional Estimating, Revised as of 02/10 (the

"Mitchell Guide"), a true and correct copy of which is attached hereto as Exhibit "B", provides,

in pertinent part:

**Labor Times**
**THE LABOR TIMES SHOWN IN THE *GUIDE* ARE IN HOURS AND TENTHS OF AN HOUR (6 MINUTES) AND ARE FOR REPLACEMENT WITH NEW, UNDAMAGED PARTS FROM THE VEHICLE MANUFACTURER ON A NEW, UNDAMAGED VEHICLE.**  Any additional

44

time needed for collision **DAMAGE ACCESS, ALIGNMENT PULLS, NON-ORIGINAL EQUIPMENT OR USED PARTS** should be agreed upon by all parties. Times for some operations are applicable after necessary bolted, attached or related parts have been removed. Exceptional circumstances, including all the sub-operations or extra operations, are indicated as notes throughout the text or are identified in the *Procedure Explanations*. The actual time taken by individual repair facilities to replace collision damaged parts can be expected to vary due to severity of collision, vehicle condition, equipment used, etc.

**Labor Categories**

The labor times shown in the *Guide* fall into various categories (for example, body, frame, mechanical) as determined by the repair facility's operating procedures. As a guide, components for which R&I or R&R is commonly considered to be a mechanical operation when performed in a collision repair environment are designated with the letter "m" in the text. These designations are only a guide. They are not necessarily all inclusive, nor do they suggest the application of a labor rate.

\* \* \*

**Refinish General Information**

**Complete Refinish**

Refinish times in this *Guide* pertain to New, Undamaged Parts and are not intended for calculating complete vehicle refinish –single- or multi-stage. An estimate of this nature would suggest all new panels have been fitted to the vehicle.

**Repaired/Used Panels**

Labor times related to repaired and/or used panels – example: remove and install or masking of glass, outside handles or exterior trim, feather prime & block, masking for primer surface application – are not included in refinish time. The steps required for refinishing a repaired and/or used panel may vary from those required for a new panel depending on the condition of the repaired and/or used panel.

Mitchell Guide at P2-3; P16.

93.     Audatex's 2014 AudaExplore Database Reference Manual ("Audatex Guide"), a

true and correct copy of which is attached hereto as Exhibit "C", provides the same, to wit:

**Labor Overview**
Labor supplied in an Audatex estimate is intended for use as a guide for collision repair. Labor allotments suggested by Audatex estimates are for replacement of new and undamaged parts. Additional allowances are provided for optional equipment supplied by the vehicle manufacturer by selecting the appropriate options and parts. Because each vehicle's collision damage is unique, automation cannot cover every situation. The flexibility of the Audatex system, coupled with the estimate preparer's knowledge and expertise, provides for adjustment of any estimate to meet the needs presented by each collision situation.

\* \* \*

**Replaced Panel Refinish**
Current Audatex refinish labor is based on the use of new and undamaged panels. Additional steps or processes that may be required should be considered during estimate preparation.

**Repaired Panel Refinish**
When a repaired panel is being refinished, the estimator provides time for the repair of the panel. The estimator also determines included operations. When Audatex refinish labor is used for repaired panels, Audatex refinish times assume that the panel has been returned to the condition of a new, undamaged OEM panel or equivalent.

When the estimator enters a judgment time for refinish labor, the estimator also determines the included operations. Operations that might be considered in the repair refinish time include any steps required to bring the panel to the condition of a new, undamaged panel. This may include feather edge, blow off and clean, mask to prime, tack off, mix etch primer, prime bare metal, mix and apply primer filler, guide coat application, unmask as required, and block sand. Panel scuff to facilitate application of clear may also be considered for two- or three-stage refinish.

Audatex Guide at 49, 150-51.

**b)** **"Included" and "Not Included" Operations**

94. CCC, Mitchell and Audatex Guides all expressly delineate repair and refinishing procedures deemed to be "Included" in each repair or part replacement, i.e., all tasks necessary for repair or replacement, as well as those procedures that are "Not Included", i.e., procedures which require the judgment of the repair professional based on the damage to and condition of

46

the vehicle and the required scope and extent of repairs.  For "Included" procedures, the

Information Providers have bundled tasks to arrive at an anticipated labor time necessary to

perform the repair or replacement procedure(s).  As part of this process, the Information

Providers account for what is known as "overlap", which is a labor operation common to the

repair or replacement or two or more parts.  Using "overlap", Information Provider estimating

programs automatically deduct time to avoid the calculation of so-called duplicate labor.  For

"Not Included" procedures, again given that these are repair and replacements tasks (including

the need for parts) that are considered to be within the professional judgmental of the repairer

based on the damage to and condition of the vehicle and the required repairs, the inclusion of the

procedures cannot be predetermined because each vehicle's collision impact is unique.

95.     The Information Provider guides all expressly state that "Not Included"

procedures do *not* mean that the procedures are unnecessary; rather, these procedures are to be

manually entered based on the judgment of the repair facility – and are indeed necessary to

restore the vehicle to pre-loss condition based on the scope and extent of the required repairs.

96.     The introductory explanation in the CCC Guide provides:

**ADD IF REQUIRED**:
MOTOR Collision Estimating Data is based on the base model vehicle
configuration, standard or regular production options, and/or standard
replacement operations. "Add if required" operations are for extra procedures
necessitated by optional factory equipment or certain collision scenarios that may
be encountered. "Add if required" operations should be added to the estimate
whenever applicable after an "on the spot" inspection of vehicle damage and/or
vehicle options.

**INCLUDED OPERATIONS**:
When items or operations appear in the Guide to Estimating pages under the
"Included" heading it means that the operation is performed in conjunction with
another operation. For example, Steering Wheel R&I is an individual operation,
but when replacing a steering column, steering wheel R&I is also performed and
therefore included in Steering Column R&R. If an item is listed without a
qualifier, it means all labor has been considered within the indicated labor

47

procedure. If a specific qualifier (such as R&I) appears, it means only the specified qualifier applies.

**NOT INCLUDED OPERATIONS**:
Items or operations listed under "Does Not Include" were not considered in the development of published labor operation times. These operations may or may not be required depending upon the vehicle or repair process used. If any of these items or operations are required, they should be considered by the estimator. If a specific qualifier (such as R&I) appears, it means only the specified qualifier applies.

CCC (Motor) Guide at G5.

97.     The Mitchell Guide provides:

**Procedures**
The *Procedure Explanations* on the following pages outline the operations which are or are not included in the labor time listed in each vehicle "service". You are encouraged to become familiar with these procedures pages to be sure you have a thorough understanding of the Mitchell approach to collision estimating.

The left **Included Operations** column means that the labor time shown in the *Mitchell Collision Estimating Guide* text includes that particular operation or operations.

The right **Not Included Operations** column means that the labor time in the text does not include that particular operation or operations. Performance of one or more of these operations may or may not be necessary as determined by the individual job requirements. If an add-on time has been established for any of these operations it will be shown in the text. If a time has not been established or if the add-on time is dependent on conditions that vary due to collision damage (example: access time, free up parts), the additional time should be recorded on the damage report. Labor times relating to the repair of a damaged panel or the use of used parts would come under this category.

Mitchell Guide at P3.

98.     The Audatex Guide provides, in pertinent part, and by way of example, that:

**Labor Exclusions**
Because each vehicle's collision damage is unique, labor to perform some of the following operations may vary. In other cases, the operation is performed less than 80% of the time and may or may not be required due to the collision damage. To address these situations, Audatex provides:

48

• Standard Manual Entries that are entered by the estimate preparer (for a complete listing, see Section 5-1).
• Additional Labor operations which are Audatex pre-stored labor for many of these operations.

When the operation has a Standard Manual Entry or an Additional Labor operation available, a note will appear next to the appropriate exclusion.

Audatex Guide at 53.

**Replacement and Recycled Operations**
The following is a general overview of operations included in Audatex's labor allowances. Each part or operation shows which specific operations are included, as well as those that are not included. Operations listed in the "Not Included" column may or may not need to be performed. To make that determination, an assessment needs to be made at the time if inspection. Review the completed estimate to see that the estimate preparer[']s considerations and allowances for the specific vehicle repair. It is the ultimate responsibility of the estimate preparer to ensure compliance, and that all necessary operations needed are included in the estimate.

All operations and labor allowances in the Audatex system are for like, kind and quality panels, including new and undamaged OEM panels.

Audatex Guide at 59.

**Replacement and Recycled Operations Overview**
Asterisks on an estimate are used to denote user entered values. They do not imply that the operation noted is not a necessary procedure.

Manual entries on an estimate do not imply that the part/operation entered is not a necessary procedure.

Audatex Guide at 61.

**Refinish Guidelines**
This section reflects the up-to-date findings of our data collection from a cross-section of repair facilities across North America, as well as our conclusions and recommendations on the most significant areas in the refinish process. It is not our intention to suggest that the observations, conclusions or recommendations apply with 100% accuracy to every refinish situation, but rather than Audatex reflects the findings of our comprehensive study coupled with our ongoing efforts.

* * *

49

**Refinish**

Based upon our observations, and the input of our Inter-Industry Client Council, we have identified several discrete application processes, conditions, and operations that are very important to the refinish process. To return the vehicle to pre-accident function and appearance, each of these areas should be understood, considered, and evaluated for potential inclusion in the estimating process.

\* \* \*

**Automated Refinish Formulas**

Based on the results of our Refinish Study, Audatex has automated our formulas for two-stage refinish, three-stage refinish, two-tone refinish, blend refinish and chipguard. The calculations are explained below. The remainder of these topics is important to the refinish process and can either be assigned a supportable average time or considered in the estimating process by some other means.

Audatex Guide at 140-41.

99. As is clearly evident from the Information Provider Guides, it is anticipated that virtually *all* repairs will require that the repair professional determine the scope and the extent of the repairs, which encompasses "Not Included" procedures and the adjustment of average designated labor times. Yet, Defendant Insurers and Conspirator Insurers systematically refuse to recognize and compensate repair facilities for necessary procedures and the full extent of the time spent performing repair procedures. In short, Defendant Insurers and Conspirator Insurers, by virtue of their respective estimating profiles and their company-wide estimating protocol and guidelines, which control the prevailing rates for collision repairs, do *not* abide by the Procedure Pages.

100. The egregiousness of Defendant Insurers' and Conspirator Insurers' conduct is evident from a review of the Information Provider Guides, which detail the permutations of the procedures that may be necessary in the judgment of the repair professionals – and frequently are necessary as the Information Providers state, but which Defendant Insurers and Conspirator simply refuse to compensate – or compensate sufficiently.

101.    For example, the CCC Guide explains that "LABOR TIME DOES NOT

INCLUDE … [T]he items listed below [which] apply to all [potentially necessary] labor

procedures."

• A/C System, Evacuate and Recharge
• Aftermarket & OEM accessories
• Alignment, check or straightening related parts
• Alignment check of front or rear suspension/steering
• Anticorrosion material restoration/application
• Battery D&R/recharge
• Brackets & braces transfer
• Broken glass removal or clean up
• Brakes, bleed and adjust
• Caulk (non-OEM), sound insulate or paint inner areas
• Clean up or detailing of vehicle prior to delivery
• Computer control module D&R/relearn
• Conversion Vans (special components, equipment and trim)
• Cutting, pulling or pushing collision damaged parts for access
• Damaged or defective replacement parts
• Drain & refill fuel tank
• Drilling, modification or fabrication of mounting holes
• Fabricate templates, reinforcing inserts, sleeves or flanges
• Filling, plugging and finishing of unneeded holes in new parts
• Information label installation
• Material costs
• Pinch weld clamp damage repair
• Refinishing

• Reset electronic memory functions after battery disconnect
• Road test vehicle
• Rusted, frozen, broken or corrosion damaged components or fasteners
• Scan tool clear/reset electronic module
• Scan tool diagnostics
• Steering Angle Sensor recalibration
• Straighten or align used, reconditioned or non-OEM parts
• Structural damage diagnosis and vehicle set up time
• Structural foam removal or application
• Test panel/spray caulk
• Undercoating, tar or grease removal
• Unprimed bumpers, removal of mold-release agents
• Waste disposal fees (all types)
• Weld through primer
• Welded seam surface finishing finer than 150 grit sandpaper
• Wheel or hub cap locks R&I

CCC (Motor) Guide at G10.

102.    Likewise, for refinishing procedures, the CCC Guide provides:

**SPECIAL NOTATION**:
The items or operations below were not considered during the development of any published basic refinish operation times. These operations may or may not be required depending upon the vehicle or process used. If any of these items or operations are required, they should be considered by the estimator and added to the estimate if necessary.

**REFINISH, WET/DRY SAND, DE-NIB and/or RUB-OUT TIME DOES NOT INCLUDE**:
• Anti-corrosion material application
• Filling, blocking, featheredging repaired panels
• Flex additive mixing time
• Flex prep application
• Material costs
• Mask inner panels ex: apron/cowl/pillars/rail/floor, etc.
• Molding & ornamentation
• Protective coating material application
• Protective coating removal
• Sound deadening application
• Spatter paint application time
• Stripe tape, decal & overlay
• Waste disposal fees (all types)

CCC (Motor) Guide at G35.

103.    To further demonstrate the particularity of each repair, again by way of example only, for basic color coat application (paint), CCC describes the spectrum of procedures in applying paint that are "Included" and those that are "Not Included" but which should be performed in the judgment of the repair professional:

**BASIC COLOR COAT APPLICATION**

| *INCLUDED:* | *DOES NOT INCLUDE:* |
|---|---|
| • Back tape opening (handle, lock cylinder, mirror) • Clean component | • Adhesion promoter (unprimed flexible component) • Backside refinishing • Blending into adjacent panels • Cover mask engine/compartment |

52

(solvent wash)

• Clean sprayer

• Color coat application

• Initial dry sand

  (as recommended by paint manufacturer)

• Light buff, lacquer paint only

• Load sprayer

• Mask adjacent panels (three-foot perimeter)

• Mask/close gap between adjacent panels up to foam tape

  (overspray)

• Mask glass opening

• Mask/protect grille radiator opening (overspray)

• Mix paint (color with necessary solvents)

• Primer-sealer coat application

• Primer-sealer coat final clean

• Primer-sealer coat final application

• Remove masking

• Retrieve accurate color information, including paint chip

to prevent overspray

• Color matching to adjacent panels

• Cover/mask for prime and block

• Cover/mask for cut-in

• Cover/mask recessed edges/jambs/weatherstrips

• Cover/mask trunk/compartment to prevent overspray

• Cover/mask entire exterior of vehicle to prevent overspray

  damage

• Cover/mask interior of vehicle to prevent overspray damage

• Edge refinishing

• Grind, fill, & smooth welded seams (up to 150 grit sandpaper)

• Paint or material costs

• Prime & block (high build/primer-filler)

• Test spray-out panel

• Tinting Primer-Sealer

• Tinting to achieve color match

• Underside refinishing

• Weld, grind or sanding damage to adjacent panels

• Wet sanding

CCC (Motor) Guide at G35-36.

104.    The Audatex and Mitchell Guides mirror the concepts set forth in the CCC Guide,

in that much of the repair process for labor and refinishing (and preparing the estimate for same)

is dependent upon the judgment of the repair professional.  Again, by way of example, the

Audatex Guide highlights a standing industry issue regarding a procedure known as "Feather,

Prime and Block" that is required in many repair refinishing circumstances but for which

Defendant Insurers and Conspirator Insurers generally refuse to pay.

**Feather/Prime/Block Collision Industry Conference – April 2006**

• The repair process associated with damaged painted body panels typically
involves multiple operations: body repair, feather, prime, block and refinish.

• The body repair process includes metal finishing and/or the use of body fillers
to return the body panel to its undamaged contour.  The repaired area is finished
to 150-grit and free of surface imperfections.

• Feather, prime and block are not-included refinish operations that complete the
process from 150-grit to the condition of a new undamaged panel and are outlined
and documented in printed and/or electronic time guidelines.

• The body/paint labor and materials necessary to prepare the repaired area from
150-grit to the condition of a new undamaged part are valid and required steps in
the process.  The labor and material allowance for these operations requires an on-
the-spot evaluation of the specific vehicle and damage.

Audatex Guide at Preamble.  And, further:

**Feather/Prime/Block**
Audatex recognizes that Feather/Prime/Block are required operations when
replacing welded-on panels.  Time to perform this operation is included in the
Audatex time for welded panel replacement in the seamed areas, to bring the
panels to the condition of a new, undamaged panel for the purpose of refinish.
Although the time is included, Audatex does not provide a material allowance for
the Feather/Prime/Block process.  If necessary, the determination and assessment
for materials is best provided by the estimate preparer for consideration and
allowance during the estimate preparation process.

Audatex recognizes that Feather/Prime/Block are required operations in the panel
repair process.  Audatex does not provide a labor time allowance for repaired
panels, as this is a judgment time.  Audatex does not provide a labor time
allowance for Feather/Prime/Block, as this, too, is a user judgment time.  Audatex

54

does not provide a material allowance for the Feather/Prime/Block process.  The
determination and assessment for this operation is best provided by the estimate
preparer for consideration and allowance during the estimate preparation process.

Audatex Guide at 151.

105.    The Audatex Guide provides various examples of procedures that are subject to

the judgment of the repair professional but which, in practice, are denied appropriate

compensation by Defendant Insurers and Conspirator Insurers.  Thus, by way of example only,

the following are certain procedures in the refinishing context that require the judgment of the

repair professional:

**Refinish within Panel Boundaries**
Refinish within panel boundaries is defined as the process of applying paint and
clear coat to the surface of a repaired panel for the sole purpose of facilitating the
appearance of color match within the confines of the panel.

**Note:** The Audatex blend formula does not apply to this operation.

**When the estimator enters a judgment time for refinish labor, the estimator
also determines the included operations.  Operations that might be
considered in the repair refinish time include any steps required to bring the
panel to the condition of a new, undamaged panel.  This may include feather
edge, blow off and clean, mask to prime, tack off, mix etch primer, prime
bare metal, mix and apply primer filler, guide coat application, unmask as
required and block sand.  Panel scuff to facilitate application of clear may
also be considered for two- or three-stage refinish.**

In the Audatex system, there are two ways to include the time to perform this
refinish operation in an estimate:

1.  The preferred method provided by Audatex is a Manual Entry.  Using this
method will not remove adjacent panel/non-adjacent panel overlap.  This labor
will also be used in paint materials calculations.  A manual entry for this
operation may be entered along with the desired value, or the Standard Manual
Entry "M10 Paint As Required" may be used.

2.  The second method is to override the pre[-]stored labor to the desired time.

It is important to keep in mind when using the method that all adjacent panel and
nonadjacent panel overlap will still be considered in an estimate when the panel
being painted is on a lower guide number.  If this method is used, and overlap is

55

not applicable, any overlap deducted by the system should be manually included in the estimated time for the spot painting.  Non-adjacent panel overlap time is 0.2 and adjacent panel overlap time is 0.4

Therefore, when using the override method and non-adjacent panel overlap applies, add 0.2 to the spot paint time.  When using the override method and adjacent panel overlap applies, add 0.4 to the refinish operation.

Audatex Guide at 149-50.[15]

### Color Sand and Buff
This process, which may or may not be required, is defined as wet sanding the entire panel by compound buffing and mechanical or hand polishing.  Color sand and buff is further defined as all of the above steps performed to the finished surface for any reason, plus cleanup.

Color sand and buff can be estimated at:
• 30% of Audatex single-stage refinish labor (not including final wash).

Audatex Guide at 150.

### Replaced Panel Refinish
Current Audatex refinish labor is based on the use of new and undamaged panels.  Additional steps or processes that may be required should be considered during estimate preparation.

### Repaired Panel Refinish
When a repaired panel is being refinished, the estimator provides time for the repair of the panel.  The estimator also determines included operations.

When Audatex refinish labor is used for repaired panels, Audatex refinish times assume that the panel has been returned to the condition of a new, undamaged OEM panel or equivalent.

When the estimator enters a judgment time for refinish labor, the estimator also determines the included operations.  Operations that might be considered in the repair refinish time include any steps required to bring the panel to the condition of a new, undamaged panel.  This may include feather edge, blow off and clean, mask to prime, tack off, mix etch primer, prime bare metal, mix and apply primer filler, guide coat application, unmask as required, and block sand.  Panel scuff to

---

[15] Significantly, the process (Refinish Within Panel Boundaries), known in the industry as "blend within panel", was established by one or more of the Defendant Insurers or Conspirator Insurers, and "suggested" to the Information Providers for inclusion in their respective programs, is the source of under-compensation by Defendant Insurers and Conspirator Insurers because when one panel is repaired and refinished, its appearance is different than adjacent panels.  The color and refinishing must be blended with adjacent panels, and cannot simply be confined to the repaired panel – at least generally not in a professionally competent manner.

facilitate application of clear may also be considered for two- or three-stage refinish.

Audatex Guide at 150-51.

### Nib Sanding/De-nib
Nib sanding (or de-nib) is defined as the removal of isolated dirt and dust particles, and polishing the affected area(s).

• Audatex's formula for Color Sand and Buff does not apply to this operation. Additional steps or processes that may be required should be considered during estimate preparation.

Audatex Guide at 151.[16]

### Welded-on Panels
Audatex base refinish labor does not include additional time to refinish adjacent panels that may be damaged by welding.

Audatex Guide at 157.

### Raw, Unprimed Bumper Covers and Plastic Parts
The Audatex formula for preparation of a raw, unprimed Bumper Cover or Plastic Part is:
• 20% of the base refinish labor

Note: Audatex will begin to add a "Prep Raw Bumper Cover" operation to the Bumper Cover part choice box for new and update vehicles, beginning with Q1 2011. This will apply only to manufacturers known to supply raw, unprimed bumper covers. This operation only applies to the front and rear bumper covers. The Audatex formula for Prep Raw, Unprimed Bumper Cover is 20% of the base refinish allowance, with a .3 minimum time.

The Audatex formula includes the following:

1. Wash cover with soap and water, rinse & dry
2. Degrease the surface with a wax, grease, and silicone remover
3. Sand cover with a sanding paste and grey scuff pad
4. Wash cover with soap and water, rinse & dry
5. Degrease the surface with a wax, grease, and silicone remover

---

[16] Again, this process is the source of controversy as well. It was likewise suggested to the Information Providers by one or more of the Defendant Insurers or Conspirator Insurers as a way to avoid compensation for more labor intensive procedures like "Color Sand and Buff" and, similarly, is another source of under-compensation by Defendant Insurers and Conspirator Insurers.

>If the paint manufacturer or OEM requires any other or additional steps to prepare a raw, unprimed bumper cover, these steps are Not Included in Audatex labor times. They may be accounted for manually, if required.

Audatex Guide at 157-58.

106.    The Mitchell Guide is the same, in that the judgment of the repair professional is required to determine the scope of virtually all repair or refinish procedures. *See* Exhibit "B", *passim*.

### iii.    Standard Labor Times and Allowances for Procedures in the Estimating Programs Are Not Representative and Are Often Misleading

107.    Notwithstanding that every collision repair is unique, and the fact that the Information Provider Guides are written to anticipate adjustment of labor times, the Defendant Insurers and Conspirator Insurers deem the labor time entries in the Information Provider estimating programs as definitive, and this applies to times for: (i) "Included" operations; (ii) deductions for overlap; and (iii) manually added procedures required in the judgment of the repair facility that are considered "Not Included", when those manually added procedures have a designated labor time or a formula which calculates additional labor time based on related procedures.[17]

108.    The Information Provider Guides explain that the labor time entries are the result of careful study, analysis, testing and data review. Upon information and belief, however, these labor time studies are based primarily on assumptive knowledge that simply cannot be widely or accurately extrapolated, with very limited actual study and testing. And, the testing is often outdated – and/or does not comport with manufacturer repair specifications.

---

[17] For example, "color, sand and buff" is a procedure that completes the refinishing process, in order to bring the finish of the vehicle back to pre-loss condition after repairs have taken place. The estimating programs provide that the labor time to perform "color sand and buff" is calculated as a percentage of the labor time designated to apply the base color coat on the repaired panel(s) of the vehicle.

109.    In addition, given the great financial influence that Defendant Insurers and Conspirator Insurers have over the Information Providers – and demonstrating that the Information providers are the economic partners of the insurers, the Information Providers: (i) re-do time studies until they are "able" to report results that are satisfactory to Defendant Insurers and Conspirator Insurers (i.e., results which reduce the labor times designated for repair procedures); (ii) bundle numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iii) impose formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (iv) collapse and combine procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (v) commonly shift necessary repair procedures to "Not Included" or discretionary categories, enabling Defendant Insurers and Conspirator Insurers to avoid compensating repair facilities for their work as unnecessary or not competitive.[18]

110.    Perhaps most importantly, the so-called data analysis that is the foundation of the Information Provider systems is predicated on DRP repairs performed using Defendant Insurers' and Conspirator Insurers' own estimating platforms – again, perpetuating the prevailing rate feedback loop.

111.    In sum, not only is each repair unique as the Information Providers set forth in their Guides, militating against standard application of labor times and compensable procedures,

---

[18] These practices apply to both labor procedures for body repairs and replacement, as well as refinishing procedures.  It can be even more egregious in the refinishing context because, by reducing refinishing times, Defendant Insurers and Conspirator Insurers are doubly reducing compensation, based on both labor time and reimbursement for the cost of "paint and materials", because the Defendant Insurers and Conspirator Insurers compensate for the latter on an artificial time basis (the "dollar per paint hour").

but also the labor times and compensable procedures that are reported in the estimating programs are not representative of industry or market repair standards.

**iv.**     **Suppression of Repair Estimates**

112.　　The Information Providers enable Defendant Insurers and Conspirator Insurers to limit and suppress the scope of repair estimates and thereby the compensation paid to non-DRP facilities.  First, the Information Provider estimating programs are not only written to constrain and limit labor time, but they are also heavily skewed toward requiring manual entry and adjustment and supplementation of procedures by repair professionals, when many of these procedures should be included in the standard sequence and progression of repair tasks, rendering it easier for Defendant Insurers and Conspirator Insurers to challenge the necessity of these required procedures and/or avoid appropriately compensating repair facilities for these procedures.

113.　　Second, any time that a repair estimate contains a deviation in the designated labor times and/or procedures from the core entries in the estimating programs, which includes any added procedure and any manually added procedure, as well as any adjustment of designated labor time or labor times that are derived based on formulas applied in the estimating programs, CCC, Mitchell and Audatex all automatically highlight each such entry with an asterisk or underline, notwithstanding the fact these adjustments and added entries are expressly contemplated and anticipated – and, in fact, necessitated – in the Information Provider Guides. In short, any time that a labor time is changed or a procedure is added per the estimating program

60

or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted.[19]

114.    Third, each of the Information Providers sells so-called "scrubber" programs to Defendant Insurers and Conspirator Insurers, which enable the insurers to search repair estimates for and remove or highlight specific procedures and labor times (as well as hourly labor rates, reimbursement rates for "paint and materials" and parts prices).  Using these scrubber programs, Defendant Insurers and Conspirator Insurers challenge and restrain compensation for procedures and times that do not comport with the Defendant Insurers' and Conspirator Insurers' estimating profiles, and/or their company estimating protocol and guidelines (which apply particularly to "Not Included" procedures or procedures which call for the judgment of the repairer), which limit the compensable repair procedures and times.  In addition, as an added catch-all, these scrubber programs can search for specific terms and entries that Defendant Insurers and Conspirator Insurers set up to trigger scrutiny.  Upon information and belief, CCC's scrubber program is "AccuMark Advisor", Mitchell's scrubber program is "WorkCenter Review and Compliance Manager" (or "Compliance Utility") and Audatex's scrubber program is "Estimate Check."  Upon further information and belief, all of the Defendant Insurers and Conspirator Insurers use these scrubber programs.

115.    Thus, while Defendant Insurers and Conspirator Insurers maintain that the Information Providers are the independent authority of estimating guidance, which repair facilities have been required to use to prepare repair estimates, the Information Providers clearly work in tandem with Defendant Insurers and Conspirator Insurers to constrain the proper scope and compensation for repairs.

---

[19] Further, mechanical repair procedures are denoted with an "m" or similar indication, which enables Defendant Insurers and Conspirator Insurers to highlight and decrease to body labor rates.

116. The labor times in all three Information Provider estimating programs are based on repairs to new, undamaged parts, so that, standing alone, the underlying foundation for computing time is counterintuitive given that repairs (by definition) are generally made on *damaged* parts and vehicles. Along the same lines, labor times computed based on repairs using original equipment parts cannot be the foundation for working with aftermarket – or worse, recycled, remanufactured or salvage – parts.

117. And, in practice, based on the damage to and condition of the vehicle, as well as a host of the aforementioned factors that invalidate the designated labor times set forth in the estimating programs, repair facilities must increase labor times in their estimates to account for times that are too low for myriad reasons, including, without limitation, because certain procedures are shorted on time or simply not accounted for, because the estimating programs have reduced too much time – or inexplicably reduced time – for purported overlap, because overlap should not be applied (indeed, again, all three Information Provider Guides instruct that overlap may need to be adjusted), or because time must be added for procedures that the estimating programs deem to be "Included" and therefore bundled in labor time, but which would otherwise go uncompensated without adding as additional procedures requiring significant additional labor time.

118. Similarly, manually entered repair procedures – and the labor time for these procedures – will always vary contingent upon damage to and condition of the vehicle. For those additional procedures and "Not Included" procedures requiring the judgment of the repairer, the Information Providers may designate labor times, either standing alone or based on formulas that are derivative of a related repair procedure; other "Not Included" procedures may have no labor time designated by the Information Providers. In either event, *all* added and

manually entered procedures are highlighted by the Information Providers in their estimating programs, irrespective of whether a labor time or formula is designated, whether the repairer adjusts the labor time designated, or whether the repairer inputs the labor time. Again, however, "Not Included" procedures do *not* mean that the procedures are unnecessary or compensable at the discretion of the Defendant Insurers and Conspirators Insurers. Rather, "Not Included" simply means that the procedures are subject to the judgment of the repair professional.

119. Notwithstanding the manner in which the Information Provider estimating programs are intended to operate, and the fact that it is the repair facilities – not insurance companies – that are repair professionals with certification, training and years of experience to determine the proper scope and extent of required repairs, Defendant Insurers and Conspirator Insurers all institute strict caps and limits on repairs and compensable procedures by establishing their own estimating profile and company protocol inflexibly using the respective Information Providers estimating programs (but not as a "guide") and are able to artificially restrain and suppress compensation to repair facilities.

120. The estimating profiles and company protocol for each of the Defendant Insurers and Conspirator Insurers all have pre-determined limits and restrictions on labor times (and labor rates) and compensable repair procedures. The estimating profile and company protocol is imposed to define the scope and extent of the repairs and, more importantly, the compensation to repair facilities for those insured repairs.

121. Repair estimates are prepared by insurers and repair facilities. Those that are prepared by insurers include estimates by their own claims adjusters, as well as so-called independent appraisers who on limited occasions prepare estimates when insurers are short-staffed or are addressing mass claims or claims in remote locations. Estimates prepared by repair

facilities include estimates by DRP facilities and non-DRP facilities. Estimates prepared by the claims adjusters and independent appraisers use the estimating profile and company protocol mandated by each specific Defendant Insurer or Conspirator Insurer and the estimating program (CCC, Mitchell or Audatex) mandated by each specific Defendant Insurer or Conspirator Insurer.[20] Likewise, Defendant Insurers and Conspirator Insurers require that their DRP facilities prepare estimates using or following their mandated estimating profile and company protocol and guidelines. These estimating profiles are frequently "locked" (meaning that they cannot be adjusted) or, at the very least, "pre-populated" with designated labor times and limits on procedures.

122.    Accordingly, only the estimates prepared by non-DRP facilities are not based on these estimating profiles and company protocol. However, Defendant Insurers and Conspirator Insurers are still able to limit and constrain the scope of these repair estimates – and suppress compensation to non-DRP facilities that perform insured repairs. If the estimate is prepared using the same estimating program used by the Defendant Insurer or Conspirator Insurer, the Defendant Insurer or Conspirator Insurer will have its adjusters and/or supervisory personnel review the estimate to conform to its profile and company protocol, often with the use of a scrubber program. If the estimate is prepared using a different estimating program, the Defendant Insurer or Conspirator Insurer will re-key the estimate using its preferred estimating program and applying its estimating profile and company protocol. Alternatively, independent companies offer software products that permit Defendant Insurers and Conspirator Insurers to interface with estimates prepared on a different estimating program to conduct similar "line-

---

[20] Though these are "independent" appraisers, they are hired by, and follow the mandates of, the insurers.

item" audits or reviews and then impose their estimating profiles and company protocol on non-DRP facilities.[21]

123.     In those circumstances, as described herein, there may be two "operative" estimates, one prepared by the Defendant Insurer or Conspirator Insurer and one prepared by the non-DRP facility.  However, as further described herein, the non-DRP facility is advised that its estimate does not meet the industry prevailing rates, which incorporates labor rates, reimbursement for "paint and materials", parts prices, and the scope and extent of compensable repair procedures.  The Defendant Insurers and Conspirator Insurers impose the purported prevailing rates upon the non-DRP facility, systematically – or more, accurately, programmatically – limiting the compensation for repairs, and forcing the non-DRP facility to accept less in compensation for the scope, time and extent of the required repairs.  The repairs have been performed, but the compensation for the repairs has been suppressed by the Defendant Insurers and Conspirator Insurers.

124.     Defendant Insurers' and Conspirator Insurers' conduct occurs uniformly across the country and impacts all facilities that are not part of Defendant Insurer' or Conspirator Insurer' DRP networks.

### d.     Parts

125.     Defendant Insurers and Conspirator Insurers, like they do with other categories of repair, frequently impose the pre-determined parts prices that they have with their respective DRP network facilities, including the required price discounts, on non-DRP facilities, under the guise of the purported prevailing rate.  This conduct similarly occurs nationwide.

---

[21] Performance Gateway is one such company that offers this technology.

### D. **The Conduct of State Farm**

126.    Defendant State Farm, given its position as the largest auto insurer in the industry, is able to exercise its dominant power to push the limits of cost control even further by imposing additional mechanisms on its DRP network to suppress repair rates, which, in turn, provides the foundation for what State Farm establishes as purported industry prevailing rates and imposes upon repair facilities like Plaintiff, which are not part of the State Farm DRP.  Further, as described below, State Farm is the fulcrum among the Defendant Insurers and Conspirator Insurers in establishing and maintaining, among other things, labor rates and "paint and materials" reimbursement rates, which further reinforces the suppression of repair compensation.

127.    State Farm has the largest DRP network in the industry, consisting of more than 10,000 repair facilities nationwide.  Given that there is a total of approximately 30,000 - 40,000 repair facilities in the United States, State Farm has one-quarter or more of all repair facilities in its nationwide DRP network.  State Farm formally launched its DRP network in or about 2000 or 2001.  Initially called "Service First", State Farm's DRP network became known as "Select Service" in or about 2006.  All Select Service network facilities enter into a uniform written contract with State Farm (true and accurate exemplars of which are attached as Exhibit "D"),[22] agreeing to abide by State Farm's repair mandates and, most importantly, the cost control measures that State Farm implements for repairs to vehicles covered by its insurance, as well as State Farm's estimating profile and company protocol to limit and restrict compensation for repairs.  Further, upon information and belief, Select Service facilities must agree that between 20% - 25% of their repairs are dedicated to State Farm work.  Accordingly, by design, Select

---

[22] For the sake of clarity, the signatories to one of the attached exemplar agreements (Capital Body Shop and Doug White) are not plaintiffs in this action, and the agreement – which was publicly filed in a separate action – is provided here solely for illustrative purposes.

Service facilities are financially beholden and reliant on State Farm. In addition to its strict enforcement of DRP agreements and its financial pressure, State Farm relies upon several other methods to control its Select Service facilities and their compensation for repairs, which enables State Farm to suppress compensation to all facilities (DRP and non-DRP alike) that perform collision repairs under State Farm insurance and, by extension, impact suppression of compensation to the entire collision repair industry.

### 1. <u>Most Favored Nation Provision</u>

128. Beginning with the inception of the Select Service program in 2006, State Farm instituted a most favored nation provision into its uniform DRP agreements ("State Farm MFN"), by which State Farm ensures the benefit of paying the lowest prices on all aspects of repairs that Select Service facilities charge to – or are paid by – any other insurer. The State Farm Select Service agreement provides, in pertinent part, that:

**Section 4.     Competitive Price**

**a. Repair Pricing**. Provider agrees to estimate and bill for repairs using the lower of the:

(1)  Most recent labor rates and paint and materials pricing information submitted by Provider to State Farm through State Farm's survey process; or
(2)  Current labor rates and paint and materials pricing identified through State Farm's survey process; or
(3)  Labor rates and paint and materials pricing offered to or agreed to with any other insurer.

Provider agrees to include on estimates the cost of competitively priced parts for the types of repair or parts replacement operations to be performed.

**b. New, Original Equipment Manufacturer (OEM) Replacement Parts.**
When estimating new, OEM replacement parts, Provider agrees to estimate and bill for repairs using the lower of the:
(1)  Manufacturer's retail price; or
(2)  Current competitive local market price; or
(3)  Resulting price based on any agreement between Provider and State Farm; or

67

(4)  Price offered to or agreed to with any other insurer.

**c. Recycled Replacement Parts.**  When estimating recycled replacement parts, Provider agrees to estimate and bill for repairs using the lower of the:

(1)  Most recent recycled parts mark-up percentage submitted by Provider to State Farm through State Farm's survey process; or
(2)  Current recycled parts mark-up percentage identified through State Farm's survey process; or
(3)  Current competitive local market price; or
(4)  Resulting price based on any agreement between Provider and State Farm; or
(5)  Recycled parts mark-up percentage offered to or agreed to with any other insurer.

**d. New, Non-OEM Replacement Parts.**  When estimating new, non-OEM replacement parts, Provider agrees to estimate and bill for repairs using the lower of:

(1)  Manufacturer's retail price; or
(2)  Current competitive local market price; or
(3)  Resulting price based on any agreement between Provider and State Farm; or
(4)  Price offered to or agreed to with any other insurer….

**e. Pricing Agreements.**  Provider acknowledges State Farm may enter into agreements with manufactures, distributors, or suppliers of automotive parts, supplies, or materials.  State Farm will give provider notice of any such agreement.  Provider may, at its option, participate with State Farm and such entities in obtaining parts, supplies, or materials for repairs when performing under this Agreement.  Provider further agrees that any pricing agreements negotiated by State Farm are in addition to the price offered by the Provider to State Farm under 4.b., 4.c., and 4.d.  State Farm shall receive the benefit of both the provider's pricing offer under 4.b., 4.c., and 4.d. and the price or discount negotiated through any pricing agreements.  If Provider chooses not to participate with State Farm and such entities, the prices charged by Provider may not exceed the price State Farm would have paid, had the Provider participated.

**f. Parts Locating Services.**  If requested by State Farm, Provider agrees to utilize automated replacement parts locating services or applications we specify for ordering and/or sourcing replacement parts and agrees these services or applications will be utilized at no additional cost to State Farm.  Provision 1.b., "Confidentiality/Privacy", does not apply to information when transmitted or supplied by Provider to any parts locating service, parts supplier, or application vendor utilized under this provision.

**g. Other Provider Discounts.**  Provider agrees that if it gives a bottom line discount, rebate, or other estimate discount on the overall repair costs to any

68

insurer, such discount constitutes an estimate and bill for repairs for purposes of this section 4. Competitive Price.  In that event, pricing offered to State Farm and its customers by Provider shall include the bottom line discount given to any other such insurer.

**h. Other Insurer Estimates and Cash Settlements.**  If Provider agrees to perform a repair based on another insurer's estimate where the vehicle owner has accepted a cash-out, cash settlement, or settlement under a similar settlement method, then any pricing for the repair shall constitute "a price offered to and agreed to" between the other insurer and Provider, is subject to subsections 4.a., 4.b., 4.c., and 4.d., and must be offered to State Farm as provided by this section 4. Competitive Price.

**Section 5.      General**

**d. Ownership or Control of Multiple Locations.**  This Agreement applies on a "per location" basis, unless the Schedule of Provider Locations Addendum is attached, and except as otherwise provided in this subsection d.  If Provider has multiple locations, only those locations owned or controlled by Provider that are listed in subsection 3 of the Schedule of Provider Locations Addendum are subject to this Agreement, provided however, that the pricing provisions contained in Section 4. Competitive Price, applies to all locations owned or controlled by Provider, even if not listed as a "participating" location in the Addendum.  If Provider provides a price to any other insurer at a "non-participating" location that is lower than the prices charged State Farm at locations participating in this Agreement, such price must be given to State Farm, and in the manner set forth in Section 4. Competitive Price.  If Provider buys or obtains control of additional facilities, Provider agrees to notify State Farm.

129.    The State Farm MFN is heavily policed and strictly enforced.  Upon information and belief, Select Service facilities are under a "one-strike" rule, meaning that any instance of a violation is cause for removal from the Select Service program.

130.    Indeed, State Farm sends its so-called "Competitive Pricing" contract provisions to its Select Service facilities, reminding the facilities of their obligations to provide State Farm with lowest rates on virtually all aspects of repairs, and enclosing a form for the facility to fill out detailing the lowest pricing offered or agreed to with any insurer.

131.    Even when State Farm does adjust, for example, labor rates or "paint and materials" reimbursement rates, Select Service facilities are still required to provide State Farm

with the lowest rates paid by any other insurer – and State Farm is only required to pay those lower rates. Thus, State Farm enjoys the benefits of the lowest rates in the industry by agreement with its Select Service facilities, which further maintains the suppression of State Farm's purported prevailing rates.

### 2. RPM Reports

132. State Farm also coerces and intimidates its Select Service facilities so that they will keep severity, i.e., State Farm's repair costs, as low as possible. To achieve this end, State Farm developed "Repairer Performance Management" reports ("RPM reports"), which, according to State Farm, provide information to each facility about their performance on the Select Service program. The RPM reports detail the average costs associated with the repairs performed for State Farm by each repair Select Service facility, and the primary metric is the average dollar amount of the repair estimate(s) for each repair. The RPM reports issue both a performance score, as well as a percentile ranking for each repair facility, to advise the facility of where it stands in relation to other repairers on the program. The higher the facility's average repair estimate (i.e., repair cost) is, the lower its ranking on the Select Service program.

133. As an initial matter, it is questionable whether there is any statistical validity to the so-called key performance indicators that are contained in the RPM reports. Upon information and belief, the RPM reports are merely State Farm's method to coerce Select Service facilities to take whatever means necessary – irrespective of the quality or comprehensiveness of the required repairs – to keep severity low. If a facility substantially or consistently underperforms, i.e., fails to keep its severity (repair costs) down or in a range acceptable to State Farm, that facility will not get repair referrals from State Farm and/or the facility will simply be removed from the Select Service program.

70

### 3. State Farm Survey

134.    State Farm is further able to control its claim costs – and suppress compensation to repair facilities – through its so-called survey process, which State Farm uses to establish its prevailing rates for, among other things: (1) labor; (2) "paint and materials" reimbursement; and (3) parts. State Farm mandates that its Select Service facilities participate in an on-line survey to provide rate information for repairs that they perform for State Farm. Participation by non-Select Service facilities is voluntary and, upon information and belief, approximately only 10%-20% of non-Select Service facilities participate in the State Farm survey. Accordingly, like the prevailing rate data that is generally established through the Information Providers by the other Defendant Insurers and Conspirator Insurers, State Farm's survey process yields results that are heavily weighted and skewed toward rates provided by Select Service (DRP) facilities, which rates are pre-determined based on the DRP agreements executed with State Farm. Again, this process serves as a feedback loop, which State Farm promulgates as the prevailing rate.

135.    In addition, as with the prevailing rate data established by other Defendant Insurers and Conspirator Insurers through the Information Providers, State Farm uses geographic regions or areas that it defines to set the prevailing rates for repair facilities in those regions. These regions are configured to enable State Farm to further suppress rates. Again, there is no foundation to compare and coordinate rates among the facilities given that the level, quality and location of the repair facilities that State Farm incorporates into each defined region varies.

136.    The State Farm survey requests that the facilities provide pricing information concerning State Farm customer repairs, including the charge for labor rates, as well as parts prices and discounts. In addition, the survey asks whether the repair facility uses a paint materials calculator to seek reimbursement for "paint and materials".

71

137.    The State Farm survey process is not representative of the prevailing rate for repairs.  First, the survey calls for hourly labor rates that the repair facility would charge State Farm for repairs, not what the repair facility considers the actual fair market rate.  Further, Select Service facilities are constrained in their reporting by the most favored nation provision in the DRP agreements, which requires the facility to sell repair services to State Farm at the lowest rates that any insurer pays.

138.    Second, State Farm is well aware that the survey process does not accurately depict the market because, in addition to the fact that it is heavily weighted toward Select Service facilities, aged responses are not deleted.  Thus, the survey results incorporate responses from facilities that have not been updated because the repair facilities have not participated in the survey every year or because the facilities are no longer in business.

139.    Third, State Farm contends that the survey represents rates charged by "a majority of the market", but this is misleading.  Rather than take into account or measure the quality of the repairs performed by the facilities or the level of equipment, training and certification of the facility, State Farm simply puts the reported rates in ascending order, starting with the facilities reporting the *lowest* rates.  Then, to determine what constitutes the "majority" of the market area for prevailing rate purposes, State Farm determines the total number of technicians and work stalls for the facilities participating in the survey (rather than the total for all facilities in the market area under review), and once the number of technicians and stalls exceeds 50% of the response total, State Farm deems the reported rates at that level to be the prevailing rate.  Thus, not only does State Farm's survey fail to capture a large segment of the rates charged by repair facilities in particular market areas, State Farm is also intentionally skewing the results to the lower reported rates, rendering the survey invalid under any statistical methodology, because the

higher reported rates are not taken into account in determining the prevailing rate. So, for example, if the labor rates for the facilities above the artificial 50% demarcation line that State Farm uses to determine the "majority" are reported as $60 per hour, while the facilities below that line all report labor rates as $30 per hour (or less), the $60 per hour labor rates will not be accounted for in State Farm's so-called prevailing rate. Significantly, State Farm refuses to disclose the results of its surveys – and the responses – to repair facilities that do question the methodology and the results.

140. Fourth, State Farm manipulates the method of compensation for "paint and materials". Numerous shops use paint materials calculators or cost invoicing methodologies to establish amounts owed for "paint and materials" because, as discussed herein, the artificial "dollar per paint hour" that State Farm (and all other Defendant Insurers and Conspirator Insurers) require as the measure for reimbursement is inaccurate and suppresses compensation to the repair facilities. The State Farm survey asks whether the repair facility uses a paint materials calculator. If the answer is no, the survey requests that the facility enter the "dollar per paint hour" rate that they would charge for State Farm repairs. Again, given that this rate is pre-determined with Select Service facilities, this is nothing more than a feedback loop. If the answer is yes, as has been well documented, State Farm will call each repair facility that responds affirmatively to using a paint materials calculator to instruct – or strongly suggest – that the facility do a new survey (in its entirety) and report that they do *not* use a paint calculator. Otherwise, State Farm advises, there will be no dollar per paint hour figure counted in the survey for that facility, which further reduces the possibility for an increase in the "dollar per paint hour rate". Even more egregiously, State Farm advises that it will not recognize and pay based on a paint materials calculator until they are used by a "majority" of the market, which State Farm

73

prevents by demanding that facilities not report the use of paint materials calculators. Thus, State Farm is able to skew and misrepresent the prevailing rate for "paint and materials" reimbursement in two ways through this coercion. One, it is able to represent that use of paint materials calculators is not the prevailing rate (i.e., methodology) for calculating reimbursement for "paint and materials" – even though calculators and other invoicing methods are a more accurate measure of reimbursement. Two, State Farm is able to further dilute – and falsely report – the prevailing rate for "paint and materials" reimbursement predicated on the "dollar per paint hour" because facilities which refuse to change their responses will have no "dollar per paint hour" reported. And, clearly, facilities who are more focused on accurate measurements of reimbursement through paint materials calculators or invoices would be reporting higher "dollar per paint hour figures" in any event. Further, State Farm is only capturing a minimal amount of non-Select Service facilities in its survey responses, and these are the facilities that more often use a paint materials calculators and seek to be paid based on a more accurate methodology – in contrast to Select Service facilities which have agreed (willingly or not) to abide by, and be compensated based on, the "dollar per paint hour".

141.     Fifth, upon information and belief, State Farm has deliberately altered certain responses by facilities in order to achieve more favorable survey results – as alleged in litigation with certain repair facilities.

142.     State Farm exerts significant pressure on its Select Service facilities, bolstered further by the downward pressure on severity through RPM reports and strict enforcement of the State Farm MFN, and, as a result, State Farm has been able to implement and maintain tight control of suppressed DRP rates. And, these are the rates that dominate the State Farm survey. Accordingly, State Farm's representation that the survey reflects the so-called prevailing rate is

74

false, because it is predicated on a flawed process, skewed by a feedback loop of fixed, pre-determined responses and rates.

143.     State Farm is then able to impose these falsely promulgated prevailing rates on non-Select Service facilities like Plaintiff, thereby artificially suppressing compensation.  In addition, notwithstanding the fact that State Farm has configured and defined geographic regions to further enhance its ability to promulgate inaccurate prevailing rates, the conduct – and injury – is the same nationwide, as facilities in all regions have been subjected to the same methods of State Farm's artificial suppression of rates.

**E.      Sharing of Information Between and Among Insurers Further Enables the Suppression of Compensation to Repair Facilities**

144.     Further enabling the suppression of compensation to repair facilities is the fact that Defendant Insurers and Conspirator Insurers share information about, and/or have access to, the costs and compensation of their respective insured repairs, including labor rates and reimbursement for "paint and materials", as well the scope and extent of compensable repairs.

145.     Defendant Insurers and Conspirator Insurers gauge and align, among other things, their hourly labor rates and reimbursement rates for "paint and materials", which together account for more than 50% of all repair compensation.  These rates are generally determined and/or guided by State Farm – the market leader, which is engaged in its own suppression of rates as described in detail above.

146.     Defendant Insurers and Conspirator Insurers are all aware of the State Farm MFN, implemented in 2006, requiring that State Farm's Select Service facilities, which comprise approximately 25% of all repair facilities in the country, provide the lowest pricing to State Farm.  Thus, even when State Farm adjusts the hourly labor rates and/or "paint and materials"

75

reimbursement rates, the Select Service facilities are still required to provide State Farm with the lowest rates paid by any other insurer. Accordingly, there exists an inherent preservation of the *status quo*, and prevailing labor rates and "paint and materials" reimbursement rates are maintained at the same or very similar levels by and among Defendant Insurers and Conspirator Insurers. In practice, Defendant Insurers and Conspirator Insurers generally align their rates with State Farm, so that when State Farm does issue an increase in hourly labor rates and/or "paint and materials" reimbursement, Defendant Insurers and Conspirator Insurers adjust their rates in concert.

147. When Defendant Insurers and Conspirator Insurers align these rates, they artificially restrain and suppress collision repair compensation. These rates are incorporated into the Defendant Insurers' and Conspirator Insurers' respective DRP network facility agreements as the fixed, maximum rates for labor and "paint and materials" reimbursement. These fixed, maximum DRP rates are then filtered through the CCC, Mitchell and Audatex data bases (or, in State Farm's case, the rates are filtered through its manipulated rate survey), and are promulgated as the "independently determined" prevailing rates in the industry. Consequently, Defendant Insurers and Conspirator Insurers are able to impose these fixed, suppressed rates for labor and "paint and materials" reimbursement upon collision repair facilities like Plaintiff and the members of the Classes, which do not serve as DRP facilities for the Defendant Insurers or Conspirator Insurers.

### 1.  Information Sharing Between and Among Insurers

148. In particular, at all material times, Defendant Insurers and Conspirator Insurers exchange and have access to costs and compensation for insured collision repairs by virtue of the following.

76

### a.     <u>Exchange of Information through the Subrogation Process</u>

149.     Through the subrogation departments of Defendant Insurers and Conspirator Insurers, each knows in full detail what the other insurers are paying to repair facilities – both DRP and non-DRP – for insured repairs. In addition, each insurer is privy to repair estimates underlying insured claim repairs paid by other insurers. Thus, Defendant Insurers and Conspirator Insurers all know what other insurers are paying in labor rates and reimbursement for "paint and materials" (as well as costs for parts and discounts provided by repair facilities on parts and compensation for certain repair procedures). Further, Defendant Insurers and Conspirator Insurers also know which estimating program is utilized by each insurer, as well as the insurer's estimating profile – or, at the very least, the parameters of the estimates that each insurer writes and pays as the prevailing rate.

150.     The foregoing data is all available to Defendant Insurers and Conspirator Insurers on a current basis, as claims settlement occurs through the subrogation process. Moreover, upon information and belief, Defendant Insurers and Conspirator Insurers all utilize the subrogation data to analyze their repair costs in order to predict and construct future pricing parameters.

### b.     <u>Data Sharing through the Information Providers</u>

151.     Defendant Insurers and Conspirator Insurers share information through the Information Providers (CCC, Mitchell and Audatex), which, as described herein, maintain data on all facets of automotive collision repairs and the compensation paid by insurers. Again, the Information Providers, although separate entities, are significantly influenced by Defendant Insurers and Conspirator Insurers and earn the majority of their revenue from Defendant Insurers and Conspirator Insurers – or through their respective DRP network facilities.

152.    Information Provider data is provided to insurers in two ways.  First, it is insurer-specific, which consists of all repairs paid for by that particular insurer.  Second, CCC, Mitchell and Audatex all furnish aggregate industry data, consisting of all repairs paid for by all insurers which have uploaded repair data into the respective Information Provider systems.  For example, for CCC, which provides claims and estimating programs to Allstate, GEICO, Farmers, USAA and Nationwide, CCC furnishes pricing information for claim repairs paid for by those insurers in the aggregate.

153.    This data is provided on a national level, or can categorized or broken down by state or geographic region, by city, or even by a particular repair facility – even though that facility has performed work for different insurers.  Moreover, this data is available for purchase by any insurer, even if that insurer does not purchase program services from that particular Information Provider.  The repair data from the Information Providers is available not only for historical and trailing time periods, but is also provided to Defendant Insurers and Conspirator Insurers on a current basis.  Upon information and belief, this comprehensive industry repair data is not available to repair facilities.

154.    In addition, upon information and belief, CCC, Mitchell and Audatex all provide reports to Defendant Insurers and Conspirator Insurers which forecast trends and make projections for repair costs and procedures, which are predicated – at least in part – on the aggregate insurance repair data that the Information Providers collect from the respective insurers.  Upon further information and belief, Information Providers also furnish to insurers customized reports concerning the repair costs that the industry anticipates will be paid on insured claim repairs in the future, based on that particular insurer's repair costs, as well as aggregate industry repair data.

78

155.    Given Defendant Insurers' and Conspirator Insurers' in-depth knowledge of each insurer's market share and operations in each region, state and city, as well as the fact that Defendant Insurers and Conspirator Insurers all know which Information Provider estimating program the other insurers use – and thus, which insurer repair data is contained in the so-called industry aggregate data compiled by CCC, Mitchell and Audatex – the Information Provider data is, upon information and belief, readily disaggregated and transparent – and all participants are keenly aware of that fact.

### c.    Enforcement of Most Favored Nation Provisions in DRP Agreements and Insurer Audits of DRP Facilities

156.    As described herein, since 2006, State Farm's DRP agreements have all contained the State Farm MFN, mandating that each of the approximate 10,000 Select Service facilities provide State Farm with the lowest pricing – on all facts of repairs – paid by *any* insurer paying for repairs at that particular facility.  In addition, like State Farm, Farmers' DRP agreements also contain a uniform most favored nation provision, requiring that its DRP facilities provide Farmers with the lowest pricing on repairs paid by any insurer.

157.    State Farm and Farmers, which together account for approximately 25% of the market, both heavily police and strictly enforce these most favored nation provisions.  As described herein, State Farm sends its "Competitive Pricing" contract provisions to its Select Service facilities, and requests that each facility fill in a form advising State Farm of the specific pricing offered or agreed to with any insurer on virtually every aspect of repairs, including, without limitation, all labor rates and "paint and material" pricing.

158.    Likewise, upon information and belief, Farmers sends out forms to their DRP facilities, asking for the lowest rates provided to other insurers as part of their DRP networks,

including all labor rates and "paint and material" rates, and also asking for the percentage of business that the facility does with each insurer as part of its DRP (although the facility is instructed not to identify the specific insurer by percentage), and all of this information is confirmed in telephone and in-person interviews. Again, even if some or all of this data is not identified by insurer name, Farmers is knowledgeable enough about the market to determine which insurers are represented by the repair data in the pricing response forms from its DRP facilities.

159.    In addition, pursuant to the written agreements with their respective DRP facilities, Defendant Insurers and Conspirator Insurers all have the right to audit the records of their facilities, which, upon information and belief, on occasion includes the right to review in whole or in part the repair estimates and compensation paid for repairs by other insurers in connection with the repairs performed by those facilities (and not just the repairs for that particular Defendant Insurer or Conspirator Insurer). Upon further information and belief, Defendant Insurers and Conspirator Insurers have exercised their rights and conducted such audits.

### d.    Insurer Discussion and Comparison of Repair Costs and Pricing Trends

160.    Upon information and belief, Defendant Insurers and Conspirator Insurers engage in regular communications about their prevailing rates and the compensation that is paid to repair facilities. In particular, upon information and belief, State Farm and Allstate, through senior claims personnel – and as directed and/or condoned by company officers – have at times conducted regular "off-the-record" comparisons of repair rates and compensation to repair facilities, in order and thereby gauge and align, for example, labor rates and "paint and

materials" reimbursement rates – and, upon information and belief, it is typical in the industry for claims adjusters to compare rates with their counterparts at other insurers.

e.     **Additional Communication Between and Among Insurers and their Conspirators**

161.    In addition, Defendant Insurers and Conspirator Insurers regularly communicate about repair estimating protocol and compensation to repair facilities at various industry meetings and conferences which occur throughout the year, sponsored by Information Providers, industry organizations and the like.  By way of example, CCC, Mitchell and Audatex all sponsor conferences which are attended by "industry stakeholders", including Defendant Insurers and Conspirator Insurers, as do manufacturers and vendors like LKQ (the largest aftermarket parts manufacturer and distributor) at its "Insurance Client Forum" and VeriFacts Automotive (the largest quality verification and technician assessment provider) at its "VeriFacts Symposium".

162.    At each of these conferences, there are seminars, presentations and open discussions concerning, among other things, repair estimating methodologies, repair protocols and, most importantly, cost containment, including past and current pricing and severity data, as well as future trends and implementation of costs-savings measures.  Upon information and belief, additional discussions about these subjects occur between and among Defendant Insurers and Conspirator Insurers – and their vendors – at these conferences.

163.    Further, there are numerous organizations, such as I-CAR, a national company engaged in, among other things, the training, development and certification of collision repair facilities and professionals, which involve the participation of the Defendant Insurers, repair facilities and industry vendors.  For example, the Executive Committee for I-CAR includes executives from Allstate (through Esurance), State Farm, Tech-Cor (Allstate's training and

81

testing facility), Liberty Mutual and a large owner-operator of collision repair facilities, among

others. Upon further information and belief, discussions likewise occur between and among

Defendant Insurers and their vendors concerning the subjects at issue in this action in the context

of their participation in organizations such as I-CAR.

164.     As a result of all of the foregoing, Defendant Insurers and Conspirator Insurers,

which comprise approximately 70% of the auto insurance market in the United States and, upon

information and belief, account for and control approximately 70% of the market for insured

collision repairs, are able to fix and maintain prevailing rates for hourly labor rates and "paint

and materials" reimbursement across the country, and repair facilities (in the respective

geographic regions) are paid the same or nearly the same rates. As a result, repair compensation

to Plaintiff and the Classes has been – and remains –artificially suppressed.

## V.     RICO ALLEGATIONS

165.     Defendants Allstate, GEICO, Progressive, Farmers, Liberty Mutual and

Nationwide, together with the respective Information Providers with which they have a standing

relationship, have each formed separate association-in-fact enterprises within the meaning of 18

U.S.C. § 1961(4). Thus, Allstate has formed an association-in-fact enterprise with CCC (the

"Allstate Enterprise"), GEICO has formed an association-in-fact enterprise with CCC (the

"GEICO Enterprise"), Farmers has formed an association-in-fact enterprise with CCC (the

"Farmers Enterprise"), Progressive has formed an association-in-fact enterprise with Mitchell

(the "Progressive Enterprise"), Liberty Mutual has formed an association-in-fact enterprise with

Audatex and CCC (the "Liberty Mutual Enterprise"), and Nationwide has formed an association-

in-fact enterprise with CCC (the "Nationwide Enterprise").

166.    In addition, defendant State Farm has formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of State Farm, its respective Select Service facilities around the country, Mitchell and Audatex (the "State Farm Enterprise").

167.    For ease of reference, the foregoing association-in-fact enterprises will sometimes be referred to collectively herein as the "RICO Enterprises".

**A.**    **Standing, Causation and Injury**

168.    Plaintiff and the members of the respective classes defined below ("Classes") are each "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

169.    Defendant Insurers (State Farm, Allstate, GEICO, Progressive, Farmers, Liberty Mutual and Nationwide) are each "persons" within the meaning of 18 U.S.C. § 1961(3).

170.    Plaintiff and each member of the Classes have sustained injury to business or property as a result of the Defendant Insurers' acts as alleged herein.  The injury to Plaintiff and the members of the Classes is under-compensation for collision repair work and services on vehicles covered by insurance, including the suppression of hourly labor rates, suppression of compensation for "paint and materials", suppression of compensation for parts, and suppression of compensation for the scope and extent of the repair procedures performed.

171.    But for Defendant Insurers' wrongful conduct, Plaintiff and the members of the Classes would have received more in compensation and would not have suffered injury.

172.    The loss in compensation suffered by Plaintiff and the members of the Classes was proximately caused by Defendant Insurers, in that their fraudulent conduct was a direct and substantial factor in brings about their injuries.

173.    Plaintiff and the members of the Classes were the victims directly injured by Defendant Insurers' fraudulent conduct.

174.    The injuries caused by Defendant Insurers are the result of the conduct of the respective association-in-fact RICO Enterprises through a pattern of racketeering activity.

175.    Plaintiff and the members of the Classes were paid compensation by Defendant Insurers for their repair work and services predicated on material misrepresentations and omissions concerning prevailing rates, market values and industry standards as described herein, and Plaintiff and the members of the Classes would not have accepted the suppressed compensation for repair work and services, i.e., being paid less for their repair work and services, but for Defendant Insurers' conduct.

176.    The injuries sustained by Plaintiff and the members of the Classes were caused by overt acts in furtherance of the Defendant Insurers' respective conspiracies in violation of 18 U.S.C. § 1962(c), including the misrepresentation of the prevailing rates for repairs and the artificial suppression of compensation for repair work and services performed on vehicles covered by Defendant Insurers

**B.     The RICO Enterprises**

177.    As described below each of the RICO Enterprises has an ascertainable structure separate and distinct from the members of the enterprise.  In addition, the pattern of racketeering activity of each enterprise is separate and apart from the business conducted by the members of each enterprise.

178.    Defendant Insurers conducted the respective enterprises through a pattern of racketeering activity by fraudulently establishing and misrepresenting the prevailing rate for collision repairs to vehicles covered by insurance, including: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repairs; and (4) parts prices.

179.    As a direct and proximate result of the fraudulent conduct, Defendant Insurers were able to and did suppress compensation for collision repair work and services to repair facilities that were not part of the respective Defendant Insurers' DRP networks, and repair facilities that were not part of the respective Defendant Insurers' DRP networks were paid less than they otherwise would have been paid but for Defendant Insurers' conduct.

180.    Each enterprise has: (i) a purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to permit the associates to pursue the enterprise's purpose.

### 1.    Purpose of the RICO Enterprises

181.    The RICO Enterprises are continuous, ongoing organizations associated for the common purpose of establishing and promulgating the prevailing rate for damage repairs to vehicles covered by the respective Defendant Insurers, including: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repair procedures; and (4) parts prices.

182.    The RICO Enterprises have respectively engaged in a pattern of racketeering activity by misrepresenting the prevailing rate for collision repairs, artificially suppressing compensation to repair facilities that are not part of each Defendant Insurer's DRP network.

### 2.    Relationships Among the Associates in the RICO Enterprises

183.    Each of the respective RICO Enterprises has an existence and structure distinct from its members.  All of the Defendant Insurers are separate corporate entities, as are the Information Providers.  And, with respect to the State Farm Enterprise, the State Farm Select Service facilities likewise are separate and distinct from State Farm.

85

184. Further, each member of the respective RICO Enterprises has an existence separate and apart from the pattern of racketeering activities of the RICO Enterprises, and each member of the respective RICO Enterprises engages in operations that are distinct from their activities on behalf of the RICO Enterprises. Defendant Insurers all issue automotive insurance – as well as other lines of insurance. The Information Providers not only license and/or sell product packages to insurers and repair facilities, including, without limitation, programs to prepare estimates for vehicle damage repairs as well as claims and operational management programs, but they also license and/or sell additional analytics programs concerning other types of claims and business. With respect to the State Farm Enterprise, State Farm's Select Service facilities are engaged in the business of performing automotive repairs for insured and non-insured vehicles.

185. Each member of the RICO Enterprises has conducted or participated in the affairs of the RICO Enterprises, directly or indirectly, has facilitated the unlawful racketeering activities of the RICO Enterprises, and has a well-defined role in the RICO Enterprises.

### a. The Allstate Enterprise

186. With respect to the Allstate Enterprise, Allstate establishes and maintains artificial prevailing rates for repairs, including, without limitation: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repair procedures; and (4) parts prices. These prevailing rates were and are established through pre-determined arrangements with Allstate's network of DRP facilities, which have agreed (willingly or not) to abide by Allstate's prevailing rates, estimating profile with CCC, and company estimating protocol, as well as CCC's estimating program that Allstate is able to exploit in promulgating the scope and extent of compensable repair procedures, based on, among other

things, the manner in which the CCC estimating program is written and designed, as well as

CCC's determination of labor times and procedures as described above. The repair estimates

prepared by Allstate's DRP facilities, as well as those prepared by Allstate for its DRP facilities

or for repairs performed by non-Allstate DRP facilities, serve as the industry repair data

maintained by the Allstate's Information Provider, CCC, upon which the purported prevailing

rates are based.

187.    When negotiating or dealing with non-Allstate DRP facilities that are performing

repairs on vehicles covered by Allstate insurance, Allstate represents that deviations in hourly

labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair

procedures that are contained in non-Allstate DRP repair estimates, and/or parts prices, do not

constitute the prevailing rates in the industry and/or that no other repair facilities (in Allstate's

artificially drawn geographic regions) charge the hourly labor rates, reimbursement rates for

"paint and materials", for the scope and extent of compensable repair procedures, and/or the

parts prices in question. In addition, Allstate conceals the foundation and basis for the purported

prevailing rates and the manner in which such prevailing rates are determined and maintained, in

forcing and coercing non-Allstate DRP facilities to accept artificially suppressed compensation

for the repairs performed.

188.    CCC aggregates, maintains and provides data that it promulgates as representative

of industry prevailing rates for hourly labor rates, reimbursement for "paint and materials" and

parts prices. In addition, to make their estimating program more amenable to insurer

exploitation, CCC: (i) reports time studies supporting designated labor times that are outdated,

incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and

equipment; (ii) re-works time studies so that CCC is able to report results that are satisfactory to

Allstate (and other insurers) (i.e., results which reduce the labor times designated for repair procedures); (iii) bundles numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposes formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapses and combines procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (vi) commonly shifts necessary repair procedures to "Not Included" or discretionary categories, enabling Allstate (and other insurers) to avoid compensating repair facilities for their work as unnecessary or not competitive.

189.    Further, CCC has written its estimating program so that any time a labor time is changed or a procedure is added per the program or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted for audit by Allstate (and other insurers).

190.    Further, CCC provides a scrubber program (upon information and belief, "AccuMark Advisor"), to Allstate, enabling Allstate to search repair estimates prepared using CCC's estimating program and remove or highlight specific procedures and labor times (as well as hourly labor rates, reimbursement rates for "paint and materials" and parts prices) that do not comport with, or deviate from Allstate's estimating profile or company protocol.

191.    Accordingly, CCC was and is a vital participant in the Allstate Enterprise, without which the scheme and acts of racketeering could not be accomplished.

### b.    The GEICO Enterprise

192.    With respect to the GEICO Enterprise, GEICO establishes and maintains artificial prevailing rates for repairs, including, without limitation: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repair

procedures; and (4) parts prices. These prevailing rates were and are established through pre-determined arrangements with GEICO's network of DRP facilities, which have agreed (willingly or not) to abide by GEICO's prevailing rates, estimating profile and company estimating protocol, as well as CCC's estimating program that GEICO is able to exploit in promulgating the scope and extent of compensable repair procedures, based on, among other things, the manner in which the CCC estimating program is written and designed, as well as CCC's determination of labor times and procedures as described above. The repair estimates prepared by GEICO's DRP facilities, as well as those prepared by GEICO for its DRP facilities or for repairs performed by non-GEICO DRP facilities, serve as the industry repair data maintained by GEICO's Information Provider, CCC, upon which the purported prevailing rates are based.

193. When negotiating or dealing with non-GEICO DRP facilities that are performing repairs on vehicles covered by GEICO insurance, GEICO represents that deviations in hourly labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair procedures, and/or parts prices, do not constitute the prevailing rates in the industry and/or that no other repair facilities (in GEICO's artificially drawn geographic regions) charge the hourly labor rates, reimbursement rates for "paint and materials", for the scope and extent of compensable repair procedures, and/or the parts prices in question. In addition, GEICO conceals the foundation and basis for the purported prevailing rates and the manner in which such prevailing rates are determined and maintained, in forcing and coercing non-GEICO DRP facilities to accept artificially suppressed compensation for the repairs performed.

194. CCC aggregates, maintains and provides data that it promulgates as representative of industry prevailing rates for hourly labor rates, reimbursement for "paint and materials" and parts prices. In addition, to make their estimating program more amenable to insurer

exploitation, CCC: (i) reports time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-works time studies so that CCC is able to report results that are satisfactory to GEICO (and other insurers) (i.e., results which reduce the labor times designated for repair procedures); (iii) bundles numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposes formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapses and combines procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (vi) commonly shifts necessary repair procedures to "Not Included" or discretionary categories, enabling GEICO (and other insurers) to avoid compensating repair facilities for their work as unnecessary or not competitive.

195.    Further, CCC has written its estimating program so that any time a labor time is changed or a procedure is added per the program or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted for audit by GEICO (and other insurers).

196.    Further, CCC provides a scrubber program (upon information and belief, "AccuMark Advisor"), to GEICO, enabling GEICO to search repair estimates prepared using CCC's estimating program and remove or highlight specific procedures and labor times (as well as hourly labor rates, reimbursement rates for "paint and materials" and parts prices) that do not comport with, or deviate from GEICO's estimating profile or company protocol.

197.    Accordingly, CCC was and is a vital participant in the GEICO Enterprise, without which the scheme and acts of racketeering could not be accomplished.

90

### c.     **The Progressive Enterprise**

198.    With respect to the Progressive Enterprise, Progressive establishes and maintains artificial prevailing rates for repairs, including, without limitation: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repair procedures; and (4) parts prices. These prevailing rates were and are established through pre-determined arrangements with Progressive network of DRP facilities, which have agreed (willingly or not) to abide by Progressive's prevailing rates, estimating profile and company estimating protocol, as well as Mitchell's estimating program that Progressive is able to exploit in promulgating the scope and extent of compensable repair procedures, based on, among other things, the manner in which the Mitchell estimating program is written and designed, as well as Mitchell's determination of labor times and procedures as described above. The repair estimates prepared by Progressive's DRP facilities, as well as those prepared by Progressive for its DRP facilities or for repairs performed by non- Progressive DRP facilities, serve as the industry repair data maintained by Progressive's Information Provider, Mitchell, upon which the purported prevailing rates are based.

199.    When negotiating or dealing with non- Progressive DRP facilities that are performing repairs on vehicles covered by Progressive insurance, Progressive represents that any deviation in hourly labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair procedures, and/or parts prices do not constitute the prevailing rates in the industry, and/or that no other repair facilities (in Progressive's artificially drawn geographic regions) charge the hourly labor rates, reimbursement rates for "paint and materials", for the scope and extent of compensable repair procedures, and/or parts prices in question. In addition, Progressive conceals the foundation and basis for the purported prevailing rates and the manner

91

in which such prevailing rates are determined and maintained, in forcing and coercing non-Progressive DRP facilities to accept artificially suppressed compensation for the repairs performed.

200.    Mitchell aggregates, maintains and provides data that it promulgates as representative of industry prevailing rates for hourly labor rates, reimbursement for "paint and materials" and parts prices.  In addition, to make their estimating program more amenable to insurer exploitation, Mitchell: (i) reports time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-works time studies so that Mitchell is able to report results that are satisfactory to Progressive (and other insurers) (i.e., results which reduce the labor times designated for repair procedures); (iii) bundles numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposes formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapses and combines procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (vi) commonly shifts necessary repair procedures to "Not Included" or discretionary categories, enabling Progressive (and other insurers) to avoid compensating repair facilities for their work as unnecessary or not competitive.

201.    Further, Mitchell has written its estimating program so that any time a labor time is changed or a procedure is added per the program or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted for audit by Progressive (and other insurers).

202.    Further, Mitchell provides a scrubber program (upon information and belief, "WorkCenter Review and Compliance Manager" or "Compliance Utility"), to Progressive, enabling Progressive to search repair estimates prepared using Mitchell's estimating program and remove or highlight specific procedures and labor times (as well as hourly labor rates, reimbursement rates for "paint and materials" and parts prices) that do not comport with, or deviate from, Progressive's estimating profile or company protocol.

203.    Accordingly, Mitchell was and is a vital participant in the Progressive Enterprise, without which the scheme and acts of racketeering could not be accomplished.

### d.      The Farmers Enterprise

204.    With respect to the Farmers Enterprise, Farmers establishes and maintains artificial prevailing rates for repairs, including, without limitation: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repair procedures; and (4) parts prices.  These prevailing rates were and are established through pre-determined arrangements with Farmers' network of DRP facilities, which have agreed (willingly or not) to abide by Farmers' prevailing rates, estimating profile and company estimating protocol, as well as CCC's estimating program that Farmers is able to exploit in promulgating the scope and extent of compensable repair procedures, based on, among other things, the manner in which the CCC estimating program is written and designed, as well as CCC's determination of labor times and procedures as described above.  The repair estimates prepared by Farmers' DRP facilities, as well as those prepared by Farmers for its DRP facilities or for repairs performed by non- Farmers DRP facilities, serve as the industry repair data maintained by Farmers' Information Provider, CCC, upon which the purported prevailing rates are based.

205. When negotiating or dealing with non-Farmers DRP facilities that are performing repairs on vehicles covered by Farmers insurance, Farmers represents that deviations in hourly labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair procedures, and/or parts prices do not constitute the prevailing rates in the industry, and/or that no other repair facilities (in Farmers' artificially drawn geographic regions) charge the hourly labor rates, reimbursement rates for "paint and materials", for the scope and extent of compensable repair procedures, and/or parts prices in question. In addition, Farmers conceals the foundation and basis for the purported prevailing rates and the manner in which such prevailing rates are determined and maintained, in forcing and coercing non- Farmers DRP facilities to accept artificially suppressed compensation for the repairs performed.

206. CCC aggregates, maintains and provides data that it promulgates as representative of industry prevailing rates for hourly labor rates, reimbursement for "paint and materials" and parts prices. In addition, to make their estimating program more amenable to insurer exploitation, CCC: (i) reports time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-works time studies so that CCC is able to report results that are satisfactory to Farmers (and other insurers) (i.e., results which reduce the labor times designated for repair procedures); (iii) bundles numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposes formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapses and combines procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (vi) commonly shifts necessary repair procedures to

94

"Not Included" or discretionary categories, enabling Farmers (and other insurers) to avoid compensating repair facilities for their work as unnecessary or not competitive.

207.    Further, CCC has written its estimating program so that any time a labor time is changed or a procedure is added per the program or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted for audit by Farmers (and other insurers).

208.    Further, CCC provides a scrubber program (upon information and belief, "AccuMark Advisor"), to Farmers, enabling Farmers to search repair estimates prepared using CCC's estimating program and remove or highlight specific procedures and labor times (as well as hourly labor rates, reimbursement rates for "paint and materials" and parts prices) that do not comport with, or deviate from, Farmers' estimating profile or company protocol.

209.    Accordingly, CCC was and is a vital participant in the Farmers Enterprise, without which the scheme and acts of racketeering could not be accomplished.

### e.      The Liberty Mutual Enterprise

210.    With respect to the Liberty Mutual Enterprise, Liberty Mutual establishes and maintains artificial prevailing rates for repairs, including, without limitation: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repair procedures; and (4) parts prices.  These prevailing rates were and are established through pre-determined arrangements with Liberty Mutual's network of DRP facilities, which have agreed (willingly or not) to abide by Liberty Mutual's prevailing rates, estimating profile and company estimating protocol, as well as Audatex's estimating program (and, as it concerns Safeco, CCC's estimating program), that Liberty Mutual is able to exploit in promulgating the scope and extent of compensable repair procedures, based on, among other things, the manner in

95

which the Audatex and CCC estimating programs are written and designed, as well as Audatex's and CCC's determination of labor times and procedures as described above. The repair estimates prepared by Liberty Mutual's DRP facilities, as well as those prepared by Liberty Mutual for its DRP facilities or for repairs performed by non- Liberty Mutual DRP facilities, serve as the industry repair data maintained by Liberty Mutual's Information Providers, Audatex and CCC, upon which the purported prevailing rates are based.

211.    When negotiating or dealing with non-Liberty Mutual DRP facilities that are performing repairs on vehicles covered by Liberty Mutual insurance, Liberty Mutual represents that deviations in hourly labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair procedures, and/or parts prices do not constitute the prevailing rates in the industry, and/or that no other repair facilities (in Liberty Mutual's artificially drawn geographic regions) charge the hourly labor rates, reimbursement rates for "paint and materials", for the scope and extent of compensable repair procedures, and/or the parts prices in question. In addition, Liberty Mutual conceals the foundation and basis for the purported prevailing rates and the manner in which such prevailing rates are determined and maintained, in forcing and coercing non-Liberty Mutual DRP facilities to accept artificially suppressed compensation for the repairs performed.

212.    Audatex and CCC aggregate, maintain and provide data that they promulgate as representative of industry prevailing rates for hourly labor rates, reimbursement for "paint and materials" and parts prices. In addition, to make their estimating programs more amenable to insurer exploitation, Audatex and CCC: (i) report time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-work time studies so that Audatex and CCC are able to

96

report results that are satisfactory to Liberty Mutual (and other insurers) (i.e., results which reduce the labor times designated for repair procedures); (iii) bundles numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposes formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapses and combines procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (vi) commonly shifts necessary repair procedures to "Not Included" or discretionary categories, enabling Liberty Mutual (and other insurers) to avoid compensating repair facilities for their work as unnecessary or not competitive.

213.    Further, Audatex and CCC have written their estimating programs so that any time a labor time is changed or a procedure is added per the program or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted for audit by Liberty Mutual (and other insurers).

214.    Further, Audatex and CCC provide scrubber programs (upon information and belief, "Estimate Check" for Audatex and "AccuMark Advisor" for CCC), to Liberty Mutual, enabling Liberty Mutual to search repair estimates prepared using Audatex's and CCC's estimating program and remove or highlight specific procedures and labor times (as well as hourly labor rates, reimbursement rates for "paint and materials" and parts prices) that do not comport with, or deviate from, Liberty Mutual's estimating profile or company protocol.

215.    Accordingly, Audatex and CCC were and are vital participants in the Liberty Mutual Enterprise, without which the scheme and acts of racketeering could not be accomplished.

97

**f.**     **The Nationwide Enterprise**

216.     With respect to the Nationwide Enterprise, Nationwide establishes and maintains artificial prevailing rates for repairs, including, without limitation: (1) hourly labor rates; (2) reimbursement for "paint and materials"; (3) the scope and extent of compensable repair procedures; and (4) parts prices. These prevailing rates were and are established through pre-determined arrangements with Nationwide's network of DRP facilities, which have agreed (willingly or not) to abide by Nationwide's prevailing rates, estimating profile and company estimating protocol, as well as CCC's estimating program that Nationwide is able to exploit in promulgating the scope and extent of compensable repair procedures, based on, among other things, the manner in which the CCC estimating program is written and designed, as well as CCC's determination of labor times and procedures as described above. The repair estimates prepared by Nationwide's DRP facilities, as well as those prepared by Nationwide for its DRP facilities or for repairs performed by non-Nationwide DRP facilities, serve as the industry repair data maintained by Nationwide's Information Provider, CCC, upon which the purported prevailing rates are based.

217.     When negotiating or dealing with non-Nationwide DRP facilities that are performing repairs on vehicles covered by Nationwide insurance, Nationwide represents that deviations in hourly labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair procedures, and/or parts prices do not constitute the prevailing rates in the industry, and/or that no other repair facilities (in Nationwide's artificially drawn geographic regions) charge the hourly labor rates, reimbursement rates for "paint and materials", for the scope and extent of compensable repair procedures, and/or parts prices in question. In addition, Nationwide conceals the foundation and basis for the purported prevailing rates and the manner

in which such prevailing rates are determined and maintained, in forcing and coercing non-Nationwide DRP facilities to accept artificially suppressed compensation for the repairs performed.

218. CCC aggregates, maintains and provides data that it promulgates as representative of industry prevailing rates for hourly labor rates and reimbursement for "paint and materials". In addition, to make their estimating program more amenable to insurer exploitation, CCC: (i) reports time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-works time studies so that CCC is able to report results that are satisfactory to Farmers (and other insurers) (i.e., results which reduce the labor times designated for repair procedures); (iii) bundles numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposes formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapses and combines procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (vi) commonly shifts necessary repair procedures to "Not Included" or discretionary categories, enabling Nationwide (and other insurers) to avoid compensating repair facilities for their work as unnecessary or not competitive.

219. Further, CCC has written its estimating program so that any time a labor time is changed or a procedure is added per the program or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted for audit by Nationwide (and other insurers).

99

220.    Further, CCC provides a scrubber program (upon information and belief,
"AccuMark Advisor"), to Nationwide, enabling Nationwide to search repair estimates prepared
using CCC's estimating program and remove or highlight specific procedures and labor times (as
well as hourly labor rates, reimbursement rates for "paint and materials" and parts prices) that do
not comport with, or deviate from, Nationwide's estimating profile or company protocol.

221.    Accordingly, CCC was and is a vital participant in the Nationwide Enterprise,
without which the scheme and acts of racketeering could not be accomplished.

### g.    The State Farm Enterprise

222.    With respect to the State Farm Enterprise, State Farm establishes and maintains
artificial prevailing rates for repairs, including, without limitation: (1) hourly labor rates; (2)
reimbursement for "paint and materials"; (3) the scope and extent of compensable repair
procedures; and (4) parts prices.  These prevailing rates were and are established through pre-
determined arrangements with State Farm's Select Service network of facilities, which have
agreed to abide by State Farm's prevailing rates, estimating profile and company estimating
protocol, State Farm's survey process (described above), as well as Mitchell's and Audatex's
estimating programs that State Farm is able to exploit in promulgating the scope and extent of
compensable repair procedures, based on, among other things, the manner in which the Mitchell
and Audatex estimating programs are written and designed, as well as Mitchell's and Audatex's
determination of labor times and procedures as described above.  The repair estimates prepared
by State Farm's Select Service facilities, as well as those prepared by State Farm for its Select
Service facilities or for repairs performed by non-State Farm Select Service facilities, serve as
the industry repair data maintained by State Farm's Information Providers, Mitchell and
Audatex, upon which the purported prevailing rates are based.

223.    When negotiating or dealing with non-State Farm Select Service facilities that are performing repairs on vehicles covered by State Farm insurance, State Farm represents that deviations in hourly labor rates, reimbursement for "paint and materials", the scope and extent of compensable repair procedures, and/or parts prices do not constitute the prevailing rates in the industry, and/or that no other repair facilities (in State Farm's artificially drawn geographic regions) charge the hourly labor rates, reimbursement rates for "paint and materials" for the scope and extent of compensable repair procedures, and/or parts prices in question. In addition, State Farm conceals the foundation and basis for the purported prevailing rates and the manner in which such prevailing rates are determined and maintained, in forcing and coercing non-State Farm Select Service facilities to accept artificially suppressed compensation for the repairs performed.

224.    With respect to State Farm's Information Providers, to make their estimating program more amenable to insurer exploitation, Mitchell and Audatex: (i) report time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-work time studies so that Mitchell and Audatex are able to report results that are satisfactory to State Farm (and other insurers) (i.e., results which reduce the labor times designated for repair procedures); (iii) bundle numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) impose formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapse and combine procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and (vi) commonly shift necessary repair procedures to "Not Included" or

101

discretionary categories, enabling State Farm (and other insurers) to avoid compensating repair facilities for their work as unnecessary or not competitive.[23]

225.     Further, Mitchell and Audatex have written their estimating programs so that any time that a labor time is changed or a procedure is added per the program or manually input as a "Not Included" or based on the repairer's judgment, those entries are highlighted for audit by Nationwide (and other insurers).

226.     Further, Mitchell and Audatex provide scrubber programs (upon information and belief, "WorkCenter Review and Compliance Manager" or "Compliance Utility" for Mitchell and "Estimate Check" for Audatex), to State Farm, enabling State Farm to search repair estimates prepared using Mitchell and/or Audatex's estimating programs and remove or highlight specific procedures and labor times (as well as hourly labor rates and reimbursement rates for "paint and materials") that do not comport with, or deviate from, State Farm's estimating profile or company protocol.

227.     Accordingly, Mitchell and Audatex were vital participants in the State Farm Enterprise, without which the scheme and acts of racketeering could not be accomplished.

228.     State Farm's Select Service facilities were and are vital participants in the State Farm Enterprise, without which the scheme and acts of racketeering could not be accomplished. *All* Select Services facilities enter into uniform, written contracts with State Farm – outlining uniform rights and obligations, are required to satisfy the same standards and undergo the same training, utilize the State Farm estimating profile and company estimating protocol, use similar repair methodologies, participate in State Farm's on-line survey to establish State Farm's

---

[23] Mitchell and Audatex also aggregate, maintain and provide data that they promulgate as representative of industry prevailing rates for hourly labor rates and reimbursement for "paint and materials" (as well as parts prices), but State Farm generally relies upon its survey methodology to establish these prevailing rates.

prevailing rates, afford State Farm with the most competitive pricing for all repair compensation, and abide by State Farm's uniform compensation.

229.    State Farm Select Service facilities all understand that they are part of a centralized program by which State Farm has implemented a uniform industry repair protocol for performing repairs and determining compensation.  At the same time, each of the Select Service facilities understand the essential nature of the scheme to establish and enforce industry prevailing rates (and estimating protocol) and knowingly agreed to participate – even, assuming that Select Service facilities did so solely because they deemed participating in the program fundamental to their economic survival, and/or because they were intimidated or coerced to do so.  By the same token, as described above, the Select Service facilities are vital to State Farm's establishment and maintenance of its prevailing rates in order to artificially suppress compensation for repairs.

### h.    Conduct of the Members in the RICO Enterprises

230.    As described herein, each and every one of the Defendant Insurers conducted or participated, directly or indirectly, in the conduct of the unlawful acts of the respective RICO Enterprises, and each of the members of the respective RICO Enterprises participated, directly or indirectly, in the conduct of the unlawful acts of the respective RICO Enterprises.

231.    These acts were taken in furtherance of the unlawful purpose of the respective RICO Enterprises.

### 3.    Continuous Existence of the RICO Enterprises

232.    At all material times, the respective RICO Enterprises all had an ongoing and continuous existence sufficient to pursue the purpose of each of the RICO Enterprises.

233.    As described herein, in each of the RICO Enterprises, there was interdependence between and/or among the members in pursuing the unlawful purpose of the respective RICO Enterprises, which could not have been accomplished without the participation of each member.

234.    Each of the RICO Enterprises has demonstrated a continuity of membership and purpose exceeding a period of two years, which is ongoing and continuing.

235.    Further, each member of the respective RICO Enterprises was aware of the purpose of the RICO Enterprises to establish artificial prevailing rates for insured repairs, which resulted in suppressed compensation for those repairs.

### C.    Pattern of Racketeering Activity

236.    As it concerns each of the respective RICO Enterprises, Defendant Insurers have all engaged in a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5), by committing in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. § 1343 (wire fraud) within at least the past ten years.  Indeed, during all material times, Defendant Insurers have committed innumerable acts of racketeering activity, as described herein, including the establishment of artificial prevailing rates for insured repairs and suppressing compensation for those repairs.

237.    Further, as it concerns each of the respective RICO Enterprises, all of the racketeering acts were related, had a common purpose, involved the same (or similar) participants, involved the same (or similar) methods for committing the acts, achieved similar results, and impacted similar victims – including Plaintiff and the members of the respective Classes.

238.     The predicate acts of racketeering that Defendant Insurers' respectively committed were related to each other, pose a threat of continued racketeering activity, and constitute a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

**D.     Predicate Acts**

239.     Pursuant to 18 U.S.C. § 1961(1)(B), "racketeering activity" includes, among other things, any act indictable under 18 U.S.C. § 1343 (relating to wire fraud).  As described herein, Defendant Insurers have engaged and continued to engage in conduct violating the foregoing statute in conducting and effectuating their fraudulent schemes.

240.     In order to execute the respective schemes to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts prices, and to suppress compensation and maintain suppressed compensation for those repairs, Defendant Insurers, in violation of 18 U.S.C. § 1343, transmitted and/or received and/or created by, or as the result of, wire, documents, materials and information including, without limitation, repair estimates and repair estimate supplements prepared using CCC, Audatex and/or Mitchell estimating programs – which are all internet based, repair estimates and repair estimate supplements exchanged with non-DRP facilities through independent vendors such as Performance Gateway or otherwise, data and other programs provided by CCC, Audatex and/or Mitchell, estimating profiles with CCC, Audatex and/or Mitchell, licensing and other contractual documents exchanged between the respective Defendant Insurers and CCC, Audatex and/or Mitchell, DRP agreements exchanged between the respective Defendant Insurers and their DRP facilities, repair assignments from the respective Defendant Insurers to their DRP facilities (and non-DRP facilities) and payments for repairs.  In addition, with respect to the State Farm Enterprise, State Farm also transmitted and/or received

105

and/or created by, or as the result of, wire, information through its on-line survey process with

Select Service facilities and non-State Farm Select Service facilities, by which it purports to

establish prevailing rates for, among other things, hourly labor rates, reimbursement for "paint

and materials", parts prices and certain compensable repair procedures.

241.    Defendant Insurers committed the violations of the aforementioned law, rendering

them indictable, pursuant to 18 U.S.C. § 2, as principals in the offenses of 18 U.S.C. § 1343.

242.    The majority of the precise dates of Defendant Insurers' use of the wire facilities

cannot be fully alleged without access to and discovery of Defendant Insurers' records.

However, Defendant Insurers engaged in thousands, if not millions, of acts in furtherance of their

fraudulent scheme, including, without limitation:

> (1) preparing repair estimates and repair estimate supplements – and causing their
> DRP facilities to prepare repair estimates and repair estimate supplements – using
> their respective estimating profiles with CCC, Audatex and/or Mitchell and
> company estimating protocols, which constrained the scope and extent of
> compensable repair procedures, hourly labor rates, reimbursement for "paint and
> materials" and/or parts prices;

> (2) using scrubber programs from CCC, Audatex and/or Mitchell – or any
> independent audit program such as Performance Gateway – to review repair
> estimates and repair estimate supplements to constrain the scope and extent of
> compensable repair procedures, hourly labor rates, reimbursement for "paint and
> materials" and/or parts prices;

> (3) establishing, promulgating, reporting, and falsely representing the prevailing
> rates for the scope and extent of compensable repair procedures, hourly labor
> rates, reimbursement for "paint and materials" and/or parts prices, as well as
> concealing and omitting the invalid bases for these falsified prevailing rates; and

> (4) entering into agreements with DRP facilities to establish and maintain
> prevailing rates for the purpose of suppressing compensation for the scope and
> extent of compensable repair procedures, hourly labor rates, reimbursement for
> "paint and materials" and/or parts prices.

243.    Defendant Insurers' knowing and intentional misrepresentations, concealment and

omissions of material facts concerning the prevailing rates were made for the purpose of

106

deceiving Plaintiff and the members of the Classes to accept artificially suppressed compensation for insured repairs.

244.    Defendant Insurers knew or recklessly disregarded the fact that their misrepresentations, concealment and omissions were material, and that non-DRP facilities would incur a loss in the form of suppressed compensation for insured repairs based on their fraudulent conduct in maintaining artificial prevailing rates for insured repairs.

245.    Though not necessary to state a violation of the wire fraud statute, Plaintiff and the members of the Classes relied to their detriment on the material misrepresentations, concealment and omissions concerning the prevailing rates for insured repairs (with the assistance of the Information Providers), as demonstrated by, among other things, the fact that they accepted suppressed compensation for the insured repairs performed.  Plaintiff and the members of the Classes had no reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of Defendant Insurers' representations of their purported prevailing rates.

246.    Further, Plaintiff and the members of the Classes were required to accept suppressed compensation for insured repairs if they wanted business from Defendant Insurers. Accordingly, Defendant Insurers have withheld money and property belonging to Plaintiff and the members of the Classes, and Plaintiff and the members of the Classes have been injured in their business or property by virtue of Defendant Insurers' overt acts of wire fraud resulting in suppressed compensation for repairs.

####    E.    __Interstate Commerce__

247.    The respective RICO Enterprises engaged in and affected interstate commerce in that the RICO Enterprises involved activities across state boundaries, including, among other things, utilizing the interstate wires to prepare estimates for claim repairs to vehicles covered by insurance, transmitting repair estimates for claim repairs to vehicles covered by insurance, transmitting funds to repair facilities to pay for repairs performed on vehicles covered by insurance, transmitting contracts and written guidelines, instructions and directives to DRP facilities (and non-DRP facilities), and transmitting other forms of business communications and transactions in a continuous and uninterrupted flow of commerce.

## VI.    __PLAINTIFF'S SUPPRESSED COMPENSATION__

248.    At all material times, Plaintiff has performed – and continues to perform – collision repair services for vehicles covered and paid by or through each of the Defendant Insurers.  By way of example, during the past four years, Plaintiff has been subjected to the following conduct by the Defendant Insurers, resulting in shortfalls in compensation for collision repairs that have not been recovered.

### __State Farm__

249.    In connection with collision repair services by Plaintiff in 2010, State Farm, among other things, prepared estimates and estimate supplements on October 18, October 22 and November 4, 2010.  Plaintiff notified State Farm that the amount due for the repairs was $2,260.30, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $1,827.33, resulting in a shortfall of compensation in the amount of $433.07.

250.    In connection with collision repair services by Plaintiff in 2011, State Farm, among other things, prepared estimates and estimate supplements on January 20, January 26,

108

February 3 and February 15, 2011. Plaintiff notified State Farm that the amount due for the repairs was $3,900.14, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $3,433.69, resulting in a shortfall of compensation in the amount of $466.45.

251.     In connection with collision repair services by Plaintiff in 2010-2011, State Farm, among other things, prepared estimates and estimate supplements on November 2, 2010 and January 6, March 15, April 4 and April 14, 2011. Plaintiff notified State Farm that the amount due for the repairs was $8,438.14, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $7,297.37, resulting in a shortfall of compensation in the amount of $1,140.77.

252.     In connection with collision repair services by Plaintiff in 2011, State Farm, among other things, prepared estimates and estimate supplements on June 13 and June 21, 2011. Plaintiff notified State Farm that the amount due for the repairs was $2,412.59, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $2,084.20, resulting in a shortfall of compensation in the amount of $328.39.

253.     In connection with collision repair services by Plaintiff in 2011-2012, State Farm, among other things, prepared estimates and estimate supplements on December 14, 2011 and January 10 and January 23, 2012. Plaintiff notified State Farm that the amount due for the repairs was $6,669.51, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $5,547.88, resulting in a shortfall of compensation in the amount of $1,121.63.

254.     In connection with collision repair services by Plaintiff in 2012, State Farm, among other things, prepared estimates and estimate supplements on May 4, June 5 and June 13,

2012.  Plaintiff notified State Farm that the amount due for the repairs was $5,099.74, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $5,047.88, resulting in a shortfall of compensation in the amount of $795.56.

255.    In connection with collision repair services by Plaintiff in 2013, State Farm, among other things, prepared estimates and estimate supplements on February 27, March 5, March 13, March 27 and April 3, 2013.  Plaintiff notified State Farm that the amount due for the repairs was $12,688.65, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $10,174.35, resulting in a shortfall of compensation in the amount of $2,514.30.

256.    In connection with collision repair services by Plaintiff in 2013, State Farm, among other things, prepared estimates and estimate supplements on April 3, April 8, April 12, twice on April 23 and May 7, 2013.  Plaintiff notified State Farm that the amount due for the repairs was $17,358.92, but payments from State Farm (and any applicable deductible from an insured) to Plaintiff totaled $13,299.20, resulting in a shortfall of compensation in the amount of $4,059.72.

257.    Plaintiff's charges for each of the foregoing repairs were based on reasonable rates and costs, as well as reasonable and necessary repair procedures.

258.    In connection with each of the foregoing repairs, State Farm represented to Plaintiff that its charges for the repairs were not in accordance with prevailing rates, including, labor rates, "paint and materials", the scope and extent of compensable repair procedures, and/or parts.

259.    In connection with each of the foregoing repairs, the shortfall failed to compensate or fully compensate Plaintiff for, among other things, labor rates and the type of

110

labor; "paint and materials,"; parts; the scope and extent of compensable procedures, including, without limitation, additional labor operations and labor time; assembly; refinishing operations; diagnoses and inspection; set-up and preparation for repairs; disconnecting, dissembling, reconnecting and/or resetting; testing and transporting; operations to clean and prepare the vehicle for return, clean-up and disposal; and/or costs incurred in connection with vendors for materials, service, storage and the like.

260. The foregoing examples of State Farm's shortfall in compensation were the result of State Farm's systematic adherence to its estimating profile and company estimating protocol and guidelines, and prevailing rates, notwithstanding that all work, services and charges were required and necessary to perform the repairs in a professionally competent manner and restore the vehicles to the appropriate condition.

### Allstate

261. In connection with collision repair services by Plaintiff in 2011, Allstate, among other things, prepared estimates and estimate supplements on August 25, September 12, September 26, October 6 and October 12, 2011. Plaintiff notified Allstate that the amount due for the repairs was $17,164.58, but payments from Allstate (and any applicable deductible from an insured) to Plaintiff totaled $15,792.26, resulting in a shortfall of compensation in the amount of $1,372.32.

262. In connection with collision repair services by Plaintiff in 2011, Allstate, among other things, prepared estimates and estimate supplements on May 27, June 22 and July 1, 2011. Plaintiff notified Allstate that the amount due for the repairs was $2,230.85, but payments from Allstate (and any applicable deductible from an insured) to Plaintiff totaled $2,151.99, resulting in a shortfall of compensation in the amount of $78.86.

263.     In connection with collision repair services by Plaintiff in 2012-2013, Allstate, among other things, prepared estimates and estimate supplements on December 6 and December 31, 2012, and January 28, February 4, February 15 and February 21, 2013.  Plaintiff notified Allstate that the amount due for the repairs was $19,530.96, but payments from Allstate (and any applicable deductible from an insured) to Plaintiff totaled $17,321.43, resulting in a shortfall of compensation in the amount of $2,209.53.

264.     Plaintiff's charges for each of the foregoing repairs were based on reasonable rates and costs, as well as reasonable and necessary repair procedures.

265.     In connection with each of the foregoing repairs, Allstate represented to Plaintiff that its charges for the repairs were not in accordance with prevailing rates, including, labor rates, "paint and materials", the scope and extent of compensable repair procedures, and/or parts.

266.     In connection with each of the foregoing repairs, the shortfall failed to compensate or fully compensate Plaintiff for, among other things, labor rates and the type of labor; "paint and materials,"; parts; the scope and extent of compensable procedures, including, without limitation, additional labor operations and labor time; assembly; refinishing operations; diagnoses and inspection; set-up and preparation for repairs; disconnecting, dissembling, reconnecting and/or resetting; testing and transporting; operations to clean and prepare the vehicle for return, clean-up and disposal; and/or costs incurred in connection with vendors for materials, service, storage and the like.

267.     The foregoing examples of Allstate's shortfall in compensation were the result of Allstate's systematic adherence to its estimating profile and company estimating protocol and guidelines, and prevailing rates, notwithstanding that all work, services and charges were

required and necessary to perform the repairs in a professionally competent manner and restore the vehicles to the appropriate condition.

**GEICO**

268.     In connection with collision repair services by Plaintiff in 2014, GEICO, among other things, prepared estimates and estimate supplements on January 23 and February 19, 2014. Plaintiff notified GEICO that the amount due for the repairs was $2,084.07, but payments from GEICO (and any applicable deductible from an insured) to Plaintiff totaled $1,769.35, resulting in a shortfall of compensation in the amount of $314.72.

269.     In connection with additional collision repair services by Plaintiff in 2014, GEICO, among other things, prepared additional estimates and estimate supplements on January 23 and February 19, 2014.  Plaintiff notified GEICO that the amount due for the repairs was $2,640.26, but payments from GEICO (and any applicable deductible from an insured) to Plaintiff totaling $2,437.65, resulting in a shortfall of compensation in the amount of $202.61.

270.     Plaintiff's charges for each of the foregoing repairs were based on reasonable rates and costs, as well as reasonable and necessary repair procedures.

271.     In connection with each of the foregoing repairs, GEICO represented to Plaintiff that its charges for the repairs were not in accordance with prevailing rates, including, labor rates, "paint and materials", the scope and extent of compensable repair procedures, and/or parts.

272.     In connection with each of the foregoing repairs, the shortfall failed to compensate or fully compensate Plaintiff for, among other things, labor rates and the type of labor; "paint and materials,"; parts; the scope and extent of compensable procedures, including, without limitation, additional labor operations and labor time; assembly; refinishing operations; diagnoses and inspection; set-up and preparation for repairs; disconnecting, dissembling,

reconnecting and/or resetting; testing and transporting; operations to clean and prepare the vehicle for return, clean-up and disposal; and/or costs incurred in connection with vendors for materials, service, storage and the like.

273.     The foregoing examples of GEICO's shortfall in compensation were the result of GEICO's systematic adherence to its estimating profile and company estimating protocol and guidelines, and prevailing rates, notwithstanding that all work, services and charges were required and necessary to perform the repairs in a professionally competent manner and restore the vehicles to the appropriate condition.

### Progressive

274.     In connection with collision repair services by Plaintiff in 2013, Progressive, among other things, prepared estimates and estimate supplements on April 3, April 8, April 13, April 26 and May 1, 2013.  Plaintiff notified Progressive that the amount due for the repairs was $16,779.78, but payments from Progressive (and any applicable deductible from an insured) to Plaintiff totaled $16,163.92, resulting in a shortfall of compensation in the amount of $615.86.

275.     In connection with collision repair services by Plaintiff in 2013-2014, Progressive, among other things, prepared estimates and estimate supplements on December 13, December 24 and December 31, 2013.  Plaintiff notified Progressive that the amount due for the repairs was $5,130.85, but payments from Progressive (and any applicable deductible from an insured) to Plaintiff totaled $3,986.42, resulting in a shortfall of compensation in the amount of $1,144.43.

276.     Plaintiff's charges for each of the foregoing repairs were based on reasonable rates and costs, as well as reasonable and necessary repair procedures.

277.    In connection with each of the foregoing repairs, Progressive represented to Plaintiff that its charges for the repairs were not in accordance with prevailing rates, including, labor rates, "paint and materials", the scope and extent of compensable repair procedures, and/or parts.

278.    In connection with each of the foregoing repairs, the shortfall failed to compensate or fully compensate Plaintiff for, among other things, labor rates and the type of labor; "paint and materials,"; parts; the scope and extent of compensable procedures, including, without limitation, additional labor operations and labor time; assembly; refinishing operations; diagnoses and inspection; set-up and preparation for repairs; disconnecting, dissembling, reconnecting and/or resetting; testing and transporting; operations to clean and prepare the vehicle for return, clean-up and disposal; and/or costs incurred in connection with vendors for materials, service, storage and the like.

279.    The foregoing examples of Progressive's shortfall in compensation were the result of Progressive's systematic adherence to its estimating profile and company estimating protocol and guidelines, and prevailing rates, notwithstanding that all work, services and charges were required and necessary to perform the repairs in a professionally competent manner and restore the vehicles to the appropriate condition.

**Farmers**

280.    In connection with collision repair services by Plaintiff in 2013, Farmers, among other things, prepared estimates and estimate supplements on January 2, January 25, February 15 and March 20, 2013.  Plaintiff notified Farmers that the amount due for the repairs was $10,086.00, but payments from Farmers (and any applicable deductible from an insured) to Plaintiff totaled $9,764.82, resulting in a shortfall of compensation in the amount of $321.18.

115

281.    Plaintiff's charges for each of the foregoing repairs were based on reasonable rates and costs, as well as reasonable and necessary repair procedures.

282.    In connection with the foregoing repairs, Farmers represented to Plaintiff that its charges for the repairs were not in accordance with prevailing rates, including, labor rates, "paint and materials", the scope and extent of compensable repair procedures, and parts.

283.    In connection with the foregoing repairs, the shortfall failed to compensate or fully compensate Plaintiff for, among other things, labor rates and the type of labor; "paint and materials,"; parts; the scope and extent of compensable procedures, including, without limitation, additional labor operations and labor time; assembly; refinishing operations; diagnoses and inspection; set-up and preparation for repairs; disconnecting, dissembling, reconnecting and/or resetting; testing and transporting; operations to clean and prepare the vehicle for return, clean-up and disposal; and/or costs incurred in connection with vendors for materials, service, storage and the like.

284.    The foregoing examples of Farmers' shortfall in compensation were the result of Farmers' systematic adherence to its estimating profile and company estimating protocol and guidelines, and prevailing rates, notwithstanding that all work, services and charges were required and necessary to perform the repairs in a professionally competent manner and restore the vehicle to the appropriate condition.

### Liberty Mutual

285.    In connection with collision repair services by Plaintiff in 2010, Liberty Mutual, among other things, prepared estimates and estimate supplements on May 20, September 30, October 8 and twice on October 27, 2010.  Plaintiff notified Liberty Mutual that the amount due for the repairs was $10,496.56, but payments from Liberty Mutual (and any applicable

116

deductible from an insured) to Plaintiff totaled $9,151.82, resulting in a shortfall of compensation in the amount of $1,344.74.

286.   In connection with collision repair services by Plaintiff in 2011, Liberty Mutual, among other things, prepared estimates and estimate supplements on April 6, April 22 and April 25, 2011.  Plaintiff notified Liberty Mutual that the amount due for the repairs was $9,962.69, but payments from Liberty Mutual (and any applicable deductible from an insured) to Plaintiff totaled $9,085.38, resulting in a shortfall of compensation in the amount of $877.31.

287.   Plaintiff's charges for each of the foregoing repairs were based on reasonable rates and costs, as well as reasonable and necessary repair procedures.

288.   In connection with each of the foregoing repairs, Liberty Mutual represented to Plaintiff that its charges for the repairs were not in accordance with prevailing rates, including, labor rates, "paint and materials", the scope and extent of compensable repair procedures, and parts.

289.   In connection with each of the foregoing repairs, the shortfall failed to compensate or fully compensate Plaintiff for, among other things, labor rates and the type of labor; "paint and materials,"; parts; the scope and extent of compensable procedures, including, without limitation, additional labor operations and labor time; assembly; refinishing operations; diagnoses and inspection; set-up and preparation for repairs; disconnecting, dissembling, reconnecting and/or resetting; testing and transporting; operations to clean and prepare the vehicle for return, clean-up and disposal; and/or costs incurred in connection with vendors for materials, service, storage and the like.

290.   The foregoing examples of Liberty Mutual's shortfall in compensation were the result of Liberty Mutual's systematic adherence to its estimating profile and company estimating

117

protocol and guidelines, and prevailing rates, notwithstanding that all work, services and charges were required and necessary to perform the repairs in a professionally competent manner and restore the vehicles to the appropriate condition.

### Nationwide

291.    In connection with collision repair services by Plaintiff in 2010, Nationwide, among other things, prepared estimates and estimate supplements on January 12 and January 22, 2010.  Plaintiff notified Nationwide that the amount due for the repairs was $1,224.75, but payments from Nationwide (and any applicable deductible from an insured) to Plaintiff totaled $1,068.45, resulting in a shortfall of compensation in the amount of $156.30.

292.    In connection with collision repair services by Plaintiff in 2011, Nationwide, among other things, prepared estimates and estimate supplements on October 4 and October 11, 2011.  Plaintiff notified Nationwide that the amount due for the repairs was $2,496.24, but payments from Nationwide (and any applicable deductible from an insured) to Plaintiff totaled $1,758.16, resulting in a shortfall of compensation in the amount of $738.08.

293.    In connection with collision repair services by Plaintiff in 2011, Nationwide, among other things, prepared estimates and estimate supplements on July 11 (twice), July 28, August 19, August 29 and September 16, 2011.  Plaintiff notified Nationwide that the amount due for the repairs was $16,914.81, but payments from Nationwide (and any applicable deductible from an insured) to Plaintiff totaled $10,222.49, resulting in a shortfall of compensation in the amount of $6,692.32.

294.    In connection with collision repair services by Plaintiff in 2012, Nationwide, among other things, prepared estimates and estimate supplements on November 21 and November 30, 2012.  Plaintiff notified Nationwide that the amount due for the repairs was

118

$2,441.74, but payments from Nationwide (and any applicable deductible from an insured) to Plaintiff totaled $1,824.49, resulting in a shortfall of compensation in the amount of $617.25.

295.     In connection with collision repair services by Plaintiff in 2012, Nationwide, among other things, prepared estimates and estimate supplements on September 20, October 4, October 9, October 19, November 1, November 14 and December 3, 2012.  Plaintiff notified Nationwide that the amount due for the repairs was $20,561.24, but payments from Nationwide (and any applicable deductible from an insured) to Plaintiff totaled $16,143.61, resulting in a shortfall of compensation in the amount of $4,417.63.

296.     In connection with collision repair services by Plaintiff in 2013, Nationwide, among other things, prepared estimates and estimate supplements on February 6 and twice on February 22, 2013.  Plaintiff notified Nationwide that the amount due for the repairs was $4,175.25, but payments from Nationwide (and any applicable deductible from an insured) to Plaintiff totaled $3,618.97, resulting in a shortfall of compensation in the amount of $556.28.

297.     In connection with collision repair services by Plaintiff in 2013-2014, Nationwide, among other things, prepared estimates and estimate supplements on December 23, 2013 and January 23, 2014.  Plaintiff notified Nationwide that the amount due for the repairs was $5,493.63, but payments from Nationwide (and any applicable deductible from an insured) to Plaintiff totaled $3,802.75, resulting in a shortfall of compensation in the amount of $1,690.88.

298.     Plaintiff's charges for each of the foregoing repairs were based on reasonable rates and costs, as well as reasonable and necessary repair procedures.

299.     In connection with each of the foregoing repairs, Nationwide represented to Plaintiff that its charges for the repairs were not in accordance with prevailing rates, including,

labor rates, "paint and materials", the scope and extent of compensable repair procedures, and parts.

300.    In connection with each of the foregoing repairs, the shortfall failed to compensate or fully compensate Plaintiff for, among other things, labor rates and the type of labor; "paint and materials,"; parts; the scope and extent of compensable procedures, including, without limitation, additional labor operations and labor time; assembly; refinishing operations; diagnoses and inspection; set-up and preparation for repairs; disconnecting, dissembling, reconnecting and/or resetting; testing and transporting; operations to clean and prepare the vehicle for return, clean-up and disposal; and/or costs incurred in connection with vendors for materials, service, storage and the like.

301.    The foregoing examples of Nationwide's shortfall in compensation were the result of Nationwide's systematic adherence to its estimating profile and company estimating protocol and guidelines, and prevailing rates, notwithstanding that all work, services and charges were required and necessary to perform the repairs in a professionally competent manner and restore the vehicles to the appropriate condition.

302.    Each and all of the Defendant Insurers used the interstate wires, as more fully described herein, to, among other things, create, transmit and receive repair estimates, communications concerning the repairs and/or process payments for the repairs, as well as materials and information to establish, exchange, process and promulgate the prevailing rates, estimating profile and company estimating protocol.

303.    As a direct and proximate result of Defendants Insurers' unlawful conduct, Plaintiff has suffered the foregoing harm in the form of lost compensation.  Further, none of the

shortfall in compensation was paid by any other source, including insureds and/or vehicle owners.

304.    Accordingly, Plaintiff has standing to assert RICO claims against the Defendant Insurers predicated on Plaintiff's injury to its business or property by virtue of Defendant Insurers' respective RICO violations.

## VII.    CLASS ACTION ALLEGATIONS

305.    Plaintiff brings this action on behalf of itself and all other similarly situated members of the classes pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and seeks certification of the following Classes:

### A.    The Classes:

#### 1.    The State Farm Enterprise Class:

All repair facilities in the United States which, at any time during the period January 1, 2006 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, State Farm; (ii) were not at the time of the automotive collision repair work or services a DRP facility for State Farm; (iii) in connection with such work or services, a repair estimate and/or supplement estimate was prepared using a CCC, Mitchell or Audatex estimating program; and (iv) were compensated for labor, "paint and materials", parts and/or the scope and extent of repair procedures based on a State Farm, prevailing, competitive or industry rate.

#### 2.    The Allstate Enterprise Class:

All repair facilities in the United States which, at any time during the period January 1, 2006 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, Allstate; (ii) were not at the time of the automotive collision repair work or services a DRP facility for Allstate; (iii) in connection with such work or services, a repair estimate and/or supplement estimate was prepared using a CCC, Mitchell or Audatex estimating program; and (iv) were compensated for labor, "paint and materials", parts and/or

the scope and extent of repair procedures based on an Allstate, prevailing, competitive or industry rate.

### 3.      The GEICO Enterprise Class:

All repair facilities in the United States which, at any time during the period January 1, 2006 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, GEICO; (ii) were not at the time of the automotive collision repair work or services a DRP facility for GEICO; (iii) in connection with such work or services, a repair estimate and/or supplement estimate was prepared using a CCC, Mitchell or Audatex estimating program; and (iv) were compensated for labor, "paint and materials", parts and/or the scope and extent of repair procedures based on a GEICO, prevailing, competitive or industry rate.

### 4.      The Progressive Enterprise Class:

All repair facilities in the United States which, at any time during the period January 1, 2006 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, Progressive; (ii) were not at the time of the automotive collision repair work or services a DRP facility for Progressive; (iii) in connection with such work or services, a repair estimate and/or supplement estimate was prepared using a CCC, Mitchell or Audatex estimating program; and (iv) were compensated for labor, "paint and materials", parts and/or the scope and extent of repair procedures based on a Progressive, prevailing, competitive or industry rate.

### 5.      The Farmers Enterprise Class:

All repair facilities in the United States which, at any time during the period January 1, 2006 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, Farmers; (ii) were not at the time of the automotive collision repair work or services a DRP facility for Farmers; (iii) in connection with such work or services, a repair estimate and/or supplement estimate was prepared using a CCC, Mitchell or Audatex estimating program; and (iv) were compensated for labor, "paint and materials", parts and/or the scope and extent of repair procedures based on a Farmers, prevailing, competitive or industry rate.

122

6. **The Liberty Mutual Enterprise Class:**

All repair facilities in the United States which, at any time during the period January 1, 2006 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, Liberty Mutual; (ii) were not at the time of the automotive collision repair work or services a DRP facility for Liberty Mutual; (iii) in connection with such work or services, a repair estimate and/or supplement estimate was prepared using a CCC, Mitchell or Audatex estimating program; and (iv) were compensated for labor, "paint and materials", parts and/or the scope and extent of repair procedures based on a Liberty Mutual, prevailing, competitive or industry rate.

7. **The Nationwide Enterprise Class:**

All repair facilities in the United States which, at any time during the period January 1, 2006 through the date that class notice is disseminated: (i) have performed automotive collision repair work or services on or in connection with a vehicle insured by, or covered under insurance issued by, Nationwide; (ii) were not at the time of the automotive collision repair work or services a DRP facility for Nationwide; (iii) in connection with such work or services, a repair estimate and/or supplement estimate was prepared using a CCC, Mitchell or Audatex estimating program; and (iv) were compensated for labor, "paint and materials", parts and/or the scope and extent of repair procedures based on a Nationwide, prevailing, competitive or industry rate.

306. Excluded from the Classes are Defendants, their officers, directors, management, employees, subsidiaries, and affiliates.

307. Members of the Classes, respectively, are reasonably estimated to be in the thousands or tens of thousands and, therefore, are so numerous that joinder is impracticable. Further, the identity and precise number of the members of the Classes, respectively, is reasonably ascertainable through the respective records of Defendant Insurers.

308. Questions of law and fact common to the members of the respective Classes, respectively, predominate over questions, if any, that may affect only individual members of the Classes, because Defendant Insurers have acted on grounds generally applicable to the respective

Classes and/or have engaged in uniform, systematic conduct with respect to members of the

respective Classes.

309.    Questions of law and fact common to the Classes include, without limitation:

a.      whether Defendant Insurers, respectively, engaged in deceptive schemes
        to establish artificial prevailing rates, and misrepresent and conceal
        material facts about the prevailing rates for: (i) labor rates; (ii) "paint and
        materials" reimbursement"; (iii) parts prices; and/or (iv) the scope and
        extent of compensable repair procedures;

b.      whether Defendant Insurers, respectively, engaged in deceptive schemes
        to suppress compensation to repair facilities, including: (i) labor rates; (ii)
        "paint and materials" reimbursement"; (iii) parts prices; and/or (iv) the
        scope and extent of compensable repair procedures;

c.      whether Defendants Insurers, respectively, prepared repair estimates and
        repair estimate supplements – and caused their DRP facilities to prepare
        repair estimates and repair estimate supplements – using their respective
        estimating profiles with CCC, Audatex and/or Mitchell and company
        estimating protocols, which constrained the scope and extent of
        compensable repair procedures, hourly labor rates, reimbursement for
        "paint and materials" and/or parts prices;

d.      whether Defendant Insurers, respectively, used scrubber programs
        from CCC, Audatex and/or Mitchell – or any independent audit
        program such as Performance Gateway – to review repair
        estimates and repair estimate supplements to constrain the scope
        and extent of compensable repair procedures, hourly labor rates,
        reimbursement for "paint and materials" and/or parts prices;

e.      whether Defendant Insurers, respectively, entered into agreements
        with DRP facilities to establish and maintain prevailing rates for
        the purpose of, and/or which had the effect of, suppressing
        compensation for the scope and extent of compensable repair
        procedures, hourly labor rates, reimbursement for "paint and
        materials" and/or parts prices;

f.      whether Defendant Insurers, respectively, required the members of
        the Classes to accept suppressed compensation for insured
        collision repairs if they wanted business from Defendant Insurers;

g.      whether Defendant Insurers, respectively, steered or withheld business as
        part of their unlawful pattern and practice of conduct;

124

h.      whether (with respect to the State Farm Enterprise Class) State Farm's survey process falsely establishes and/or misrepresents prevailing rates;

i.      whether, as a result of conduct of the respective Defendant Insurers, the CCC, Mitchell and/or Audatex estimating programs are impacted, influenced or tainted by: (i) time studies supporting designated labor times that are outdated, incomplete or improperly extrapolated to procedures involving unrelated vehicles, parts and equipment; (ii) re-worked time studies enabling the Information providers to report results that are satisfactory to insurers (i.e., results which reduce the labor times designated for repair procedures); (iii) bundling numerous repair procedures and tasks to significantly understate the labor time necessary to perform the procedures in a professional and competent manner; (iv) imposing formulas for calculating labor times for procedures that are arbitrary and understated, which do not reflect the labor time necessary to perform the procedures in a professional and competent manner; (v) collapsing and combining procedures to achieve greater overlap to reduce labor times and costs in repair estimates; and/or (vi) shifting necessary repair procedures to "Not Included" or discretionary categories, enabling insurers to avoid compensating repair facilities for their work as unnecessary or not competitive

j.      whether Defendant Insurers, respectively, engaged in wire fraud;

k.      whether Defendant Insurers, respectively, engaged in a pattern of racketeering;

l.      whether the alleged respective RICO Enterprises are "enterprises" within the meaning of 18 U.S.C. § 1961(4);

m.      whether Defendant Insurers, and each of them, conducted or participated in the affairs of the respective RICO Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

n.      whether Defendant Insurers, respectively, fraudulently concealed their conduct.

o.      whether, as a result of Defendant Insurers' respective unlawful conduct, Plaintiff and the Classes received less in compensation for collision repair services for: (i) labor rates; (ii) "paint and materials" reimbursement"; (iii) parts prices; and/or (iv) the scope and extent of compensable repair procedures;

p.      the difference between the compensation that Plaintiff and the members of the Classes received from insured collision repair services, and the compensation that Plaintiff and the members of the Classes would have

125

        received in the absence of the unlawful conduct and effect of the respective RICO Enterprises;

q.      whether Defendant Insurers, respectively, have been unjustly enriched as a result of their conduct.

r.      whether Plaintiff and the members of the Classes are entitled to monetary damages; and

s.      the measure of damages suffered by Plaintiff and the Classes;

310.    Plaintiffs' claims are typical of the claims of the members of the respective Classes. Plaintiffs and the members of the Classes were damaged by, and as a result of, the same wrongful conduct by Defendant Insurers, *i.e.,* they received less in compensation for insured collision repair services.

311.    Plaintiff will fairly and adequately protect and represent the interests of the Classes. Plaintiff's interests are aligned with, and not antagonistic to, those of the Classes.

312.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action litigation, and have particular experience with class action RICO litigation.

313.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Among other things, class treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

314.     Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VIII.     **FRAUDULENT CONCEALMENT**

315.     Each Defendant Insurer (and Conspirator) concealed from Plaintiff and the members of the Classes the fraudulent conduct establishing artificial prevailing rates for insured repairs and suppressing compensation for those repairs.  Each Defendant Insurer (and Conspirator) prevented Plaintiff and the members of the Classes from knowing or discovering the methods by which the artificial prevailing rates for insured repairs were established and by which compensation for those repairs was suppressed.

316.     The efforts by each Defendant Insurer (and Conspirator) to conceal the aforementioned are indicative of the fact that they knew that the conduct was fraudulent.

317.     Each Defendant Insurer (and Conspirator) participated in the unlawful conduct to establish artificial prevailing rates for repairs – as described herein – and, thus, each Defendant Insurer (and Conspirator) knew of the harm that was caused by the unlawful conduct in suppressing compensation for repairs.

318.     Plaintiff did not know, nor could reasonably have known, that it sustained injuries caused by Defendant Insurers' respective uniform policies, patterns and practices as described herein.  Further, the facts necessary to establish Plaintiff's claims alleged herein were intentionally concealed from Plaintiff, which concealment was for the purpose of obtaining delay on the Plaintiff's part in filing a complaint predicate on the claims.

## IX.     **TOLLING OF APPLICABLE STATUTES OF INFORMATION**

319.     Any applicable statutes of limitation have been tolled by the knowing and active concealment of the facts alleged herein by Defendant Insurers (and the Conspirators).  Plaintiff

127

and the members of the Classes were unaware of the facts alleged herein without any fault of

lack of diligence on their part, and could not have reasonably discovered the fraudulent scheme

to establish artificial prevailing rates for insured repairs and suppress compensation for those

repairs.

320.    Based on their knowing, affirmative and/or active concealment of the fraudulent

nature of the scheme to establish artificial prevailing rates for insured repairs and suppress

compensation for those repairs, Defendant Insurers (and the Conspirators) are estopped from

relying on any applicable statutes of limitation.

## X.    CLAIMS FOR RELIEF

### COUNT I

**(Violation of the Racketeer Influenced and Corrupt Organization Act,
18 U.S.C. §§ 1962(c) and (d))
(Against Defendant State Farm Predicated on the State Farm Enterprise)**

321.    Plaintiff incorporates and realleges all of the allegations contained in the

preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the

State Farm Enterprise Class against Defendant State Farm.

322.    Defendant State Farm is and at all relevant times was a "person" within the

meaning of 18 U.S.C. § 1961(3), because it was "capable of holding a legal or beneficial interest

in property."

323.    Defendant State Farm, as described herein, carried out a scheme to defraud

Plaintiff and the State Farm Enterprise Class members by conducting an "enterprise" within the

meaning of 18 U.S.C. § 1961(4).

324.    At all relevant times, the State Farm Enterprise was engaged in, and its activities

affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

325.    By virtue of the conduct alleged herein, Defendant State Farm, in violation of 18

U.S.C. § 1962(c), conducted and participated in the conduct of the State Farm Enterprise's

affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18

U.S.C. § 1961(5).

326.    Defendant State Farm, as described herein, has committed numerous predicate

acts of "racketeering activity", as defined in 18 U.S.C. § 1961(5), prior to and during the class

period, and continued to commit such predicate acts, in furtherance of Defendant State Farm's

scheme to establish artificial prevailing rates for insured repairs, including hourly labor rates,

reimbursement for "paint and materials", compensable repair procedures, and parts, and to

suppress compensation and maintain suppressed compensation for those repairs, including wire

fraud, in violation of 18 U.S.C. § 1343.

327.    In furtherance of its scheme, Defendant State Farm, in violation of 18 U.S.C. §§

1343, 1961 and 1962, regularly and repeatedly used the interstate wires to further all aspects of

the intentional suppression of compensation to Plaintiff and the State Farm Enterprise Class

members by transmitting and/or receiving materials necessary to carry out the scheme to defraud.

328.    These communications were incident to and an essential part of Defendant State

Farm's scheme to defraud as described herein.

329.    Each such use of the U.S. interstate wire facilities alleged herein constituted a

separate and distinct predicate act of "racketeering activity" and collectively, constitutes a

"pattern of racketeering activity".

330.    The State Farm Enterprise was and is engaged in a common purpose to enable

Defendant State Farm to establish artificial prevailing rates for insured repairs, including hourly

labor rates, reimbursement for "paint and materials", compensable repair procedures , and parts,

and to suppress compensation and maintain suppressed compensation for those repairs. As described herein, each member of the State Farm Enterprise (i.e., State Farm, its network of Select Service facilities, Mitchell and Audatex) is necessary and essential to the function and success of the State Farm Enterprise, and the State Farm Enterprise occurred over the course of a number of years, and continues to occur, enabling the pursuit of the common scheme and purpose to defraud. Further, the "pattern of racketeering activity" is related because it involves common persons, common practices, common results impacting common victims, and is continuous because it occurred over the course of a number of years, constitutes and promotes the common purpose of the State Farm Enterprise, such that it poses a threat of continued racketeering activity. Defendant State Farm's scheme to defraud and Plaintiff and the State Farm Enterprise Class members is open-ended and ongoing.

331. To the extent deemed required, Plaintiff and the State Farm Enterprise Class members relied, to their detriment, on Defendant State Farm's fraudulent misrepresentations and omissions as described herein. Reliance by Plaintiff and the class is evidenced by the compensation that they accepted – and were required to accept – for their collision repair services. Plaintiff and the members of the State Farm Enterprise Class had no reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of State Farm's representations of their purported prevailing rates.

332. Defendant State Farm knew that Plaintiff and the State Farm Enterprise Class members relied on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the State Farm Enterprise Class would – and did – receive less in compensation for collision repair services.

333.     The direct and intended victims of the pattern of racketeering activity are Plaintiff and the State Farm Enterprise Class members.

334.     The injuries in the form of suppressed compensation for collision repair services sustained by Plaintiff and the State Farm Enterprise Class members were directly and proximately caused by Defendant State Farm's racketeering activity and RICO violations, which injuries were the foreseeable, direct, intended and natural consequence of Defendant State Farm's conduct.  But for Defendant State Farm's racketeering activity and RICO violations, Plaintiff and the State Farm Enterprise Class members would not have suffered these injuries.

335.     18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

336.     In violation of 18 U.S.C. § 1962(d), Defendant State Farm conspired to defraud the Plaintiff and the State Farm Enterprise Class members for their money and property by establishing artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and suppressing compensation and maintaining suppressed compensation for those repairs.  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

337.     In furtherance of the conspiracy, Defendant State Farm agreed to conduct or participate in the affairs of the State Farm Enterprise and agreed to commit at least two of the predicate acts described above.

338.     As a result and by reason of the foregoing, Plaintiff and the State Farm Enterprise Class members have been injured, suffered harm and sustained damage to the business and property, and, pursuant to 18 U.S.C. § 1964(c), are therefore entitled to recover actual and treble

damages, as well as their costs of suit and reasonable attorneys' fees, and all other appropriate relief.

## COUNT II

**(Violation of the Racketeer Influenced and Corrupt Organization Act,
18 U.S.C. §§ 1962(c) and (d))
(Against Defendant Allstate Predicated on the Allstate Enterprise)**

339.    Plaintiff incorporates and realleges all of the allegations contained in the preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the Allstate Enterprise Class against Defendant Allstate.

340.    Defendant Allstate is and at all relevant times was a "person" within the meaning of 18 U.S.C. § 1961(3), because it was "capable of holding a legal or beneficial interest in property."

341.    Defendant Allstate, as described herein, carried out a scheme to defraud Plaintiff and the Allstate Enterprise Class members by conducting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

342.    At all relevant times, the Allstate Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

343.    By virtue of the conduct alleged herein, Defendant Allstate, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Allstate Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

344.    Defendant Allstate, as described herein, has committed numerous predicate acts of "racketeering activity", as defined in 18 U.S.C. § 1961(5), prior to and during the class period, and continued to commit such predicate acts, in furtherance of Defendant Allstate's scheme to

establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs, including wire fraud, in violation of 18 U.S.C. § 1343.

345. In furtherance of its scheme, Defendant Allstate, in violation of 18 U.S.C. §§ 1343, 1961 and 1962, regularly and repeatedly used the interstate wires to further all aspects of the intentional suppression of compensation to Plaintiff and the Allstate Enterprise Class members by transmitting and/or receiving materials necessary to carry out the scheme to defraud.

346. These communications were incident to and an essential part of Defendant Allstate's scheme to defraud as described herein.

347. Each such use of the U.S. interstate wire facilities alleged herein constituted a separate and distinct predicate act of "racketeering activity" and collectively, constitutes a "pattern of racketeering activity".

348. The Allstate Enterprise was and is engaged in a common purpose to enable Defendant Allstate to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs. As described herein, each member of the Allstate Enterprise (i.e., Allstate and CCC) is necessary and essential to the function and success of the Allstate Enterprise, and the Allstate Enterprise occurred over the course of a number of years, and continues to occur, enabling the pursuit of the common scheme and purpose to defraud. Further, the "pattern of racketeering activity" is related because it involves common persons, common practices, common results impacting common victims, and is continuous because it occurred over the course of a number of years, constitutes

133

and promotes the common purpose of the Allstate Enterprise, such that it poses a threat of continued racketeering activity. Defendant Allstate's scheme to defraud Plaintiff and the Allstate Enterprise Class members is open-ended and ongoing.

349. To the extent deemed required, Plaintiff and the Allstate Enterprise Class members relied, to their detriment, on Defendant Allstate's fraudulent misrepresentations and omissions as described herein. Reliance by Plaintiff and the Allstate Enterprise Class is evidenced by the compensation that they accepted – and were required to accept – for their collision repair services. Plaintiff and the members of the Allstate Enterprise Class had no reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of Allstate's representations of their purported prevailing rates.

350. Defendant Allstate knew that Plaintiff and the Allstate Enterprise Class members relied on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the Allstate Enterprise Class would – and did – receive less in compensation for collision repair services.

351. The direct and intended victims of the pattern of racketeering activity are Plaintiff and the Allstate Enterprise Class members.

352. The injuries in the form of suppressed compensation for collision repair services sustained by Plaintiff and the Allstate Enterprise Class members were directly and proximately caused by Defendant Allstate's racketeering activity and RICO violations, which injuries were the foreseeable, direct, intended and natural consequence of Defendant Allstate's conduct. But for Defendant Allstate's racketeering activity and RICO violations, Plaintiff and the Allstate Enterprise Class members would not have suffered these injuries.

353.    18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

354.    In violation of 18 U.S.C. § 1962(d), Defendant Allstate conspired to defraud the Plaintiff and the Allstate Enterprise Class members for their money and property by establishing artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and suppressing compensation and maintaining suppressed compensation for those repairs.  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

355.    In furtherance of the conspiracy, Defendant Allstate agreed to conduct or participate in the affairs of the Allstate Enterprise and agreed to commit at least two of the predicate acts described above.

356.    As a result and by reason of the foregoing, Plaintiff and the Allstate Enterprise Class members have been injured, suffered harm and sustained damage to the business and property, and, pursuant to 18 U.S.C. § 1964(c), are therefore entitled to recover actual and treble damages, as well as their costs of suit and reasonable attorneys' fees, and all other appropriate relief.

## COUNT III

**(Violation of the Racketeer Influenced and Corrupt Organization Act,
18 U.S.C. §§ 1962(c) and (d))
(Against Defendant GEICO Predicated on the GEICO Enterprise)**

357.    Plaintiff incorporates and realleges all of the allegations contained in the preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the GEICO Enterprise Class against Defendant GEICO.

358. Defendant GEICO is and at all relevant times was a "person" within the meaning of 18 U.S.C. § 1961(3), because it was "capable of holding a legal or beneficial interest in property."

359. Defendant GEICO, as described herein, carried out a scheme to defraud Plaintiff and the GEICO Enterprise Class members by conducting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

360. At all relevant times, the GEICO Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

361. By virtue of the conduct alleged herein, Defendant GEICO, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the GEICO Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

362. Defendant GEICO, as described herein, has committed numerous predicate acts of "racketeering activity", as defined in 18 U.S.C. § 1961(5), prior to and during the class period, and continued to commit such predicate acts, in furtherance of Defendant GEICO's scheme to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs, including wire fraud, in violation of 18 U.S.C. § 1343.

363. In furtherance of its scheme, Defendant GEICO, in violation of 18 U.S.C. §§ 1343, 1961 and 1962, regularly and repeatedly used the interstate wires to further all aspects of the intentional suppression of compensation to Plaintiff and the GEICO Enterprise Class members by transmitting and/or receiving materials necessary to carry out the scheme to defraud.

364. These communications were incident to and an essential part of Defendant GEICO's scheme to defraud as described herein.

365. Each such use of the U.S. interstate wire facilities alleged herein constituted a separate and distinct predicate act of "racketeering activity" and collectively, constitutes a "pattern of racketeering activity".

366. The GEICO Enterprise was and is engaged in a common purpose to enable Defendant GEICO to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs. As described herein, each member of the GEICO Enterprise (i.e., GEICO and CCC) is necessary and essential to the function and success of the GEICO Enterprise, and the GEICO Enterprise occurred over the course of a number of years, and continues to occur, enabling the pursuit of the common scheme and purpose to defraud. Further, the "pattern of racketeering activity" is related because it involves common persons, common practices, common results impacting common victims, and is continuous because it occurred over the course of a number of years, constitutes and promotes the common purpose of the GEICO Enterprise, such that it poses a threat of continued racketeering activity. Defendant GEICO's scheme to defraud Plaintiff and the GEICO Enterprise Class members is open-ended and ongoing.

367. To the extent deemed required, Plaintiff and the GEICO Enterprise Class members relied, to their detriment, on Defendant GEICO's fraudulent misrepresentations and omissions as described herein. Reliance by Plaintiff and the GEICO Enterprise Class is evidenced by the compensation that they accepted – and were required to accept – for their collision repair services. Plaintiff and the members of the GEICO Enterprise Class had no

reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of GEICO's representations of their purported prevailing rates.

368.    Defendant GEICO knew that Plaintiff and the GEICO Enterprise Class members relied on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the GEICO Enterprise Class would – and did – receive less in compensation for collision repair services.

369.    The direct and intended victims of the pattern of racketeering activity are Plaintiff and the GEICO Enterprise Class members.

370.    The injuries in the form of suppressed compensation for collision repair services sustained by Plaintiff and the GEICO Enterprise Class members were directly and proximately caused by Defendant GEICO's racketeering activity and RICO violations, which injuries were the foreseeable, direct, intended and natural consequence of Defendant GEICO's conduct.  But for Defendant GEICO's racketeering activity and RICO violations, Plaintiff and the GEICO Enterprise Class members would not have suffered these injuries.

371.    18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

372.    In violation of 18 U.S.C. § 1962(d), Defendant GEICO conspired to defraud the Plaintiff and the GEICO Enterprise Class members for their money and property by establishing artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and suppressing compensation and maintaining suppressed compensation for those repairs.  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

138

373.    In furtherance of the conspiracy, Defendant GEICO agreed to conduct or

participate in the affairs of the GEICO Enterprise and agreed to commit at least two of the

predicate acts described above.

374.    As a result and by reason of the foregoing, Plaintiff and the GEICO Enterprise

Class members have been injured, suffered harm and sustained damage to the business and

property, and, pursuant to 18 U.S.C. § 1964(c), are therefore entitled to recover actual and treble

damages, as well as their costs of suit and reasonable attorneys' fees, and all other appropriate

relief.

### COUNT IV

**(Violation of the Racketeer Influenced and Corrupt Organization Act,
18 U.S.C. §§ 1962(c) and (d))
(Against Defendant Progressive Predicated on the Progressive Enterprise)**

375.    Plaintiff incorporates and realleges all of the allegations contained in the

preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the

Progressive Enterprise Class against Defendant Progressive.

376.    Defendant Progressive is and at all relevant times was a "person" within the

meaning of 18 U.S.C. § 1961(3), because it was "capable of holding a legal or beneficial interest

in property."

377.    Defendant Progressive, as described herein, carried out a scheme to defraud

Plaintiff and the Progressive Enterprise Class members by conducting an "enterprise" within the

meaning of 18 U.S.C. § 1961(4).

378.    At all relevant times, the Progressive Enterprise was engaged in, and its activities

affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

379.    By virtue of the conduct alleged herein, Defendant Progressive, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Progressive Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

380.    Defendant Progressive, as described herein, has committed numerous predicate acts of "racketeering activity", as defined in 18 U.S.C. § 1961(5), prior to and during the class period, and continued to commit such predicate acts, in furtherance of Defendant Progressive's scheme to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs, including wire fraud, in violation of 18 U.S.C. § 1343.

381.    In furtherance of its scheme, Defendant Progressive, in violation of 18 U.S.C. §§ 1343, 1961 and 1962, regularly and repeatedly used the interstate wires to further all aspects of the intentional suppression of compensation to Plaintiff and the Progressive Enterprise Class members by transmitting and/or receiving materials necessary to carry out the scheme to defraud.

382.    These communications were incident to and an essential part of Defendant Progressive's scheme to defraud as described herein.

383.    Each such use of the U.S. interstate wire facilities alleged herein constituted a separate and distinct predicate act of "racketeering activity" and collectively, constitutes a "pattern of racketeering activity".

384.    The Progressive Enterprise was and is engaged in a common purpose to enable Defendant Progressive to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts,

and to suppress compensation and maintain suppressed compensation for those repairs. As described herein, each member of the Progressive Enterprise (i.e., Progressive and Mitchell) is necessary and essential to the function and success of the Progressive Enterprise, and the Progressive Enterprise occurred over the course of a number of years, and continues to occur, enabling the pursuit of the common scheme and purpose to defraud. Further, the "pattern of racketeering activity" is related because it involves common persons, common practices, common results impacting common victims, and is continuous because it occurred over the course of a number of years, constitutes and promotes the common purpose of the Progressive Enterprise, such that it poses a threat of continued racketeering activity. Defendant Progressive's scheme to defraud Plaintiff and the Progressive Enterprise Class members is open-ended and ongoing.

385. To the extent deemed required, Plaintiff and the Progressive Enterprise Class members relied, to their detriment, on Defendant Progressive's fraudulent misrepresentations and omissions as described herein. Reliance by Plaintiff and the Progressive Enterprise Class is evidenced by the compensation that they accepted – and were required to accept – for their collision repair services. Plaintiff and the members of the Progressive Enterprise Class had no reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of Progressive's representations of their purported prevailing rates.

386. Defendant Progressive knew that Plaintiff and the Progressive Enterprise Class members relied on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the Progressive Enterprise Class would – and did – receive less in compensation for collision repair services.

141

387.    The direct and intended victims of the pattern of racketeering activity are Plaintiff and the Progressive Enterprise Class members.

388.    The injuries in the form of suppressed compensation for collision repair services sustained by Plaintiff and the Progressive Enterprise Class members were directly and proximately caused by Defendant Progressive's racketeering activity and RICO violations, which injuries were the foreseeable, direct, intended and natural consequence of Defendant Progressive's conduct.  But for Defendant Progressive's racketeering activity and RICO violations, Plaintiff and the Progressive Enterprise Class members would not have suffered these injuries.

389.    18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

390.    In violation of 18 U.S.C. § 1962(d), Defendant Progressive conspired to defraud the Plaintiff and the Progressive Enterprise Class members for their money and property by establishing artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and suppressing compensation and maintaining suppressed compensation for those repairs.  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

391.    In furtherance of the conspiracy, Defendant Progressive agreed to conduct or participate in the affairs of the Progressive Enterprise and agreed to commit at least two of the predicate acts described above.

392.    As a result and by reason of the foregoing, Plaintiff and the Progressive Enterprise Class members have been injured, suffered harm and sustained damage to the business and property, and, pursuant to 18 U.S.C. § 1964(c), are therefore entitled to recover actual and treble

damages, as well as their costs of suit and reasonable attorneys' fees, and all other appropriate relief.

## COUNT V

**(Violation of the Racketeer Influenced and Corrupt Organization Act,
18 U.S.C. §§ 1962(c) and (d))
(Against Defendant Farmers Predicated on the Farmers Enterprise)**

393.    Plaintiff incorporates and realleges all of the allegations contained in the preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the Farmers Enterprise Class against Defendant Farmers.

394.    Defendant Farmers is and at all relevant times was a "person" within the meaning of 18 U.S.C. § 1961(3), because it was "capable of holding a legal or beneficial interest in property."

395.    Defendant Farmers, as described herein, carried out a scheme to defraud Plaintiff and the Farmers Enterprise Class members by conducting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

396.    At all relevant times, the Farmers Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

397.    By virtue of the conduct alleged herein, Defendant Farmers, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Farmers Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

398.    Defendant Farmers, as described herein, has committed numerous predicate acts of "racketeering activity", as defined in 18 U.S.C. § 1961(5), prior to and during the class period, and continued to commit such predicate acts, in furtherance of Defendant Farmers' scheme to

143

establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs, including wire fraud, in violation of 18 U.S.C. § 1343.

399.    In furtherance of its scheme, Defendant Farmers, in violation of 18 U.S.C. §§ 1343, 1961 and 1962, regularly and repeatedly used the interstate wires to further all aspects of the intentional suppression of compensation to Plaintiff and the Farmers Enterprise Class members by transmitting and/or receiving materials necessary to carry out the scheme to defraud.

400.    These communications were incident to and an essential part of Defendant Farmers' scheme to defraud as described herein.

401.    Each such use of the U.S. interstate wire facilities alleged herein constituted a separate and distinct predicate act of "racketeering activity" and collectively, constitutes a "pattern of racketeering activity".

402.    The Farmers Enterprise was and is engaged in a common purpose to enable Defendant Farmers to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs.  As described herein, each member of the Farmers Enterprise (i.e., Farmers and CCC) is necessary and essential to the function and success of the Farmers Enterprise, and the Farmers Enterprise occurred over the course of a number of years, and continues to occur, enabling the pursuit of the common scheme and purpose to defraud.  Further, the "pattern of racketeering activity" is related because it involves common persons, common practices, common results impacting common victims, and is continuous because it occurred over the course of a number of years, constitutes

and promotes the common purpose of the Farmers Enterprise, such that it poses a threat of continued racketeering activity. Defendant Farmers' scheme to defraud Plaintiff and the Farmers Enterprise Class members is open-ended and ongoing.

403. To the extent deemed required, Plaintiff and the Farmers Enterprise Class members relied, to their detriment, on Defendant Farmers' fraudulent misrepresentations and omissions as described herein. Reliance by Plaintiff and the Farmers Enterprise Class is evidenced by the compensation that they accepted – and were required to accept – for their collision repair services. Plaintiff and the members of the Farmers Class had no reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of Farmers' representations of their purported prevailing rates.

404. Defendant Farmers knew that Plaintiff and the Farmers Enterprise Class members relied on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the Farmers Enterprise Class would – and did – receive less in compensation for collision repair services.

405. The direct and intended victims of the pattern of racketeering activity are Plaintiff and the Farmers Enterprise Class members.

406. The injuries in the form of suppressed compensation for collision repair services sustained by Plaintiff and the Farmers Enterprise Class members were directly and proximately caused by Defendant Farmers' racketeering activity and RICO violations, which injuries were the foreseeable, direct, intended and natural consequence of Defendant Farmers' conduct. But for Defendant Farmers' racketeering activity and RICO violations, Plaintiff and the Farmers Enterprise Class members would not have suffered these injuries.

145

407.     18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

408.     In violation of 18 U.S.C. § 1962(d), Defendant Farmers conspired to defraud the Plaintiff and the Farmers Enterprise Class members for their money and property by establishing artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and suppressing compensation and maintaining suppressed compensation for those repairs.  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

409.     In furtherance of the conspiracy, Defendant Farmers agreed to conduct or participate in the affairs of the Farmers Enterprise and agreed to commit at least two of the predicate acts described above.

410.     As a result and by reason of the foregoing, Plaintiff and the Farmers Enterprise Class members have been injured, suffered harm and sustained damage to the business and property, and, pursuant to 18 U.S.C. § 1964(c), are therefore entitled to recover actual and treble damages, as well as their costs of suit and reasonable attorneys' fees, and all other appropriate relief.

## COUNT VI

**(Violation of the Racketeer Influenced and Corrupt Organization Act,
18 U.S.C. §§ 1962(c) and (d))
(Against Defendant Liberty Mutual Predicated on the Liberty Mutual Enterprise)**

411.     Plaintiff incorporates and realleges all of the allegations contained in the preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the Liberty Mutual Enterprise Class against Defendant Liberty Mutual.

146

412.    Defendant Liberty Mutual is and at all relevant times was a "person" within the meaning of 18 U.S.C. § 1961(3), because it was "capable of holding a legal or beneficial interest in property."

413.    Defendant Liberty Mutual, as described herein, carried out a scheme to defraud Plaintiff and the Liberty Mutual Enterprise Class members by conducting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

414.    At all relevant times, the Liberty Mutual Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

415.    By virtue of the conduct alleged herein, Defendant Liberty Mutual, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Liberty Mutual Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

416.    Defendant Liberty Mutual, as described herein, has committed numerous predicate acts of "racketeering activity", as defined in 18 U.S.C. § 1961(5), prior to and during the class period, and continued to commit such predicate acts, in furtherance of Defendant Liberty Mutual's scheme to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs, including wire fraud, in violation of 18 U.S.C. § 1343.

417.    In furtherance of its scheme, Defendant Liberty Mutual, in violation of 18 U.S.C. §§ 1343, 1961 and 1962, regularly and repeatedly used the interstate wires to further all aspects of the intentional suppression of compensation to Plaintiff and the Liberty Mutual Enterprise

147

Class members by transmitting and/or receiving materials necessary to carry out the scheme to defraud.

418.    These communications were incident to and an essential part of Defendant Liberty Mutual's scheme to defraud as described herein.

419.    Each such use of the U.S. interstate wire facilities alleged herein constituted a separate and distinct predicate act of "racketeering activity" and collectively, constitutes a "pattern of racketeering activity".

420.    The Liberty Mutual Enterprise was and is engaged in a common purpose to enable Defendant Liberty Mutual to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs.  As described herein, each member of the Liberty Mutual Enterprise (i.e., Liberty Mutual, Audatex and CCC) is necessary and essential to the function and success of the Liberty Mutual Enterprise, and the Liberty Mutual Enterprise occurred over the course of a number of years, and continues to occur, enabling the pursuit of the common scheme and purpose to defraud.  Further, the "pattern of racketeering activity" is related because it involves common persons, common practices, common results impacting common victims, and is continuous because it occurred over the course of a number of years, constitutes and promotes the common purpose of the Liberty Mutual Enterprise, such that it poses a threat of continued racketeering activity.  Defendant Liberty Mutual's scheme to defraud Plaintiff and the Liberty Mutual Enterprise Class members is open-ended and ongoing.

421.    To the extent deemed required, Plaintiff and the Liberty Mutual Enterprise Class members relied, to their detriment, on Defendant Liberty Mutual's fraudulent misrepresentations

and omissions as described herein. Reliance by Plaintiff and the Liberty Mutual Enterprise Class is evidenced by the compensation that they accepted – and were required to accept – for their collision repair services. Plaintiff and the members of the Liberty Mutual Enterprise Class had no reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of Liberty Mutual's representations of their purported prevailing rates.

422.    Defendant Liberty Mutual knew that Plaintiff and the Liberty Mutual Enterprise Class members relied on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the Liberty Mutual Enterprise Class would – and did – receive less in compensation for collision repair services.

423.    The direct and intended victims of the pattern of racketeering activity are Plaintiff and the Liberty Mutual Enterprise Class members.

424.    The injuries in the form of suppressed compensation for collision repair services sustained by Plaintiff and the Liberty Mutual Enterprise Class members were directly and proximately caused by Defendant Liberty Mutual's racketeering activity and RICO violations, which injuries were the foreseeable, direct, intended and natural consequence of Defendant Liberty Mutual's conduct. But for Defendant Liberty Mutual's racketeering activity and RICO violations, Plaintiff and the Liberty Mutual Enterprise Class members would not have suffered these injuries.

425.    18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

426.    In violation of 18 U.S.C. § 1962(d), Defendant Liberty Mutual conspired to defraud the Plaintiff and the Liberty Mutual Enterprise Class members for their money and

property by establishing artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and suppressing compensation and maintaining suppressed compensation for those repairs.  This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

427.    In furtherance of the conspiracy, Defendant Liberty Mutual agreed to conduct or participate in the affairs of the Liberty Mutual Enterprise and agreed to commit at least two of the predicate acts described above.

428.    As a result and by reason of the foregoing, Plaintiff and the Liberty Mutual Enterprise Class members have been injured, suffered harm and sustained damage to the business and property, and, pursuant to 18 U.S.C. § 1964(c), are therefore entitled to recover actual and treble damages, as well as their costs of suit and reasonable attorneys' fees, and all other appropriate relief.

## COUNT VII

**(Violation of the Racketeer Influenced and Corrupt Organization Act,
18 U.S.C. §§ 1962(c) and (d))
(Against Defendant Nationwide Predicated on the Nationwide Enterprise)**

429.    Plaintiff incorporates and realleges all of the allegations contained in the preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the Nationwide Enterprise Class against Defendant Nationwide.

430.    Defendant Nationwide is and at all relevant times was a "person" within the meaning of 18 U.S.C. § 1961(3), because it was "capable of holding a legal or beneficial interest in property."

431.    Defendant Nationwide, as described herein, carried out a scheme to defraud Plaintiff and the Nationwide Enterprise Class members by conducting an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

432.    At all relevant times, the Nationwide Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).

433.    By virtue of the conduct alleged herein, Defendant Nationwide, in violation of 18 U.S.C. § 1962(c), conducted and participated in the conduct of the Nationwide Enterprise's affairs, directly and indirectly, through a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5).

434.    Defendant Nationwide, as described herein, has committed numerous predicate acts of "racketeering activity", as defined in 18 U.S.C. § 1961(5), prior to and during the class period, and continued to commit such predicate acts, in furtherance of Defendant Nationwide's scheme to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs, including wire fraud, in violation of 18 U.S.C. § 1343.

435.    In furtherance of its scheme, Defendant Nationwide, in violation of 18 U.S.C. §§ 1343, 1961 and 1962, regularly and repeatedly used the interstate wires to further all aspects of the intentional suppression of compensation to Plaintiff and the Nationwide Enterprise Class members by transmitting and/or receiving materials necessary to carry out the scheme to defraud.

436.    These communications were incident to and an essential part of Defendant Nationwide's scheme to defraud as described herein.

437.     Each such use of the U.S. interstate wire facilities alleged herein constituted a separate and distinct predicate act of "racketeering activity" and collectively, constitutes a "pattern of racketeering activity".

438.     The Nationwide Enterprise was and is engaged in a common purpose to enable Defendant Nationwide to establish artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and to suppress compensation and maintain suppressed compensation for those repairs.  As described herein, each member of the Nationwide Enterprise (i.e., Nationwide and CCC) is necessary and essential to the function and success of the Nationwide Enterprise, and the Nationwide Enterprise occurred over the course of a number of years, and continues to occur, enabling the pursuit of the common scheme and purpose to defraud.  Further, the "pattern of racketeering activity" is related because it involves common persons, common practices, common results impacting common victims, and is continuous because it occurred over the course of a number of years, constitutes and promotes the common purpose of the Nationwide Enterprise, such that it poses a threat of continued racketeering activity.  Defendant Nationwide's scheme to defraud Plaintiff and the Nationwide Enterprise Class members is open-ended and ongoing.

439.     To the extent deemed required, Plaintiff and the Nationwide Enterprise Class members relied, to their detriment, on Defendant Nationwide's fraudulent misrepresentations and omissions as described herein.  Reliance by Plaintiff and the Nationwide Enterprise Class is evidenced by the compensation that they accepted – and were required to accept – for their collision repair services.  Plaintiff and the members of the Nationwide Enterprise Class had no

reasonable means of verifying, testing or discovering the accuracy (or lack thereof) of Nationwide's representations of their purported prevailing rates.

440.     Defendant Nationwide knew that Plaintiff and the Nationwide Enterprise Class members relied on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the Nationwide Enterprise Class would – and did – receive less in compensation for collision repair services.

441.     The direct and intended victims of the pattern of racketeering activity are Plaintiff and the Nationwide Enterprise Class members.

442.     The injuries in the form of suppressed compensation for collision repair services sustained by Plaintiff and the Nationwide Enterprise Class members were directly and proximately caused by Defendant Nationwide's racketeering activity and RICO violations, which injuries were the foreseeable, direct, intended and natural consequence of Defendant Nationwide's conduct.  But for Defendant Nationwide's racketeering activity and RICO violations, Plaintiff and the Nationwide Enterprise Class members would not have suffered these injuries.

443.     18 U.S.C. § 1962(d) provides, in pertinent part, that: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section."

444.     In violation of 18 U.S.C. § 1962(d), Defendant Nationwide conspired to defraud the Plaintiff and the Nationwide Enterprise Class members for their money and property by establishing artificial prevailing rates for insured repairs, including hourly labor rates, reimbursement for "paint and materials", compensable repair procedures, and parts, and

suppressing compensation and maintaining suppressed compensation for those repairs. This conspiracy to violate 18 U.S.C. § 1962(c) constitutes a violation of 18 U.S.C. § 1962(d).

445. In furtherance of the conspiracy, Defendant Nationwide agreed to conduct or participate in the affairs of the Nationwide Enterprise and agreed to commit at least two of the predicate acts described above.

446. As a result and by reason of the foregoing, Plaintiff and the Nationwide Enterprise Class members have been injured, suffered harm and sustained damage to the business and property, and, pursuant to 18 U.S.C. § 1964(c), are therefore entitled to recover actual and treble damages, as well as their costs of suit and reasonable attorneys' fees, and all other appropriate relief.

## COUNT VIII

### (Fraud)
### (Against Defendant Insurers State Farm, Allstate, GEICO, Progressive, Farmers, Liberty Mutual and Nationwide)

447. Plaintiff incorporates and realleges all of the allegations contained in the preceding paragraphs as though fully set forth herein. This claim is brought by Plaintiff and the State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide Enterprise Class against Defendant Insurers.

448. As described herein at length and in detail, Defendant Insurers have made false and misleading representations of fact, and concealed and omitted facts regarding the prevailing rates for insured collision repair services and compensable repair procedures. These facts were material to Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise

Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide Enterprise Class.

449.    Defendant Insurers knew that Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide Enterprise Class would rely on their misrepresentations and omissions about prevailing rates and compensation for repairs and knew that, as a result of the misrepresentations and omissions described herein, Plaintiff and the foregoing classes would – and did – receive less in compensation for collision repair services.

450.    Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide Enterprise Class relied, to their detriment, on Defendant Insurers' fraudulent misrepresentations and omissions as described herein.

451.    As a direct and proximate result, Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide Enterprise Class have suffered injury.

452.    Defendant Insurers' conduct was wanton, willful and in reckless disregard of the rights of Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide Enterprise Class, warranting punitive damages.

453.    As a result and by reason of the foregoing, Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive

Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide

Enterprise Class are therefore entitled actual and punitive damages, and all other appropriate

relief.

**COUNT IX**

**(Unjust Enrichment)**<br>**(Against Defendant Insurers State Farm, Allstate, GEICO, Progressive, Farmers,**<br>**Liberty Mutual and Nationwide)**

454.    Plaintiff incorporates and realleges all of the allegations contained in the

preceding paragraphs as though fully set forth herein.  This claim is brought by Plaintiff and the

State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive

Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class and Nationwide

Enterprise Class against Defendant Insurers.

455.    Defendant Insurers all benefitted from their respective pattern and practice of

conduct as described herein, and unjustly failed to fully and properly compensate Plaintiff and

the members of the State Farm Enterprise Class, Allstate Enterprise Class, GEICO Enterprise

Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual Enterprise Class

and Nationwide Enterprise Class for their collision repair services.

456.    Defendant Insurers' failure to fully and properly compensate was to the detriment

of the Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise Class,

GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty Mutual

Enterprise Class and Nationwide Enterprise Class.

457.    As a result and by reason of Defendant Insurers' failure to fully and properly

compensate Plaintiff and the members of the State Farm Enterprise Class, Allstate Enterprise

Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers Enterprise Class, Liberty

156

Mutual Enterprise Class and Nationwide Enterprise Class for their collision repair services,

Defendant Insurers have retained money which, in equity and good conscience, does not belong

to Defendant Insurers. Accordingly, Plaintiff and the members of the State Farm Enterprise

Class, Allstate Enterprise Class, GEICO Enterprise Class, Progressive Enterprise Class, Farmers

Enterprise Class, Liberty Mutual Enterprise Class and Nationwide Enterprise Class are entitled

to recover same, together with all appropriate relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Classes, respectfully requests that the

Court:

A.      Certify the Classes defined herein pursuant to Fed. R. Civ. P. 23(a) and (b)(3),

and designate Plaintiff as the representative of the Classes and its counsel as Class Counsel;

B.      Enter judgments against each of the Defendants and in favor of Plaintiff and

each of the Classes predicated on Defendants' respective violations of RICO;

C.      Award Plaintiff and the Classes actual and compensatory damages, trebled, in an

amount to be determined at trial;

D.      Award Plaintiff and the Classes restitution or disgorgement of ill-gotten gains, as

appropriate;

E.      Award Plaintiff and the Classes exemplary and/or punitive damages predicated

on their claim for fraud, as allowed by law;

F.      Award Plaintiff and the Classes their costs of suit, including reasonable

attorneys' fees, as provided by law;

G.      Award Plaintiff and the Classes prejudgment and post-judgment interest, as

allowed by law; and

H.     Award such further and additional relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the

proposed Classes, demands a trial by jury on all issues so triable.

Dated: April 30, 2014

                              Respectfully,

BERGER & MONTAGUE, P.C.          CAFFERTY CLOBES MERIWETHER &
                                   SPRENGEL LLP

                              */s/      Jennifer W. Sprengel*
Steven L. Bloch                  Jennifer W. Sprengel
1622 Locust Street               30 North LaSalle Street-Suite 3200
Philadelphia, PA 19103           Chicago, IL 60602
Tel: (215) 875-3000              Tel: (312) 782-4880
Fax: (215) 875-4604              Fax: (312) 782-4485
Email: sbloch@bm.net             Email: jsprengel@caffertyclobes.com


*Lead Counsel for Plaintiff*       *Local Counsel for Plaintiff*
*and the Proposed Classes*         *and the Proposed Classes*